## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>F-SQUARED INVESTMENT MANAGEMENT, LLC, et al.,<br><br>Debtors | **Chapter 11**<br><br>**Case No. 15-11469 (LSS)**<br><br>**(Jointly Administered)** |
| Craig Jalbert, in his Capacity as Trustee for F2 Liquidating Trust,<br><br>Plaintiff<br><br>v.<br><br>Agnes Carol McClelland<br>Ann Aghababian<br>Charles Hart<br>Geordie McClelland<br>George McClelland<br>Graham Hart<br>Hazel McClelland<br>Jacquelyn McClelland<br>Lindsay Hart<br>Lindsay McClelland<br>McClelland Irrevocable Grantor Trust<br>Quinn McClelland Hart<br>Defendants | Adv. Pro No. 17-50718-LSS<br>Adv. Pro No. 17-50719-LSS<br>Adv. Pro No. 17-50722-LSS<br>Adv. Pro No. 17-50755-LSS<br>Adv. Pro No. 17-50758-LSS<br>Adv. Pro No. 17-50767-LSS<br>Adv. Pro No. 17-50772-LSS<br>Adv. Pro No. 17-50786-LSS<br>Adv. Pro No. 17-50849-LSS<br>Adv. Pro No. 17-50850-LSS<br>Adv. Pro No. 17-50854-LSS<br>Adv. Pro No. 17-50859-LSS |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

I.      BRIEF STATEMENT ................................................................................................1

II.     FACTUAL BACKGROUND.....................................................................................3

III.    ARGUMENT............................................................................................................6

      A.    The Trustee Failure to Plead a Plausible Claim of Insolvency
          Compels Dismissal of the Complaints................................................................7

          1.    The Complaint Does Not Allege Facts Sufficient to Establish
              A Case of Balance Sheet Insolvency ........................................................8

          2.    F-Squared Was Not "Insolvent From the Inception" ...............................9

          3.    The Distributions Did Not Leave F-Squared Undercapitalized nor
              Unable to Pay its Debts as They Became Due ......................................11

      B.    Count III of the G. McClelland Complaint Should Be Dismissed Because
          George McClelland Was Not an Insider When the Distributions Were
          Made During the Relevant Time Frame .............................................................14

IV.     CONCLUSION .....................................................................................................16

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*American Cancer Society v. Cook*,
    675 F.3d 524 (5th Cir. 2012) ............................................................................9

*Ashcoft v. Iqbal*,
    556 US 662, 129 S. Ct. 1937 (2009) ................................................................6

*Boyer v. Crown Stock Distribution, Inc.*,
    587 F.3d 787 (7th Cir. 2009) ..........................................................................12

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ............................................................................6

*In re Butler*,
    72 F.3d 437 (4th Cir. 1996) ...........................................................................14

*In re Charys Holding Co., Inc.*,
    2010 WL 2788152 (Bankr. D. Del., July 14, 2010) ........................................8

*In re Edgewater Med. Ctr.*,
    373 B.R. 845 (Bankr. N.D. Ill. 2007) .............................................................12

*In re Global Protection USA, Inc.*,
    546 B.R. 586 (Bankr. D. N.J. 2016) .................................................................8

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ...........................................................11

*In re Netbank, Inc.*,
    424 B.R. 568 (Bankr. M.D. Fla. 2010) ...........................................................14

*In re Semcrude, L.P.*,
    526 B.R. 556 (Bankr. D. Del. 2014) ...............................................................11

*In re SemCrude L.P.*,
    648 F. Appx. 205 (3d Cir. 2016) .....................................................................12

*In re Semcrude L.P.*,
    648 Fed. Appx. 205 (3d Cir. 2016) .................................................................12

*In re THQ, Inc.*,
    2016 WL 1599798 (Bankr. D. Del., April 18, 2016) .......................................8

*In re U.S. Medical, Inc.*,
    531 F.3d 1272 (10th Cir. 2008) ......................................................................15

*In re Winstar Communications, Inc.*,
 554 F.3d 382 (3d Cir. 2009) ............................................................................15

*Moody v. Security Pacific Business Credit, Inc.*,
 971 F. 2d 1056 (3d Cir. 1992) ..........................................................................11

*Schneider v. Barnard*,
 508 B.R. 533 (E.D.N.Y. 2014) .........................................................................10

## STATUTES

11 U.S.C. 101(32)(A) ................................................................................................8

11 U.S.C. 547(b)(4)(B) ...........................................................................................14

11 U.S.C. 548(a)(1)(B)(i) ..........................................................................................7

11 U.S.C. 548(a)(1)(B)(ii) .........................................................................................7

11 U.S.C. § 101(31)............................................................................................14-15

DEL. CODE Title 6, § 1304(a)(2) ..............................................................................7

Lanham Act ..............................................................................................................11

MASS. GEN. LAWS Chapter 109A, § 5(a)(2) ...........................................................7

## OTHER AUTHORITIES

FEDERAL RULES OF BANKRUPTCY PROCEDURE 7012(b)(6) .........................................3, 6

George McClelland ("G. McClelland"), Charles Hart, Geordie McClelland, Graham Hart, Hazel McClelland, Jacquelyn McClelland, Lindsay Hart, McClelland Irrevocable Grantor Trust, Quinn McClelland Hart, Lindsay McClelland and Agnes Carol McClelland (collectively, "the McClelland defendants") and Ann Aghababian ("Aghababian" and together with the McClelland Defendants the "Defendants"), by their undersigned counsel, Potter Anderson & Corroon, LLP and McLane Middleton, Professional Association, hereby provide this memorandum in support of their motions to dismiss all counts of the Trustee's Complaints.

## I.    BRIEF STATEMENT

Defendants were each unit holders of F-Squared Investment Management, LLC. Complaint, ¶6. In these Adversary Proceedings, the Trustee seeks to avoid and recover seven payments that F-Squared[1] made to each of the Defendants between August 29, 2013 (over twenty-two months before F-Squared filed for bankruptcy) and October 30, 2014 (more than eight months before filing for bankruptcy). Of the payments, six were designated by the Trustee as "Tax Distributions." (See, Exhibit A, Complaint).[2] F-Squared paid those quarterly distributions to the Defendants to cover the estimated income taxes owed by the Defendants based on the "pass through" to their personal tax returns of F-Squared's estimated quarterly

---

[1]    There were eight entities that did business under the F-Squared mantel. They were, along with the last four digits of each Debtor's federal tax identification number: F-Squared Investment Management, LLC (9247), F-Squared Investments, Inc. (0788), F-Squared Retirement Solutions, LLC (9247), F-Squared Alternative Investments, LLC (9247), F-Squared Solutions, LLC (9247), F-Squared Institutional Advisors, LLC (9247), F-Squared Capital, LLC (5257), AlphaSector LLS GP 1, LLC (3342), and Active Index Solutions, LLC (0788). The Debtors' address is 2221 Washington Street, Suite 201, Newton, Massachusetts 02462. In referencing "F-Squared" below we include all of the related entities unless specifically noted otherwise.

[2]    All of the complaints, with the exception of the one against G. McClelland, are in all material respects identical. The G. McClelland Complaint includes an additional count alleging an insider preference claim. It also differs in that he received two additional payments as later noted and described herein. When reference is made to "Exhibit A, Complaint" any of the captioned complaints other than the G. McClelland Complaint may be reviewed for reference.

profits.[3] The Tax Distribution payments to the Defendants totaled in excess of $5 million. The remaining payment was designated by the Trustee as a "Profit Distribution" and was made to each unit holder in January of 2014, based on the Defendant's share of ownership in F-Squared. (See, Exhibit A, Complaint.)

G. McClelland received two additional payments. One was made in February, 2014, (sixteen months before the bankruptcy filing) and designated by the Trustee as a "Bonus Payment." G. McClelland received that distribution in his capacity as a director.[4] The other, a payment designated by the Trustee as a "Units Repurchase" was made in October 2014, nine months before the filing. This was paid entirely at the Debtor's initiative to prevent G. McClelland from exercising an option he held for 60,000 units. (See, Exhibit A, G. McClelland Complaint). (The Tax Distribution payments, the Profit Distribution, the Bonus Payment and the Units Repurchase are collectively herein referred to as the "Distributions".)

The Trustee alleges that each of the Distributions constitute a constructively fraudulent transfer that he can avoid and recover. To prove his case the Trustee must establish two key elements: (1) that F-Squared did not receive reasonably equivalent value for each Distribution made to the Defendants; and (2) at the time each Distribution was made, F-Squared was insolvent or was thereby rendered insolvent.

Though the Trustee has been in place for well over 1 year and had ample time and opportunity to analyze the books and records of F-Squared, he pleads no financial or accounting based fact that would plausibly support a finding that F-Squared was insolvent when it made the

---

[3]    Until 2010, F-Squared was organized as a C-Corporation.    In 2010 F-Squared converted to a limited liability company that paid no income taxes of its own; rather, income taxes were paid by each individual or entity with an ownership interest in F-Squared on a ratable basis. (¶10, Complaint.)

[4]    G. McClelland was a director of F-Squared but resigned in May 2014, over 13 months before the Bankruptcy filing. (See, ¶6, G. McClelland Complaint.)

Distributions. That deficiency exists for good reason. F-Squared was thriving throughout the time the Distributions were made with over $28.5 billion invested by its clients and their customers as of June of 2014. (¶14, Complaint). F-Squared's business generated tremendous profits that in turn generated pass through income and the need for the Tax Distributions that had been promised to the limited liability company unit holders in order to induce them to support the conversion of F-Squared from a C-Corporation to a limited liability company. F-Squared's significant financial success also made the Profit Distributions appropriate.

With no traditional method to establish insolvency available, the Trustee attempts to equate F-Squared to a Ponzi-like scheme by declaring that the Debtors generated most of their revenue by "illegal" activities and thus were "insolvent from the inception." (¶17, Complaint). The allegations do not assert facts necessary to establish a Ponzi (or Ponzi-like) scheme nor has anyone ever claimed F-Squared constituted such an enterprise. Accordingly, and because the Trustee has failed to plead a plausible case of insolvency, Defendants request that the Court, pursuant to Rule 7012(b)(6) of the Federal Rules of Bankruptcy Procedure, dismiss the above-referenced claims as they relate to the Tax Distributions and Profit Distributions.

Finally, the Trustee has also brought claims that G. McClelland received preferences between 91 days and one year before the filing. The Trustee has not pled facts that establish G. McClelland was a statutory insider or a non-statutory insider and therefore, Count III of Adv. Pro. #17-50758 must also be dismissed.

## II.   FACTUAL BACKGROUND

F-Squared was founded in May 2006. (See, ¶ 6, Declaration of David N. Phelps in Support of Chapter 11 Petitions and First Day Motions, (Doc #3, Case No. 17-50719-LSS) incorporated by reference into each complaint at ¶10 and hereinafter referenced as the "Phelps

Declaration"). F-Squared consisted of SEC registered investment management firms with corporate headquarters in Wellesley, Massachusetts and New Jersey. (¶6, Phelps Declaration). F-Squared clients were generally investment advisors who sold its model services to their own clients. ( ¶6, Phelps Declaration). F-Squared served clients in the advisory, institutional, retail and retirement markets. (¶6, Phelps Declaration).

F-Squared's approach to investment was designed to protect clients in down markets and to enhance the likelihood of their participation in up markets. (¶6, Phelps Declaration). Specifically, F-Squared provided various index products (the "Index Product Services") on a non-discretionary basis to unaffiliated third parties, and separately provided discretionary investment advisory services to various separately managed account clients based on those index products. (¶6, Phelps Declaration). For the Index Product Services, F-Squared created and licensed a series of specialty indexes (the "AlphaSector Indexes") covering a range of asset classes. The AlphaSector Indexes were based on sector rotation strategies that used quantitative models programmed to measure the volatility and price movements of ETFs as criteria for inclusion and weighting in the indexes. (¶7, Phelps Declaration, ¶13, Complaint).

From the last quarter of 2010 until early 2015, F-Squared was profitable.[5] This profitability is evidenced by the nature of the payments themselves. To be exact, most of the payments the Trustee seeks to recover are Tax Distributions made to unit holders to help them pay local, state and federal income taxes generated by income passed through from F-Squared to the unit holder's personal tax returns. If F-Squared had not been profitable, it would have had no need to make these Tax Distributions. The Profit Distributions were by definition due to the company's profitability. The Distributions at issue are identified with particularity on Exhibit A.

---

[5]     The $30 million disgorgement payment made to the SEC noted in ¶14 of the Complaint was designated as a disgorgement of profits. (See, Phelps Declaration, ¶17.)

4

The U.S. Securities and Exchange Commission ("SEC") began a review of F-Squared's operations in 2013. (¶14, Complaint). The Trustee does not state exactly when in 2013 the investigation began, describe the nature of the review or explain how that review evolved. He does not suggest what findings, if any, the SEC shared with F-Squared as the investigation unfolded or the timing of any such shared findings.

On December 22, 2014, F-Squared agreed to an administrative SEC order wherein it admitted that it had misrepresented the performance track record of its sector rotation strategy for the April 2001- September 2008 period such that its advertised results were "materially inflated, hypothetical and back tested." F-Squared also agreed to disgorge $30 million in profits and pay a $5 million fine. (See, ¶14, Complaint; ¶17, Phelps Declaration.)

From these allegations, and without more, the Trustee concludes that at ". . . all relevant times, F-Squared generated a great majority of its revenue by means of *illegal activity* almost certain to give rise, *at some point*, to massive liabilities on account of that activity, and so [debtors] were *insolvent from the inception* of [their] use of the Alpha Sector index strategy." (emphasis added). (¶16, Complaint). Nowhere does the Trustee identify when or to what extent these "massive liabilities" accrued or how those supposed liabilities compared to F-Squared's assets and ability to generate income to pay them.

Nowhere does the Trustee allege any facts that would support a claim for balance sheet insolvency. Rather, the facts contained in the Phelps Declaration and incorporated by reference in the Complaint point in the other direction—that F-Squared was solvent and profitable during the times it made the Distributions. Over $28 billion was invested by F-Squared Clients as of June 30, 2014, and over $16 billion remained invested a full five months after F-Squared made the last of the questioned payments to the Defendants. (¶6, Phelps Declaration).  It was only

subsequent events that were not and could not have been known when the Distributions were made that led to the July 8, 2015 bankruptcy filing—almost two years after some Distributions were made and at least eight months after the last Distribution.

## III.    ARGUMENT

The Defendants Joint Motion seeks to dismiss the Complaints pursuant to Rule 7012(b)(6) of the Federal Rules of Bankruptcy Procedure on the grounds the Trustee fails to plead a plausible claim of recovery.

In reviewing a Complaint on a motion to dismiss for failure to state a claim, the Court must discern whether it contains factual allegations that on their face or by inference support a viable claim of recovery. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)("All civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible,").

In analyzing whether a Complaint presents a plausible claim, the Court credits only factual allegations, not conclusions. Conclusory statements are not entitled to the presumption of truth.  Courts reject as not supportable those pleadings that contain only "labels and conclusions" a "formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement" *Ashcoft v. Iqbal*, 556 US 662, 678, 129 S. Ct. 1937 (2009) (quoting *Bell Atl. Corp. v Twombly*, 550 US 544, 555 and 557 (2007).  Determining whether a claim is plausible is a practical exercise that requires the court to draw on "its judicial experience and common sense." *Iqbal*, at 679.    A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, at 678.    "Threadbare recitals of elements of a cause of action, supported by mere conclusory statements do not suffice." *Iqbal*, at 678.

### A. The Trustee Failure to Plead a Plausible Claim of Insolvency Compels Dismissal of the Complaints

The Defendants seek dismissal of all counts of each complaint wherein the Trustee seeks to avoid the Distributions on the grounds their payment constituted a constructive fraud on F-Squared's creditors.

The elements of a constructive fraud claim, no matter whether founded on the Bankruptcy Code or state law, are well established. They entail proof of two primary elements. First, the debtor must have received less than a reasonably equivalent value in exchange for such transfer or obligation. *See*, 11 U.S.C. 548(a)(1)(B)(i); Mass. Gen. Laws ch. 109A, §5(a)(2); Del. Code tit. 6, §1304(a)(2).   Second, the debtor must have been either: (a) insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer obligation; (b) engaged in business or transaction, or was about to engage in business or transaction, for which any property or assets of the debtor were unreasonably small in relation to the business (also referred to unreasonably small capital); or (c) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. *See*, 11 U.S.C. 548(a)(1)(B)(ii); Mass. Gen. Laws Ch. 109A, §5(a)(2); Del. Code tit. 6, §1304(a)(2).

Though Defendants believe that the Debtors received reasonably equivalent value for each Tax Distribution, this motion focuses only on the second requisite element.  The Trustee fails to plead a plausible case to prove insolvency. On that basis alone the Complaints must be dismissed.[6]

---

[6]    Defendants believe that reasonably equivalent value was received by the Debtors for each or nearly every Distribution and will establish that after discovery if the actions survive dismissal or are dismissed, amended and refiled.

7

**1.  The Complaint Does Not Allege Facts Sufficient to Establish A Case of Balance Sheet Insolvency.**

In order to survive a motion to dismiss, a party to a bankruptcy action seeking to set aside a transfer as a constructive fraud must, among other items, plead sufficient facts to establish insolvency. *In re THQ, Inc.*, 2016 WL 1599798 (Bankr. D. Del., April 18, 2016)(mere assertion that entity was insolvent is a legal conclusion that will not support viable pleading); *cf. In re Charys Holding Co., Inc.*, 2010 WL 2788152 (Bankr. D. Del., July 14, 2010)(finding that the plaintiff satisfied its pleading requirement with respect to pleading insolvency where plaintiff presented facts related to the debtor's balance sheet information and asset valuations). The constructive fraud advocate must establish a plausible case for insolvency as of the date of each and every questioned transfer. *In re Global Protection USA, Inc.*, 546 B.R. 586, 609-10 (Bankr. D. N.J. 2016).

Insolvency is defined as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of" property that has already been fraudulently conveyed and property that is otherwise exempted from the property of the bankruptcy estate. 11 U.S.C. 101(32)(A). "In determining what constitutes 'fair valuation' the Court must decide whether to value assets on a going concern basis or at liquidation prices." *Autobacs Strauss, Inc.*, 473 B.R. 525, 553 (Bankr. D. Del. 2012). In general, a company's assets are valued on a going concern basis unless "the business is 'wholly inoperative, defunct, or dead on its feet' or if liquidation in bankruptcy was clearly imminent on the transfer date." *Id.* at 553.

The Trustee makes no effort whatsoever to compare F-Squared's assets to its liabilities in the time frame the Distributions were made--August 29, 2013 to October 30, 2014.  Indeed, the Trustee makes no reference at all to the company's assets and liabilities at any point in time. That deficiency's genesis arises from what was actually occurring during this period—F-Squared was

8

thriving and was generating extraordinary profits. The Trustee's own allegations suggest as much. At paragraph 13 of the Complaint he alleges: "As of June 30, 2014, there were approximately $28.5 billion invested by F-Squared clients pursuant to F-Squared's AlphaSector Indexes, including $13 billion in mutual fund assets sub-advised by F-Squared." (¶ 13, Complaint). While admission of a thriving investment advisory business, standing alone, does not establish solvency, it also does not and cannot support the contrary conclusion. The Trustee has not met his burden of establishing a plausible case for insolvency by means of a balance sheet analysis.

## 2.  F-Squared Was Not "Insolvent From the Inception."

Knowing that proof of insolvency by traditional means is not possible, the Trustee seeks to avoid his burden by labeling F-Squared's entire business "illegal activity" and, *a fortiori*, "insolvent from the inception." In essence, the Trustee apparently seeks to equate F-Squared to a Ponzi-like illegal enterprise, and by doing so, evidently hopes to benefit from the presumptions that arise in Ponzi scheme cases. This the Trustee cannot do. There are no facts pled that directly or inferentially support this claim—nor could there be. F-Squared admitted to violating securities laws by making inaccurate advertising claims about a certain product it sold; but F-Squared was in every other way a legitimate and for some years highly successful business that rendered investment advice that allowed its customers (mutual fund managers and financial advisors) to invest their client's funds profitably.

Violating the securities laws does not render a company insolvent. As the courts have recognized, "[n]ot all securities frauds are Ponzi schemes." *American Cancer Society v. Cook*, 675 F.3d 524 (5th Cir. 2012)(reversing a district court's determination that charitable contribution made by an entity that the SEC alleged had committed numerous securities

violations was a fraudulent transfer because claims of a Ponzi like scheme were conclusory and unsupported by the evidence). A Ponzi scheme is "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors" as opposed to generating profits from a legitimate business activity. *Schneider v. Barnard*, 508 B.R. 533, 542 (E.D.N.Y. 2014). As a result, Ponzi scheme operators "know all along, from the very nature of [their] activities, that investors at the end of the line will lose their money." *Schneider v. Barnard*, 508 B.R. 533, 542 (E.D.N.Y. 2014).

Apart from the advertising issue, F-Squared's operation was entirely legitimate. The core of F-Squared's business was selling its investment strategy to investment advisors who were investing their own clients' funds using that strategy. (See, ¶14, Complaint; ¶7 Phelps Declaration). F-Squared's earned its income from fees charged those who purchased F-Squared's market signals and then used those market signals to invest for the benefit of their customers. In other words, F-Squared did not generate investment returns directly for investors. No investor funds were directly held or invested. There was therefore no room to fake the returns on investments, manipulate results or misuse funds. Instead, the returns were recorded by outside advisors who were investing their clients' funds using the F-Squared strategy.

The Trustee seeks to transform F-Squared's agreement to disgorge profits and to pay a fine for misleading advertisements into a finding that F-Squared's entire operation was "illegal." This theory defies logic and is without support in the Complaint. Had that been the case, the SEC's actions would not have ended with disgorgement and a fine—it would have shut the F-Squared's operations down. It did not do so.[7] In essence, the Trustee would have this Court equate an

---

[7] In fact, the SEC Administrative Cease and Desist Order acknowledges the product would have produced solid investment returns had it been utilized in the 2001-2008 period. Paragraph 20 notes an individual who invested in $100,000 in the S&P 500 during this period would have $128,000 while an individual using the Alpha Sector product would have ended with $138,000.

advertising based Lanham Act or a state "Little FTC Act" violation with a determination that the offending entity was "illegal" and therefore "insolvent" from the inception. That is not the law and the Court should reject the Trustee's theory.

### 3. The Distributions Did Not Leave F-Squared Undercapitalized nor Unable to Pay its Debts as They Became Due.

The Trustee infers, without alleging facts, that F-Squared had insufficient capital to cover liabilities that later accrued after it entered into the SEC Order in December 2014. This unstated conclusion is unsupported by facts as alleged and does not make out a plausible claim for constructive fraud.

A finding of past undercapitalization, or unreasonably small capital does not follow automatically from a later bankruptcy filing. Instead, to find that a debtor was undercapitalized and therefore "insolvent" when a distribution is made, there must be proof that the debtor could reasonably have foreseen that insolvency would result from the targeted transfer. *Moody v. Security Pacific Business Credit, Inc.*, 971 F. 2d 1056, 1070, 1073 (3d Cir. 1992). Capital is required, but funds retained need not be unlimited. "While a company must be adequately capitalized, it does not need resources sufficient to withstand any and all setbacks." *In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007).

Courts must "take [ ] into account that businesses fail for all sorts of reasons and that fraudulent conveyance laws are not a panacea for all such failures." *Moody*, at 1073. To avoid the slippery slope that a later bankruptcy filing must have meant a previous period of undercapitalization, the analysis should be confined to the questioned time frame and strict causation between the questioned transfer and the company's ultimate insolvency. *In re Semcrude, L.P.*, 526 B.R. 556, 556 (Bankr. D. Del. 2014).

11

Courts also warn against the trap of hindsight bias. To do so, the focus must remain on the time the transfer took place and at that time, not later, what was reasonably foreseeable and likely to occur; not what with the benefit of hindsight actually happened. *Boyer v. Crown Stock Distribution, Inc.,* 587 F.3d 787, 794 (7th Cir. 2009)(noting a term like unreasonably small capital is "in danger of being interpreted under the influence of hindsight bias"); *In re Semcrude L.P.,* 648 Fed. Appx. 205 (3d Cir. 2016)(noting that absent the bias of hindsight, the Trustee cannot show that Debtor could reasonably foresee either that its trading strategy would fail or that the lender would declare a default based upon that trading strategy).

Here, the Trustee's allegations in support of undercapitalization are limited to the conclusory statement that F-Squared's activities were "almost certain to give rise, at some point" to substantial liabilities. Presumably he is relying on F-Squared's misrepresentation of the Alpha Sector Strategy track record. While wrongful, it was not certain the misrepresentations would be identified, nor if they were that their discovery would foreseeably lead to a bankruptcy filing. See, *In re SemCrude L.P.,* 648 F. Appx. 205, 210 (3d Cir. 2016) (rejecting trustee's argument that debtor's trading strategy necessarily left it undercapitalized because debtor's strategy was risky and violated its lender agreements; conclusion that lenders would have necessarily pulled debtor's credit line upon discovery would require the "speculative exercise" of "multiple levels of forecasting" given the "broad range of [alternative] options" available to the lenders); See also, *In re Edgewater Med. Ctr.,* 373 B.R. 845, 855 (Bankr. N.D. Ill. 2007) (rejecting, in context of insolvency analysis, theory that at the time of transfers debtor was engaging in Medicare fraud which would have led to "devastating financial consequences" upon discovery by the government; "[t]o reach a finding of insolvency . . . the court would have to disregard the large

amounts of cash the debtor had on hand and *speculate* on what the Department of Human Services would have done if it had discovered the Medicare fraud").

The allegations made in the Complaints, while barely touching on the topic of undercapitalization, make clear the events that triggered insolvency came well after; not before or at the time the Distributions were made. At paragraph 16 of the Complaints the Trustee alleges that "by 2014, a substantial majority of F-Squared's revenues . . . were on account of fees paid by clients"; and at paragraph 17 notes that *following* the December SEC Order, that clients stopped using the algorithms for "several reasons." It then lists each reason but, with one exception (the commencement of investigations by the SEC against F-Squared customers), provides no facts to support the argument that those reasons would lead to a significant drop in business.[8]   Nowhere does the Trustee allege the events were reasonably foreseeable when the Distributions were made in the August '13 to September '14, timeframe nor could they have been.

The Defendants believe that the Trustee's failure to plead a viable claim of undercapitalization is not due to a lack of rigor on the Trustee's part, but rather an absence of supporting facts. After all, F-Squared continued to thrive for several months after making the last of the payments to the Defendants. That F-Squared ultimately filed for bankruptcy 22 months after the first Distribution and eight months after the last Distribution was made cannot, standing alone, support the contention that a reasonable individual would have forecast insolvency without employing the sort of hindsight bias that the courts have been directed to eschew. That is particularly true where, as in the case, the supermajority of the Distributions were made for the

---

[8]     Most of the reasons enumerated do not even seem of themselves likely to have caused clients to flee and instead appear to be mere speculation on the part of the trustee with the exception of the commencement of enforcement proceedings against clients which likely did lead to the termination of business relations with F-Squared.

payment of taxes made necessary due to F-Squared's extraordinary profitability during the two year period in question.

Because the Trustee's Complaint is barren of allegations (apart from sweeping pronouncements) that would support a plausible claim of undercapitalization, insolvency has not been adequately pled and the complaints must be dismissed.

### B. Count III of the G. McClelland Complaint Should Be Dismissed Because George McClelland Was Not an Insider When the Distributions Were Made During the Relevant Time Frame.[9]

Count III of the Trustee's Complaint alleges that G. McClelland received two payments that constitute avoidable preferences. The first payment was made on September 4, 2014 and the second on October 30, 2014. Both were paid more than 90 days prior to, but within one year of, the bankruptcy filing. (Exhibit A, G. McClelland Complaint.)  It also alleges that McClelland was a "co-founder and Director of Business Development for F-Squared, and on F-Squared's Board of Directors from May 2008 through May 2014" and goes on to allege that G. McClelland was a statutory insider pursuant to 11 U.S.C. §101(31). (¶6, G. McClelland Complaint).

To recover an allegedly preferential transfer made between 90 days and one year before a bankruptcy filing, among other things, the trustee must allege that the defendant was an insider "at the time of such transfer." 11 U.S.C. 547(b)(4)(B); *In re Butler*, 72 F.3d 437 (4th Cir. 1996) (a trustee may avoid transfers made up to one year prior to the filing of the petition in bankruptcy if the transferee "*at the time of the transfer* was an insider . . . .Thus, the question is not whether the [Defendant] was an insider, but rather whether [the defendant] was an insider at the time of the challenged transfer."); *In re Netbank, Inc.*, 424 B.R. 568 (Bankr. M.D. Fla. 2010)("Section

---

[9]    Without adequate facts pled to establish a plausible claim of insolvency, this Count cannot be sustained and must be dismissed. However, should the court rule otherwise, this section of the memo establishes an alternative ground to dismiss this Count III of the G. McClelland Complaint.

547(b)(4)(B) provides for an extended time frame of one year before the date of the filing of the petition but only if such creditor *at the time of such transfer* was an insider.").

The Complaint acknowledges that Mr. McClelland was a director but also notes he only held that status through May 2014. (¶6, G. McClelland Complaint). In fact, G. McClelland resigned from the Board in May and was fired as the Director of Business Development in 2013. Each of the allegedly preferential transfers occurred well after both events—one transfer occurred in September of 2014; and the other in October of 2014. McClelland was not an insider *at the time* of the transfer and therefore Count III fails as pled.

The Trustee may attempt to survive dismissal by arguing Mr. McClelland was a non-statutory insider. The Complaint alleges in a conclusory fashion: ". . . Plaintiff seeks to avoid and recover from Defendant . . . all preferential transfers of property that occurred during the ninety (90) day period or, in the case of Insiders or *non-statutory* Insiders, the one year period . . . ." ¶10, G. McClelland Complaint (emphasis added). This too fails.

It is possible to establish "insider" status without meeting the enumerated definitions contained in the Code. The definition of "insider" notes the term includes the enumerated categories and they are therefore not limiting. *See In re Winstar Communications, Inc.,* 554 F.3d 382 (3d Cir. 2009) (". . . in light of Congress's use of the term 'includes' in §101(31) courts have identified a category of creditors, sometimes called 'non-statutory insiders,' who fall within the definition but outside any of the enumerated categories."). Nevertheless, it is not enough to baldly allege a recipient is a non-statutory insider without more. To qualify, the Complaint must allege facts that could lead to a finding that the recipient has both : (1) a close relationship with the debtor; and (2) something beyond closeness to suggest the transactions were not conducted at arm's length. *Winstar, supra.; See also, In re U.S. Medical, Inc.,* 531 F.3d 1272 (10th Cir. 2008)

(in assessing party's insider status, inquiry is whether there is close relationship between party and the debtor and whether there is anything other than closeness to suggests that any transitions were not conducted at arm's length).

The G. McClelland Complaint is devoid of even a single allegation that could lead to a finding that G. McClelland was a non-statutory insider at the time the transfers were made. By then, he had been terminated as an employee from the company and had resigned from the board. There is no allegation that he retained any influence over the Debtors after his respective termination and resignations. Further, of the $470,000 sought to be avoided, $383,592.00 constituted distributions on account of taxes (See Exhibit A, G. McClelland Complaint). Distributions were made to essentially every member interest holder on or about the same date. *See Exhibit A.* The other much smaller transfer was designated as a Units Repurchase—a buy-out of McClelland's option to purchase additional membership interests, which discovery will show occurred at management's insistence.

Simply put, the allegations of the Complaint do not and cannot make out a claim for insider preference and Count III to G. McClelland's Complaint too must be dismissed.

## IV.    CONCLUSION

For the above-referenced reasons, the Court should dismiss Counts I-III of each complaint the Complaints with prejudice.

Dated: November 7, 2017
Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ D. Ryan Slaugh*
Jeremy W. Ryan (DE Bar No. 4057)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
            rslaugh@potterandercon.com

-and-

Joseph A. Foster
**MCLANE MIDDLETON, PROFESSIONAL ASSOCIATION**
900 Elm Street, P.O. Box 326
Manchester, NH 03105-0326
Telephone: (603) 628-1175
Facsimile: (603) 625-5650
Email:  joseph.foster@mclane.com

*Counsel for George McClelland, Charles Hart,
Geordie McClelland, Graham Hart, Hazel
McClelland, Jacquelyn McClelland, Lindsay Hart,
McClelland Irrevocable Grantor Trust, Quinn
McClelland Hart, Lindsay McClelland, Agnes
Carol McClelland  and Ann Aghababian*