## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F-SQUARED INVESTMENT MANAGEMENT, LLC, *et al.*,[1] | Case No. 15-11469 (LSS) |
| Debtors. | (Jointly Administered) |
| CRAIG JALBERT, IN HIS CAPACITY AS TRUSTEE FOR F2 LIQUIDATING TRUST, | |
| Plaintiff, | |
| vs. | |
| AGNES CAROL MCCLELLAND, | Adv. No. 17-50718 (LSS) |
| ANN AGHABABIAN, | Adv. No. 17-50719 (LSS) |
| CHARLES HART, | Adv. No. 17-50722 (LSS) |
| GEORDIE MCCLELLAND, | Adv. No. 17-50755 (LSS) |
| GEORGE MCCLELLAND, | Adv. No. 17-50758 (LSS) |
| GRAHAM HART, | Adv. No. 17-50767 (LSS) |
| HAZEL MCCLELLAND, | Adv. No. 17-50772 (LSS) |
| JACQUELYN MCCLELLAND, | Adv. No. 17-50786 (LSS) |
| LINDSAY HART, | Adv. No. 17-50849 (LSS) |
| LINDSAY MCCLELLAND, | Adv. No. 17-50850 (LSS) |
| MCCLELLAND IRREVOCABLE GRANTOR TRUST, and | Adv. No. 17-50854 (LSS) |
| QUINN MCCLELLAND HART | Adv. No. 17-50859 (LSS) |
| Defendants. | |

## TRUSTEE'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

THE ROSNER LAW GROUP LLC
Frederick B. Rosner (DE No. 3995)
Jason A. Gibson (DE No. 6091)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Tel: (302) 777-1111

-and-

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: F-Squared Investment Management, LLC (9247), F-Squared Investments, Inc. (0788), F-Squared Retirement Solutions, LLC (9247), F-Squared Alternative Investments, LLC (9247), F-Squared Solutions, LLC (9247), Squared Institutional Advisors, LLC (9247), F-Squared Capital, LLC (5257), AlphaSector LLS GP 1, LLC (3342), and Active Index Solutions, LLC (0788). The Debtors' address is Verdolino & Lowey, P.C., 124 Washington Street, Suite 101, Foxboro, Massachusetts 02035, Attn: Craig R. Jalbert.

BROWN RUDNICK LLP
William R. Baldiga (admitted *pro hac vice*)
Sunni P. Beville (admitted *pro hac vice*)
Sharon I. Dwoskin (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200

*Counsel to the F2 Liquidating Trust*

## TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

NATURE AND STAGE OF  THE PROCEEDINGS ....................................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 2

FACTUAL BACKGROUND ........................................................................................... 3

    A.  F-Squared's Business ........................................................................................ 3

    B.  F-Squared's Liabilities to its Clients on Account of Misconduct ............................ 4

    C.  F-Squared's Liabilities to the SEC .................................................................... 6

    D.  F-Squared's Indemnification Liabilities ............................................................. 8

    E.  Distributions to Defendants ........................................................................... 10

PROCEDURAL BACKGROUND ................................................................................. 11

APPLICABLE LEGAL STANDARD............................................................................. 11

ARGUMENT ................................................................................................................. 14

    I.  THE COMPLAINTS ADEQUATELY PLEAD INSOLVENCY ................... 14

        A.  INSOLVENCY IS NOT PROPERLY DETERMINED AT THIS
            STAGE ................................................................................................ 14

        B.  THE COMPLAINTS CONTAINED ADEQUATE
            ALLEGATIONS THAT F-SQUARED WAS INSOLVENT AT
            THE TIMES OF THE TRANSFERS ................................................... 15

            1.  Trustees Are Not Obligated To Provide Specific Financial
               Information ....................................................................................... 16

            2.  The Trustee's Allegations of Fraud are Sufficient to Show F-
               Squared's Insolvency ....................................................................... 18

CONCLUSION .............................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

Adelphia Recovery Tr. v. FPL Grp. (In re Adelphia Commc'ns Corp.),
    512 B.R. 447 (Bankr. S.D.N.Y. 2014) .......................................................................22, 23, 25

In re AgFeed USA, LLC,
    546 B.R. 318 (Bankr. D. Del. 2016) ...........................................................................14

Barry v. Santander Bank, N.A. (In re Liberty State Benefits of Del., Inc.),
    541 B.R. 219 (Bankr. D. Del. 2015) (Gross, J.)........................................................12

Borough of Moosic v. Darwin Nat'l Assurance Co.,
    556 F. App'x 92 (3d Cir. 2014) ..................................................................................13

Burtch v. Masiz (In re Vaso Active Pharm., Inc.),
    Adv. No. 11-52005(CSS), 2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) .................10, 19

Chem. Separations Corp. v. Rohm and Haas Co. (In re Chem. Separations Corp.),
    38 B.R. 890 (Bankr. E.D. Tenn. 1984) ....................................................................25

Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.),
    144 B.R. 663 (Bankr. S.D.N.Y. 1992) ...............................................................21, 24

Cunningham v. Brown,
    265 U.S. 1 (1924)........................................................................................................22

Edgewater Med. Ctr. v. Edgewater Prop. Co. (In re Edgewater Med. Ctr.),
    373 B.R. 845 (Bankr. N.D. Ill. 2007) .......................................................................24

Forman v. HBK Master Fund L.P. (In re Glencoe Acquisition Inc.),
    No. 12-12071(KG), 2015 WL 3777972 (Bankr. D. Del. June 16, 2015) .........................13, 17

FTI Consulting, Inc. v. Sweeney (In re Centaur, LLC),
    No. 10-10799 (KJC), 2013 WL 4479074 (Bankr. D. Del. Aug. 19, 2013) ......................17, 22

Gillman v. Sci. Research Prods. Inc. (In re Mama D'Angelo, Inc.),
    55 F.3d 552 (10th Cir. 1995) .....................................................................................25

Global Link Liquidating Tr. v. Avantel, S.A. (In re Global Link Telecom Corp.),
    327 B.R. 711 (Bankr. D. Del. 2005) .........................................................................17

Grady v. A.H. Robins Co.,
    839 F.2d 198 (4th Cir. 1988) .....................................................................................18

Halperin v. Moreno (In re Green Field Energy Servs., Inc.), Adv. Pro. No. 15-
    50262 (KG),
    2015 WL 5146161 (Bankr. D. Del. Aug. 31, 2015) .................................................14

Howard Hess Dental Labs. Inc. v. Dentsply Int'l Inc.,
   602 F.3d 237 (3d Cir. 2010)..................................................................................13

Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.),
   607 F.3d 114 (3d Cir. 2010)....................................................................18, 24, 25

JNA-1 Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC),
   404 B.R. 767 (Bankr. D. Del. 2009) ...................................................................12

Kaymark v. Bank of Am., N.A.,
   783 F.3d 168 (3d Cir. 2015)..................................................................................13

Kost v. Kozakiewicz,
   1 F.3d 176 (3d Cir. 1993) .....................................................................................13

Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC),
   426 B.R. 488 (Bankr. D. Del. 2010) (Gross, J.)...................................................12

Official Comm. of Unsecured Creditors v. The CIT Grp./Bus. Credit, Inc. (In re
   Jevic Holding Corp.),
   Adv. No. 08-51903, 2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ...............17

Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.),
   326 B.R. 301 (Bankr. D. Del. 2005) .....................................................................17

Phillips v. Cty. of Allegheny,
   515 F.3d 224 (3d Cir. 2008)..................................................................................13

In re Pillowtex Corp.,
   427 B.R. 301 (Bankr. D. Del. 2010) .....................................................................17

In re Piper Aircraft Corp.,
   162 B.R. 619 (Bankr. S.D. Fla. 1994) ..................................................................18

Roach v. Edge (In re Edge),
   60 B.R. 690 (Bankr. M.D. Tenn. 1986) ................................................................18

SEC v. Antar,
   120 F. Supp. 2d 431 (D. N.J. 2000) ......................................................................20

In re SemCrude L.P.,
   648 Fed. Appx. 205 (3d Cir. 2016)..................................................................23, 24

Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity, LLC),
   No. 14-10569(KG), Adv. Pro. No. 16-50212(KG), 2017 WL 65069 (Bankr. D.
   Del. Jan. 5, 2017) (Gross, J.)................................................................................12

In re W.R. Grace & Co.,
   281 B.R. 852 (Bankr. D. Del. 2002) ...................................................................20

Warfield v. Byron,
   436 F.3d 551 (5th Cir. 2006) .............................................................................22

Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.),
   141 B.R. 552 (Bankr. S.D.N.Y. 1992) (vacated on other grounds) ......................18

Wiand v. Lee,
   753 F.3d 1194 (11th Cir. 2014) .........................................................................22

**Statutes**

11 U.S.C. § 544 .......................................................................................................1

11 U.S.C. § 547 ....................................................................................................1, 16

11 U.S.C. § 548 ................................................................................................1, 15, 16

11 U.S.C. § 550 .......................................................................................................1

15 U.S.C. § 80a-9 ....................................................................................................6

15 U.S.C. § 80a-41(e) ..............................................................................................6

15 U.S.C. § 80b-3 ....................................................................................................6

15 U.S.C. § 80b-9(e) ...............................................................................................6

Delaware Uniform Fraudulent Transfer Act § 1304(a)(1) .............................................1

Investment Advisers Act of 1940 ........................................................................ passim

Investment Company Act of 1940 ....................................................................... passim

MASS. GEN. LAWS 109A § 5 .................................................................................1

**Other Authorities**

Fed. R. Bankr. P. 7008 ...........................................................................................11

Fed. R. Civ. P. 8 ...........................................................................................11, 12, 17

Fed. R. Civ. P. 12(b)(6) ..........................................................................................13

**NATURE AND STAGE OF THE PROCEEDINGS**

1.      On July 7, 2017, Craig Jalbert, in his capacity as trustee for the F2 Liquidating Trust (the "Trustee"), filed complaints (the "Complaints") against moving parties Agnes Carol McClelland, Ann Aghababian, Charles Hart, Geordie McClelland, George McClelland, Graham Hart, Hazel McClelland, Jacquelyn McClelland, Lindsay Hart, Lindsay McClelland, the McClelland Irrevocable Grantor Trust, and Quinn McClelland Hart, (collectively, the "Defendants"), seeking to avoid and recover a total of approximately $6 million in dividends and other payments as constructively fraudulent transfers under federal and state laws (collectively the "Transfers").   The Defendants were holders of equity units in F-Squared Investment Management LLC (together with its subsidiaries, "F-Squared").  In addition, Defendant George McClelland was one of the co-founders of F-Squared, and for many years served as F-Squared's Vice Chairman and Director of Business Development, and also served on F-Squared's Board of Managers.

2.      On November 7, 2017, the Defendants filed a motion to dismiss the Complaints [Adv. D.I. 13] (the "Motion to Dismiss") and a memorandum in support of that motion [Adv. D.I. 14] (the "Memorandum").[2] [3]

3.      The Complaints allege the following counts for relief:

    a.  Constructive fraudulent transfer under 11 U.S.C. § 548;

    b.  Fraudulent transfer under 11 U.S.C. § 544, MASS. GEN. LAWS 109A § 5, Delaware Uniform Fraudulent Transfer Act § 1304(a)(1);

    c.  Preferential transfer under 11 U.S.C. § 547 (as to George McClelland); and

    d.  Recovery of transfers under 11 U.S.C. § 550.[4]

---

[2]   Capitalized terms used but not otherwise defined herein shall the meanings ascribed to them in the Memorandum.

[3]   The same Motion to Dismiss and Memorandum were filed in all of the above-captioned adversary proceedings. All citations to the Complaints or docket entries shall refer to the filings in the proceedings against George McClelland, Adv. No. 17-50758 (LSS), which contains allegations relevant to all of the Defendants.

4.      The Trustee submits this memorandum of law in opposition to the Motion to Dismiss.

## SUMMARY OF ARGUMENT

5.      The Motion to Dismiss should be denied, because the Trustee has alleged sufficient facts to state colorable claims sounding in fraudulent transfer under the Bankruptcy Code and applicable non-bankruptcy law.

6.      In particular, the Trustee's allegations are sufficient because:

- Under the legal precedent in this District, insolvency is a fact-intensive inquiry not appropriate for a motion to dismiss;

- Plaintiffs are not required to allege balance-sheet insolvency or to provide specific financial information to survive a motion to dismiss as to allegations of insolvency;

- The allegations in the Complaints regarding F-Squared's pervasive securities fraud and related misconduct, committed prior to all Transfers to be avoided and that (when discovered) gave rise to massive contractual, indemnification and regulatory liabilities, are sufficient to establish insolvency at the time of the Transfers, because:

    o At the times of each of the Transfers, and whether it knew of such liabilities or not, F-Squared had incurred massive unbooked liabilities based on its pervasive fraudulent conduct as to virtually all of its clients and on account of F-Squared's repeated and pervasive securities fraud and breaches of contracts with virtually all of its clients;

    o The amount of such liabilities far exceeded the fair value of F-Squared's assets and left it with unreasonably small capital with which to operate;

---

4   After further review of additional facts, the Trustee agrees that George McClelland was not an insider at the time of the Transfers to him.  The Trustee therefore hereby withdraws the preference claim (Count III) against George McClelland.  As preferential transfer was pled in the alternative to fraudulent transfer, and as no insider status is required for fraudulent transfer, the Trustee reasserts that all Transfers to George McClelland are avoidable, but solely as fraudulent transfers.  The Trustee intends to work with counsel to Mr. McClelland to have the preference count voluntarily dismissed in the record in these proceedings.

o The value of F-Squared's assets was at all relevant times artificially inflated by its misconduct;

o F-Squared was undercapitalized at the time of the Transfers; and

o It is not impermissible hindsight bias for the Court to consider F-Squared's misconduct in valuing its assets and liabilities or conducting a solvency analysis as of the time of the Transfers.

## FACTUAL BACKGROUND[5]

*A.    F-Squared's Business*

7.    In 2006, Defendant George McClelland (together with former CEO Howard Present) created F-Squared as an investment management and research firm.  F-Squared's first foray into investment management was the development of a quantitative-based investment product called AlphaCycle.  Despite years of effort, AlphaCycle failed to generate a profit or even generate meaningful revenue.  Indeed, in the first two years of F-Squared's existence, F-Squared generated less than $200 (two hundred dollars) of revenue from client fees from the use of that product.

8.    In early 2008, F-Squared began discussions with David Morton, a private wealth advisor, as to a possible joint venture.   Morton's firm had been developing a sector-based model that analyzed price trend and volatility data to generate buy/sell signals for the management of client investments, and, by July 28, 2008, at least one third party had expressed interest in both F-Squared's product and Morton's sector rotation model.  Morton provided a table of these buy/sell signals to F-Squared, generated by the third and most refined version of the model, and F-Squared used this version, along with earlier versions of the model, to adapt these algorithm-

---

[5] The great majority of the facts below can be found in the Complaints, in the *Declaration of David N. Phelps in Support of Chapter 11 Petitions and First Day Motions* incorporated into the Complaints by reference at ¶ 11, the Transfer Order referenced in the Complaints at ¶ 15, and the SEC complaint referenced in the Complaints at ¶ 16 (of which the Court can take judicial notice).   Some additional facts were derived from additional information obtained by the Trustee.

generated signals into a model portfolio of exchange-traded funds ("ETFs") that could be measured and tracked as an index.

9.     F-Squared in fact did reach an agreement with a company formed by Mr. Morton and others, Newfound Research LLC ("NFR"), under which F-Squared purchased from NFR the right to weekly trading signals as to this model, which F-Squared could then use to manage client money or provide for a fee to other money managers, brokers and other financial advisors.  In 2008, F-Squared began to market its new product, which it called "AlphaSector," to various broker-dealers and mutual fund companies (F-Squared's "Financial Clients") who wanted to use the AlphaSector strategy to manage their own clients' assets.  F-Squared conducted business primarily by means of sub-advisory agreements with these Financial Clients, but also used AlphaSector to manage assets directly for individual customers.

10.     As described below, starting with the first sale of these signals to its customers in 2008, F-Squared's advertisement and use of AlphaSector created very substantial liabilities to its customers (arising in contract and tort), to the SEC (arising under the federal securities laws), and to its Financial Clients (arising under indemnification provisions in the relevant contracts).

B.     *F-Squared's Liabilities to its Clients on Account of Misconduct*

11.     From October 2008 through September 2013, in multiple press releases, presentations and mailings to potential Financial Clients and customers, and postings on its website, F-Squared claimed that the sector rotation model upon which AlphaSector was based had been used on a live basis to manage client assets since 2001, and claimed that AlphaSector had outperformed the S&P 500 index since 2001.  F-Squared also made these claims in its Forms ADV that it filed with the Securities and Exchange Commission (the "SEC") in 2008, 2012, and 2013.

12.     These claims, however, were false.  As F-Squared later admitted to the SEC, neither AlphaSector nor the sector-rotation model upon which it was based had been used on a live basis since 2001.  Rather, back-tested data, instead of live data, was used to develop the track record for AlphaSector.  Accordingly, F-Squared's revenue from of the use its AlphaSector model was derived from F-Squared's misrepresentations to its contract counter-parties, direct clients, and regulators.

13.     This (unfortunately false) marketing permitted F-Squared to generate enormous revenue, at least while its fraud went undiscovered.  Based on the Trustee's review of F-Squared's books and records, from the beginning of 2009 through the third quarter of 2013, F-Squared collected a total of approximately $105.6 million in fees related to the use and licensing of the AlphaSector strategy, with yearly fees as follows:

- 2009: $140,000
- 2010: $2 million
- 2011: $16.5 million
- 2012: $38 million
- 2013 (through the third quarter): $49 million

14.     This revenue, in the form of fees paid by F-Squared's Financial Clients and direct investment clients for the AlphaSector strategy, was generated by F-Squared on the basis of its false statements regarding AlphaSector. More specifically, F-Squared's only material business activity was the sale of weekly trading signals.  Each representation that these signals were based on a model live-tested since 2001 was false and constituted a breach of contract and (now admitted) securities fraud.  This fraud gave rise to massive liabilities (some of which were filed as claims in these Bankruptcy Cases).   All of these liabilities were incurred when F-Squared falsely advertised the AlphaSector strategy, which it did from 2008 through September 2013,

even though the fraud was not uncovered by the SEC until later.  F-Squared's Financial Clients and other clients had the legal right to recover at least all of the $100 million or more of fees paid under false pretenses *at the time* these fees were paid -- that is, before the date of all subject Transfers to be recovered in this litigation.

C.      *F-Squared's Liabilities to the SEC*

15.     Additionally, F-Squared's false advertisements and inaccurate securities filings described above violated the federal securities laws, including the Investment Advisers Act of 1940 (the "IAA") and the Investment Company Act of 1940 (the "ICA").  These laws impose certain sanctions and penalties for the kinds of violations committed by F-Squared.

16.     When enforcing these laws, the SEC can opt to proceed either by litigating in federal court or by instituting an administrative proceeding.  See 15 U.S.C. §§ 80a-9(d); 80a-41(e); 80b-3(i); 80b-9(e).  In an action in federal court, the SEC is permitted by each of the IAA and the ICA to impose a penalty of up to the greater of $500,000 per violation of each statute, or the gross amount of pecuniary gain resulting from such violation.  See 15 U.S.C. §§ 80a-41(e); 15 U.S.C. § 80b-9(e).  Similarly, in an administrative proceeding, the IAA and the ICA permit the SEC to impose a penalty of up to $500,000 per violation of each statute.  See 15 U.S.C. §§ 80a-9(d); 15 U.S.C. § 80b-3(i).  Additionally, the SEC is able, under certain circumstances, to seek disgorgement of ill-gotten gains.  See 15 U.S.C. §§ 80a-9(e) 80a-9(f)(5) 80b-3(j); 80b-3(k)(5).

17.     Each instance of a false statement to each client or potential client constituted a separate violation of the securities laws.  Every presentation and every email that F-Squared sent to each client or potential client from 2008 through 2013 that included false statements about AlphaSector's track record constituted a violation of the ICA and the IAA.  F-Squared also issued a number of press releases containing false statements about AlphaSector's track record,

put false statements on its website, and made false statements in its public SEC filings. Therefore, F-Squared was exposing itself to significant liabilities each and every time it made a false statement about the AlphaSector track record, all before the dates of each of the subject Transfers.

18.    Indeed, in July 2013, the SEC informed F-Squared that it would be commencing an examination of the company, and requested, among other things, supporting documentation for investor assets using the AlphaSector strategy starting in 2001.    Because no such documentation could be produced (as it did not exist), the SEC referred its examination to the SEC Enforcement Division in September 2013, which ultimately uncovered F-Squared's fraudulent scheme.

19.    In late 2013 or early 2014, the SEC and F-Squared entered into negotiations to attempt to resolve this matter by means of an administrative proceeding.    Initially, the SEC's demand was that F-Squared disgorge all illegally-obtained profits.    Further negotiations resulted in the Transfer Order, which was entered on December 22, 2014.    The Transfer Order instituted both administrative and cease-and-desist proceedings pursuant to Sections 203(e) and 203(k) of the IAA and Section 9(b) and 9(f) of the ICA, made findings, and imposed sanctions and a cease-and-desist order on F-Squared.

20.    Pursuant to the Transfer Order:

- F-Squared admitted that it willfully violated the securities laws, including Section 206(1) of the IAA, which prohibits any investment adviser from employing any device, scheme, or artifice to defraud any client or prospective client, and 206(2) of the IAA, which prohibits any investment adviser from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

- F-Squared undertook to engage an independent compliance consultant to review all of F-Squared's relevant compliance policies and procedures;

- The SEC extracted a $5 million penalty; and

- The SEC extracted a $30 million so-called "disgorgement."

*D.    F-Squared's Indemnification Liabilities*

21.    F-Squared's contracts with its Financial Clients included indemnification clauses requiring F-Squared to indemnify its Financial Clients against all losses, claims, damages, liabilities, and expenses suffered by those Financial Clients arising out of F-Squared's misconduct.    In the Transfer Order, F-Squared admitted to the pervasive deception of its Financial Clients and other tortious acts, based on F-Squared's false advertising and inaccurate securities filings from 2008 through 2013.

22.    As F-Squared understood, many if not all of F-Squared's Financial Clients relied on and used F-Squared's advertisements and securities filings in their own advertisements and securities filings in their dealings with their *own* clients.    As a result, the SEC also opened investigations into many of F-Squared's Financial Clients, and charged several such clients with violations of the ICA and IAA based on false advertising and failing to maintain accurate books and records.    These investigations resulted in settlements with the SEC in 2015 and 2016, in which each charged F-Squared Financial Client admitted to violation of the securities laws, due to each entity's use of F-Squared's AlphaSector strategy as to their own clients.    From public information available to the Trustee, the Trustee believes that these entities paid the following amounts to the SEC as penalties under the ICA and IAA relating to their relationships with F-Squared and resulting from F-Squared's fraud :

- Virtus Investment Advisers, Inc. ("Virtus"): Disgorgement of $13.4 million; interest of $1.1 million, penalty of $2 million;

- AssetMark, Inc.: Penalty of $500,000;

- BB&T Securities, LLC: Penalty of $200,000;

- Banyan Partners, LLC: Penalty of $200,000;

- <u>J.J.B. Hilliard, W.L. Lyons, LLC</u>: Penalty of $200,000;

- <u>Ladenburg Thalmann Asset Management Inc.</u>: Penalty of $200,000;

- <u>Shamrock Asset Management LLC</u>: Penalty of $200,000;

- <u>Congress Wealth Management LLC</u>: Penalty of $100,000;

- <u>Constellation Wealth Advisors LLC</u>: Penalty of $100,000;

- <u>Executive Monetary Management, LLC</u>: Penalty of $100,000;

- <u>HT Partners LLC</u>: Penalty of $100,000;

- <u>Prospera Financial Services, Inc.</u>: Penalty of $100,000;

- <u>Risk Paradigm Group, LLC</u>: Penalty of $100,000; and

- <u>Schneider Downs Wealth Management Advisors, LP</u>: Penalty of $100,000.

23.     These Financial Clients (and perhaps many others) were also forced to incur legal and other expenses related to these investigations, and otherwise incur costs and other liabilities indemnifiable under their contracts with F-Squared.  Pursuant to certain of F-Squared's indemnification agreements, F-Squared was liable not only for the amounts paid to the SEC, but for all losses, claims, damages, liabilities, and expenses these entities suffered due to F-Squared's admitted misconduct (which included, for example, the expenses of any SEC investigation, lost profits, contract damages, and amounts which certain of F-Squared's Financial Clients incurred as to their *own* clients).  Under its indemnification agreements, therefore, F-Squared's misconduct subjected it to massive unliquidated liabilities to its Financial Clients, which began accruing (of course, unbeknownst to those clients and the public generally) in 2008, with F-Squared's first false advertisement.

24.     Many Financial Clients and related parties filed claims in these Bankruptcy Cases on account of these liabilities.  Of the 235 claims filed in these Bankruptcy Cases, 94 were on account of F-Squared's indemnification obligations and liabilities arising under tort or contract

due to F-Squared's fraud.[6]  These claims are listed in the chart attached hereto as **Exhibit A**.[7]

Thus, at the time of F-Squared's misconduct, beginning in 2008, F-Squared was accruing vast

unliquidated liabilities to its Financial Clients.

E.      *Distributions to Defendants*

25.      While F-Squared was accruing all of these liabilities, and even dealing with the

ongoing SEC investigation, it was also paying out millions of dollars in dividends to holders of

its common equity and in discretionary bonuses to its employees.  In the two years prior to the

Petition Date--during the bulk of which period the SEC investigation was pending--F-Squared

paid nearly $2.75 million in dividends (described internally as "profit interests") to owners of its

equity units, nearly $17 million in additional dividends (described internally as "tax

distributions") to owners of its equity interests corresponding to the income tax obligations of the

recipient equity interest owner on account of their ownership of F-Squared equity, and over $19

million in discretionary bonuses.

26.      Exhibit A to each Complaint lists Defendants' shares of these payments.  Between

August 29, 2013 and October 30, 2014, F-Squared distributed $874,609.05 to Defendants as

dividends (described internally as "profit interests") on account of Defendants' ownership of

equity units in F-Squared.  Additionally, in the same time frame, the F-Squared distributed

---

6    Certain of these indemnification claims, filed by Virtus and its affiliates, relate to a lawsuit against Virtus by
     certain of Virtus's own clients (the "Youngers Plaintiffs").  The Youngers Plaintiffs also sued F-Squared for
     $1.5 billion.  While the Younger Plaintiffs' own complaint against F-Squared was dismissed (because F-
     Squared was not liable *directly* to the Youngers Plaintiffs), Virtus filed unliquidated indemnification claims for
     any and all amounts Virtus was required to pay to the Youngers Plaintiffs on account of their companion suit
     against Virtus.

7    The Debtors, the official committee of unsecured creditors, and the Trustee have resolved many of these claims
     (including the Virtus claims) on favorable terms based largely on defenses that were available to them only in
     these Chapter 11 cases, and not available before the demise of F-Squared and the filing of these Chapter 11
     cases.  The fact that these estates have had available to them defenses (such as subordination) provided by the
     Bankruptcy Code is not legally relevant to the amount or validity of these claims at the times of the Transfers.
     See Burtch v. Masiz (In re Vaso Active Pharm., Inc.), Adv. No. 11-52005(CSS), 2012 WL 4793241, at *22
     (Bankr. D. Del. Oct. 9, 2012) (holding that whether or not a claim would have been allowed, or how such claim
     would have been classified, is irrelevant to the fact that a claim existed at the time of a transfer).

$4,882,762 in additional dividends (described internally as "tax distributions") to Defendants. On February 6, 2014, F-Squared paid George McClelland, a co-founder of F-Squared, a discretionary bonus of $75,000 (as listed on Exhibit A to the Complaint against George McClelland).

## PROCEDURAL BACKGROUND

27.     On July 8, 2015 (the "Petition Date"), the Debtors filed their respective voluntary Chapter 11 petitions in this Court.

28.     On October 28, 2015, the Debtors and the official committee of unsecured creditors appointed in the case by the Office of the United States Trustee filed a joint plan of reorganization (the "Plan"), which was confirmed by the Bankruptcy Court on January 14, 2016 and soon thereafter became effective.

29.     Pursuant to the Plan, the F2 Liquidating Trust (the "Trust") was established for the purpose of, among other things, pursuing all causes of action not released, compromised and/or settled under the Terms of the Plan (the "Retained Causes of Action").  See Plan Arts. I(A)(73), IV(B)(1).

30.     The Trustee was given power under the Plan to "prosecute, settle, abandon or compromise the Retained Causes of Action."  Plan Art. IV(C).

31.     In late June and early July of 2017, the Trustee filed the Complaints against Defendants on behalf of the Trust, seeking to recover the Transfers in order to ratably redistribute such payments to all of F-Squared's unsecured creditors.  The Trust does not have sufficient assets to pay all of the creditors' claims in full.

## APPLICABLE LEGAL STANDARD

32.     Rule 8(a)(2) requires that the Trustee's Complaint set forth "a short and plain statement of the claim[s] showing that the pleader is entitled to relief."  Fed. R. Bankr. P. 7008;

Fed. R. Civ. P. 8(a)(2).  The rule "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s].  And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  Stanziale v. Versa Capital Mgmt., LLC (In re Simplexity, LLC), No. 14-10569(KG), Adv. Pro. No. 16-50212(KG), 2017 WL 65069, at *3 (Bankr. D. Del. Jan. 5, 2017) (Gross, J.) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)) (internal quotations and citation omitted).  Under Rule 8(a)(2), "[a] fraudulent transfer complaint 'need only set forth the facts with sufficient particularity to apprise the defendant fairly of the charges made against him.'"  Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC), 426 B.R. 488, 495 (Bankr. D. Del. 2010) (Gross, J.) (quoting AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.), 335 B.R. 309, 333 (Bankr. D. Del. 2005)); see also Barry v. Santander Bank, N.A. (In re Liberty State Benefits of Del., Inc.), 541 B.R. 219, 233 (Bankr. D. Del. 2015) (Gross, J.) ("Under this standard, substantive sufficiency and sufficient notice are all that are required under the Rules.").

33.    Where (as here) a plaintiff-trustee is a third-party to the facts and circumstances underlying its complaint, a more relaxed pleading standard is employed by the reviewing court, because "[a] trustee must 'rely on secondhand knowledge for the benefit of the estate and all of its creditors.'"  Liberty State Benefits, 541 B.R. at 233 (quoting Global Link Liquidating Tr. v. Avantel, S.A. (In re Global Link Telecom Corp.), 327 B.R. 711, 717 (Bankr. D. Del. 2005)).

34.    In deciding a motion to dismiss, the court "must accept all well-pleaded allegations in the complaint as true, and view them in the light most favorable to the plaintiff."  JNA-1 Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC), 404 B.R. 767, 783 (Bankr. D. Del. 2009) (citation omitted).  The court "do[es] not inquire whether a plaintiff will ultimately

prevail" but "whether the [claimant] is entitled to offer evidence to support his or her claims." Borough of Moosic v. Darwin Nat'l Assurance Co., 556 F. App'x 92, 95-96 (3d Cir. 2014) (citation omitted); see also Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted) ("[O]n a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits.").

36.    Further, the court must read the factual allegations "as a whole and in context," Howard Hess Dental Labs. Inc. v. Dentsply Int'l Inc., 602 F.3d 237, 256 (3d Cir. 2010) (citations omitted), and must "draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."  See Phillips, 515 F.3d at 228; accord Kaymark v. Bank of Am., N.A., 783 F.3d 168, 174 (3d Cir. 2015) (citation omitted).  The moving party must show that the plaintiff has failed to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that [those] elements exist."  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted).

36.    Thus, a motion to dismiss must be denied if the proffered grounds for dismissal require the court to "draw inferences against the [plaintiff]."  Forman v. HBK Master Fund L.P. (In re Glencoe Acquisition Inc.), No. 12-12071(KG), 2015 WL 3777972, at *4 (Bankr. D. Del. June 16, 2015); see also Phillips, 515 F.3d at 233 (citation omitted) (motion to dismiss must be denied if "under any reasonable reading of the complaint, the plaintiff may be entitled to relief.").

37.    Additionally, the standard for pleading constructive fraud is well established. Courts have found that where a complaint alleges specific facts such as dates, amounts, source, and transferee, a plaintiff has alleged sufficient facts to support a claim for constructive fraud.

See In re AgFeed USA, LLC, 546 B.R. 318, 337 (Bankr. D. Del. 2016) ("[t]he complaint identifies the date, amounts, source and transferee of each of the transfers. At this stage of the proceedings, the Court concludes that the facts alleged by the Trustee are sufficient to support a claim for constructive fraud under section 548(a)(1)(B)."). Unlike actual fraud, in the case of constructive fraud, "the transaction is presumptively fraudulent and all that need be alleged is that the conveyance was made without fair consideration while the debtor was functionally insolvent." Id. at 336. (quoting Global Link, 327 B.R. at 718).

## ARGUMENT

### I.    THE COMPLAINTS ADEQUATELY PLEAD INSOLVENCY

#### A.    INSOLVENCY IS NOT PROPERLY DETERMINED AT THIS STAGE

38.    Established case law in this District and beyond directs that insolvency is a factual question not appropriate for resolution at the motion to dismiss stage. See, e.g., Halperin v. Moreno (In re Green Field Energy Servs., Inc.), Adv. Pro. No. 15-50262 (KG), 2015 WL 5146161, at *7 (Bankr. D. Del. Aug. 31, 2015) ("With respect to insolvency or indebtedness of the Debtors, the Moving Defendants are correct that the Trustee did not provide a detailed valuation analysis demonstrating an exact pre-petition time frame in which the Debtors became insolvent. But such an analysis is not necessary at this stage in the proceeding.") (citing Zazzali v. Mott (In re DBSI, Inc.), 447 B.R. 243, 248 (Bankr. D. Del. 2011) ("insolvency is generally a factual determination not appropriate for resolution in a motion to dismiss")); Buckley v. Merrill Lynch & Co. (In re DVI, Inc.), Adv. Pro. No. 08-50248 (MFW), 2008 WL 4239120, at *9 (Bankr. D. Del. Sept. 16, 2008) (a "simple factual allegation of transfer while debtor was insolvent is sufficient"); Indus. Enters. of Am., Inc. v. Tabor Acad. (In re Pitt Penn Holding Co.), Adv. Pro. No. 11-51879 (BLS), 2011 WL 4352373, at *10 (Bankr. D. Del. Sept. 16, 2011) ("Here, the Plaintiff alleges that '[a]t the time of each transfer of stock to [the defendant], [the

14

debtor] . . . was insolvent under 11 U.S.C. § 548(a)(1)(B)(ii)(I).'  The Court concludes that this allegation is sufficient to survive a motion to dismiss.") (citation omitted).  Here the Trustee included the appropriate factual allegations that F-Squared was insolvent at the time of each Transfer.  Accordingly, the Trustee respectfully submits that the Motion to Dismiss should be denied.

> B.    THE COMPLAINTS CONTAINED ADEQUATE ALLEGATIONS THAT F-SQUARED WAS INSOLVENT AT THE TIMES OF THE TRANSFERS

39.    Even if this Court decides to consider insolvency at this stage of these proceedings, the Complaints contain sufficient allegations to withstand the Motion to Dismiss.

40.    The factual allegations in the Complaints are far beyond a formulaic recitation of the elements of a cause of action, and are consistent with the types of allegations routinely found to be sufficient to allow the Court to plausibly infer insolvency.

41.    These allegations include:

- **F-Squared's revenues were earned predominantly on account of the AlphaSector Indexes**: A substantial majority of F-Squared's revenues consisted of fees paid by F-Squared's clients to F-Squared to permit these clients to manage their own client investments based on the AlphaSector strategy, which F-Squared had falsely advertised, in violation of federal securities laws.  Complaints at ¶ 17.
- **F-Squared had enormous unliquidated liabilities at all relevant times**: At all relevant times, F-Squared generated a significant portion of its revenue by means of illegal activity giving  rise to massive liabilities on account of that activity that would be asserted once the fraud was uncovered.  These enormous liabilities, even if unliquidated (because, of course, F-Squared did not advertise its fraud), were sufficient to render F-Squared insolvent *at all times* that the Transfers were paid.  Complaints at ¶ 17.
- **F-Squared was charged with, and admitted to securities fraud**: The SEC began its investigation of F-Squared in 2013.  The SEC charged, and F-Squared admitted, that F-Squared's performance track record for AlphaSector for the period between April 2001 and September 2008 was materially inflated, hypothetical, and backtested.  Complaints at ¶ 15.

- **F-Squared paid $35 million to the SEC in December 2014**: As a result of the SEC's charges against F-Squared, F-Squared was forced to pay $35 million to the SEC.  After this payment, F-Squared was no longer a viable business and was no longer able to operate with its remaining capital.  However, its insolvency originated prior to this payment, as described above.  Complaints at ¶¶ 15, 17.
- **The SEC also opened investigations into F-Squared's clients**: The SEC opened investigations into many of F-Squared's clients for securities fraud related to their use of the AlphaSector strategy.  The SEC announced penalties against fourteen of these clients.  As described in F-Squared's schedules and statements of financial affairs, F-Squared had indemnification agreements with many of these clients -- indeed, several of these clients filed indemnification claims against F-Squared -- and the estate of F-Squared faced a lawsuit against it for $1.5 billion on account of these indemnification claims.  Complaints at ¶ 20.
- **Due to F-Squared's fraud, and because many of them were facing their own SEC investigations and penalties for false advertisement, F-Squared's clients fled**: Once F-Squared's clients became aware of F-Squared's securities violations, and while for some the transition to alternatives took some time, these clients  deserted F-Squared in droves.  Complaints at ¶¶ 18, 19.

42.    As described below, these allegations, if true, would be sufficient to set forth a plausible claim that F-Squared was insolvent at all times that the Transfers were made, and would thus support the avoidance and recovery of the Transfers under Sections 547 and 548 of the Bankruptcy Code, and under applicable state law.

*1.    Trustees Are Not Obligated To Provide Specific Financial Information*

43.    Defendants argue that the Complaints must be dismissed because "[t]he Trustee has not met his burden of establishing a plausible case for insolvency by means of a balance sheet analysis." Memorandum at 9.  The legal precedent in this District, however, is that trustees have no burden to provide a balance sheet analysis or any other specific financial information in alleging a debtor's insolvency in an avoidance complaint.  See, e.g., Gavin Solmonese, LLC v. Shyamsundar (In re Amcad Holdings, LLC), Adv. No. 15-51979 (MFW), 2017 Bankr. LEXIS

4079, at *9 (Bankr. D. Del. Nov. 29, 2017) (finding that Trustee sufficiently pled insolvency "without providing specific financial information");[8] Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.), 326 B.R. 301, 307 (Bankr. D. Del. 2005) ("Even allegations of insolvency in general terms comply with Rule 8 and there is no need to allege the particulars."); Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit, Inc. (In re Jevic Holding Corp.), Adv. No. 08-51903, 2011 WL 4345204, at *9 (Bankr. D. Del. Sept. 15, 2011) (finding that allegations that the debtor "was insolvent or would be rendered insolvent by the transactions undertaken in connection with the [Jevic] LBO, the [Refinancing Facility], and Sale-Lease Back" were sufficient to survive a motion to dismiss). While it is not sufficient to merely "allege the statutory elements" of fraudulent transfer, In re Global Link Telecom Corp., 327 B.R. at 718; Wahowski v. Classic Packaging Co. (In re Pillowtex Corp.), 427 B.R. 301, 311 (Bankr. D. Del. 2010), a plaintiff is not required to evidence balance sheet insolvency. See In re Glencoe Acquisition Inc., 2015 WL 3777972, at *4.

44.    As alleged in the Complaints, F-Squared's violations of the securities laws gave rise to vast unliquidated liabilities to its Financial Clients and other customers, and subjected it to millions of dollars in additional SEC penalties. Complaints at ¶ 17. The fact that the amount of these liabilities are not reflected in F-Squared's books and records, and thus not specified in the Complaints, is not determinative of solvency or insolvency. To the contrary, where a plaintiff "provide[s] sufficient allegations from which a reasonable person could infer" that the challenged conduct caused insolvency, the pleading standard is satisfied. In re Glencoe Acquisition Inc., 2015 WL 3777972, at *4. Moreover, the legal precedent in this district is that no lengthy, probing analysis is appropriate at this stage. See FTI Consulting, Inc. v. Sweeney (In

---

8    As no such information is necessary at this juncture, the Trustee reserves the right to introduce, at the appropriate stage of these proceedings, specific financial information about F-Squared's insolvency under any of the three tests in 11 U.S.C. § 548(a)(1)(B)(ii).

re Centaur, LLC), No. 10-10799 (KJC), 2013 WL 4479074, at *4 (Bankr. D. Del. Aug. 19, 2013) (concluding that pleading standard was satisfied where plaintiff alleged incurrence of massive debt and overestimation of value of certain assets); Official Comm. of Unsecured Creditors v. Nat'l Amusements, Inc. (In re Midway Games, Inc.), 428 B.R. 303, 321 (Bankr. D. Del. 2010) (insolvency adequately pled based on allegations including, *inter alia*, large trade debt, liabilities far exceeding assets, debtor not paying debts as they came due).

45.     As the pleading standard on a motion to dismiss does not require the Trustee to allege balance sheet insolvency, or to provide specific financial information, the Trustee's allegations of vast unliquidated liabilities sufficient to render F-Squared insolvent at all relevant times are adequate to survive the Motion to Dismiss.

*2.   The Trustee's Allegations of Fraud are Sufficient to Show F-Squared's Insolvency*

*i.     Liabilities arise at the time of misconduct*

46.     At least in this Circuit, liabilities arising from misconduct come into existence at the time of such misconduct. Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.), 607 F.3d 114, 125 (3d Cir. 2010) (holding that "a 'claim' arises when an individual is exposed pre-petition to . . . conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code.'"); see also Grady v. A.H. Robins Co., 839 F.2d 198 (4th Cir. 1988) (claim arose when claimant was inserted with a Dalkon Shield); Waterman S.S. Corp. v. Aguiar (In re Waterman S.S. Corp.), 141 B.R. 552 (Bankr. S.D.N.Y. 1992) (vacated on other grounds) (claims arose "at the moment the asbestos claimants came into contact with the asbestos."); Roach v. Edge (In re Edge), 60 B.R. 690, 699 (Bankr. M.D. Tenn. 1986) (holding that Bankruptcy Code recognizes a claim for a victim of prepetition misconduct "at the earliest point in the relationship between victim and wrongdoer."); cf. In re Piper Aircraft Corp., 162 B.R. 619 (Bankr. S.D. Fla. 1994) (because plaintiff class included only potential future claimants with no prepetition relationship

to the debtors and no exposure to a specific identifiable defective product, no claim was permissible).

47.     In that same way, and based on these same legal principles, F-Squared's fraudulent advertisements subjected it to significant unliquidated liabilities *as of the time of that activity* -- that is, beginning in October 2008.  Complaints at ¶ 17.  F-Squared's conduct violated the ICA and the IAA, which permit the SEC, under certain circumstances, to extract disgorgement of certain ill-gotten gains and to exact certain statutory penalties.  At the time of the misconduct, therefore, F-Squared had certain unliquidated liabilities to the SEC. Additionally, F-Squared's contracts with its clients included broad indemnification clauses requiring F-Squared to indemnify such clients against any and all losses, claims, damages, liabilities or expenses arising on account of F-Squared's misconduct.  As F-Squared admitted to the SEC, its years-long campaign of false advertisement also was a willful violation of the federal securities laws.  Some claims on account of these liabilities have been filed in these Bankruptcy Cases by F-Squared's former Financial Clients alleging, for example, that F-Squared is required to indemnify them against lawsuits or claims filed against them by *their own* clients, or on account of proceedings brought by the SEC, all related to the AlphaSector strategy.  These claims are listed on Exhibit A.  Whether or not claims were eventually filed in the Bankruptcy Cases on account of these liabilities, however, or are valid and non-subordinated claims under the Bankruptcy Code, F-Squared incurred all of these liabilities (whether liquidated or not) from the time it began falsely advertising the AlphaSector product--that is, October 2008.  See In re Vaso Active Pharm., Inc., 2012 WL 4793241, at *22 (where debtor had accrued wages owed to two employees, "[t]he right or basis for payment . . . was based on the accrual of unpaid wages.

Thus, [employees] both had a *claim* against Debtor at the time of the transfers.  Whether that claim would have been allowed in whole or in part or how it would be classified is irrelevant.").

      *ii.*     *Companies engaging in misconduct can have liabilities of which they are unaware*

    48.    Liabilities that result from a debtor's misconduct can render a debtor insolvent at the time of a transfer, even where a debtor is unaware of those liabilities.  In a case directly on point, <u>SEC v. Antar</u>, 120 F. Supp. 2d 431 (D. N.J. 2000), the SEC filed a fraudulent transfer complaint against recipients of transfers from Sam Antar, who had committed securities fraud, and against whom the SEC had obtained a disgorgement ruling.  The SEC sought the avoidance of the transfers and asked that the transferred assets be placed in a constructive trust.  The court found that because the SEC's claim was based on Antar's securities fraud, Antar possessed significant, but unliquidated, liabilities at the time he made the transfers.  Furthermore, because the value of that claim was greater than Antar's net worth, he was insolvent at the time of the transfers.  The court further found that whether or not Antar knew of the SEC's claim at the time of the transfers was irrelevant for constructive fraud purposes.

    49.    Similarly, in <u>Official Comm. of Asbestos Pers. Injury v. Sealed Air Corp. (In re W.R. Grace & Co.)</u>, 281 B.R. 852 (Bankr. D. Del. 2002), claimants who had been exposed to asbestos were found to have a right to payment before it became known that asbestos caused harm, and before any asbestos claims had been filed.  The court found that these liabilities must be factored into a solvency analysis, *regardless of whether the debtor or the claimants were, or could have been, aware of those claims*.  <u>Id.</u> at 867-68.

    50.    F-Squared successfully hid its fraud for years, accruing billions of dollars in assets under management while pulling in more than $100 million in client fees.  Whether or not any particular transferee, or even F-Squared itself, was aware that it was simultaneously accruing

millions of dollars in liabilities to its Financial Clients, its customers, and the SEC is irrelevant to the insolvency calculation.    Rather, its misconduct resulted in massive liabilities from the inception of its fraudulent advertising scheme, and these liabilities must be considered when analyzing F-Squared's insolvency.    See Coated Sales, Inc. v. First Eastern Bank, N.A. (In re Coated Sales, Inc.), 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992) (taking ongoing hidden misconduct into account when determining insolvency and holding that "[t]he finding of false accounts receivable, nonexistent inventory, and illegal transfers must be taken into account in accurately determining [debtor's] financial condition at the transfer date. . . . which, if not concealed, would have undoubtedly had an effect on asset values similar to that experienced in the bankruptcy proceeding.").

51.    Nor is it significant, as Defendants suggest, that F-Squared's illegal activity was limited to illegal advertisement.  While the AlphaSector strategy itself  "worked" (in the sense of enabling certain clients to trade client money as hoped), and while that strategy did not in itself violate the securities laws, F-Squared's *use* of that strategy constituted securities fraud because of how it had chosen to advertise it.  See Complaints at ¶ 15.  From 2008 until September 2013, F-Squared generated its customer base for this AlphaSector strategy from advertisements, direct mailings, press releases, and SEC filings that all contained false information about AlphaSector's live track record dating back to 2001.  F-Squared carried out very little other business.  Thus, accepting all of the Trustee's allegations as true, F-Squared's liabilities on account of the securities fraud underlying its entire business rendered the company insolvent not only at all times that it made the Transfers, but from its very first fraudulent advertisement in 2008, which

predated by several years even the first of the Transfers the Trustee seeks to recover from Defendants in these cases.[9]

> ### iii.    The value of F-Squared's assets was inflated

52.    Moreover, the fair value of F-Squared's assets was always artificially inflated by F-Squared's ongoing fraud.  Once this fraud was exposed, F-Squared's customers, including its Financial Clients, began to flee.  Complaints at ¶¶ 18, 19.  The SEC also opened investigations into F-Squared's clients on account of these clients' involvement with F-Squared, and required many of these clients to cease doing business with F-Squared in order to resolve these investigations.  Complaints at ¶ 20.  Thus, any value ascribed to goodwill, or any valuation of F-Squared's assets on a going-concern basis, is dramatically over-valued to the extent that such valuation does not take into account the results of the discovery of F-Squared's fraud.  See In re Centaur, LLC, 2013 WL 4479074, at *4 (finding adequate pleading of insolvency where plaintiff alleged that certain assets had been overvalued); Adelphia Recovery Tr. v. FPL Grp. (In re Adelphia Commc'ns Corp.), 512 B.R. 447, 495 (Bankr. S.D.N.Y. 2014) ("Subsequent discovery of fraud is appropriately considered when determining the real financial condition of the company at the time of the transfer. . . ." in order to assure that "valuation is based in reality."). As a result of its fraud, F-Squared's assets, including the value of its business as a going concern, were worth very little; indeed, once the fraud was exposed, the company sold at auction for only $1 million.  See Disclosure Statement for Joint Plan of Liquidation Under Chapter 11 of the

---

[9]    Defendants contend that F-Squared could not have been insolvent from its inception because it was not engaged in a Ponzi scheme.  Memorandum at 9.  This is not a Ponzi scheme case.  While Ponzi schemes are indeed presumed to be insolvent from the inception (see, e.g., Cunningham v. Brown, 265 U.S. 1, 8 (1924); Wiand v. Lee, 753 F.3d 1194, 1201 (11th Cir. 2014); Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006)), even where a debtor does not operate a Ponzi scheme, a debtor's pervasive illegal activity can result in a debtor's insolvency due to substantial liabilities on account of that illegal activity.  In this case, where F-Squared engaged in fraud from 2008 onward, and where it accrued liabilities due to that misconduct at the time of that misconduct, and where those liabilities were numerous and vast enough to outstrip its assets, these allegations are sufficient for the Court to infer that F-Squared was insolvent at the times of the Transfers.

*Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors*
[D.I. 421] at § II(C)(4)(c).

> iv.      *F-Squared was always undercapitalized*

53.      Similarly, F-Squared was undercapitalized at the times the Transfers were made.
Even though F-Squared generated large quantities of cash during and after its fraudulent
advertising campaign, this cash flow slowed to a trickle once F-Squared admitted to its fraud,
and the company used much of the cash it had in its coffers to make the Transfers.  Complaints at
¶¶ 19, 21, 28.

> v.      *The Trustee's allegations do not require impermissible hindsight*

54.      Defendants argue that the Trustee's allegations regarding F-Squared's insolvency
improperly rely on hindsight, and thus may not be factored into the Court's consideration of
whether the Trustee sufficiently alleged that F-Squared was insolvent when the Transfers were
made.  This argument relies on the accusation of "hindsight bias": that is, the failure to value a
company's assets at the time of the transfer, and valuing them instead at some time after the
bankruptcy intervened.  See In re SemCrude L.P., 648 Fed. App'x 205, 211 (3d Cir. 2016)
("[A]bsent the bias of hindsight, it simply cannot be said that [debtor] was likely to be denied
access to a credit facility that had been in place while it was engaging in the allegedly improper
trading strategy. . . .").  However, Defendants incorrectly conflate impermissible hindsight bias
with the entirely appropriate use of "information 'originating subsequent to the transfer date
[that] tends to shed light on a fair and accurate assessment of the asset or liability as of the
pertinent date. . . .'"  Adelphia, 512 B.R. at 495.  F-Squared's fraud, and liabilities resulting
therefrom, are properly considered when evaluating whether the Trustee alleged sufficient facts

as to F-Squared's financial condition at the time of the Transfers, even though that fraud was uncovered *subsequent* to the date of certain of the Transfers.

55.    Here, the Court need not engage in any speculative exercise to determine what *would have happened* had the SEC discovered F-Squared's fraud, because the SEC *did* discover F-Squared's fraud.  The question is, rather, whether it is proper in a solvency analysis (and, thus, in determining whether the Trustee adequately pled insolvency at the time of the Transfers) to take into account liabilities that *arose* prior to the Transfers, but *came to light* only after the Transfers.  The Third Circuit has clearly answered this question in the affirmative: where a company engages in misconduct that is hidden or undiscovered for some period of time, as it was here, liabilities that arise on account of that misconduct are deemed to have arisen not when the misconduct was *discovered*, but when the misconduct created a cause of action for a claimant. See In re Grossman's, Inc., 607 F.3d at 125.

56.    This is, therefore, unlike the situation in SemCrude, where the bankruptcy court was asked, and refused, to engage in a "speculative exercise" to determine whether a debtor whose lenders granted it access to credit *would have done so* had they been aware of the debtors' improper trading strategy--had they *not* done so, the debtor would have been insolvent. SemCrude, 648 Fed. App'x at 211; see also Edgewater Med. Ctr. v. Edgewater Prop. Co. (In re Edgewater Med. Ctr.), 373 B.R. 845, 854-55 (Bankr. N.D. Ill. 2007) (refusing to "incorporate hypothetical fines, penalties, or cessation of payments" in consideration of solvency and to "*speculate* on what the Department of Human Services would have done if it had discovered the Medicare fraud. . . .").

57.    As the court in Edgewater indicated, impermissible hindsight bias is distinguishable from, and is not relevant to, situations like those in this case or in Coated Sales

where a debtor's liabilities were not hypothetical, but had simply not yet been uncovered. Edgewater, 373 B.R. at 854; see also Gillman v. Sci. Research Prods. Inc. (In re Mama D'Angelo, Inc.), 55 F.3d 552, 556 (10th Cir. 1995) ("[I]t is not improper hindsight for a court to attribute current circumstances which may be more correctly defined as current awareness or current discovery of the existence of a previous set of circumstances."); Adelphia, 512 B.R. at 495 ("Subsequent discovery of fraud is appropriately considered when determining the real financial condition of the company at the time of the transfer."); Chem. Separations Corp. v. Rohm and Haas Co. (In re Chem. Separations Corp.), 38 B.R. 890, 895-96 (Bankr. E.D. Tenn. 1984) ("[T]he court may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date.").

58.     Here, F-Squared's liabilities to the SEC, its clients, and certain indemnitees existed on account of illegal activity that F-Squared succeeded in concealing for years.  These liabilities were not hypothetical, but arose, per the Third Circuit's opinion in In re Grossman's, when F-Squared commenced its illegal conduct.  Thus, it is not impermissible hindsight to consider them.  Rather, consideration of these liabilities is necessary to accurately assess F-Squared's financial condition at the times of the Transfers.  When the Court considers the Trustee's allegations concerning those liabilities, and viewing all such allegations as true and drawing all reasonable inferences in favor of the Trustee, it must reach the conclusion that the Complaints contain a sufficient pleading of insolvency at the times of the Transfers.

59.     Viewing the facts alleged in the Complaints as true and drawing all reasonable inferences in favor of the Trustee, the Court must therefore find that the Trustee has sufficiently stated a claim for relief against the Defendants for avoidance of the Transfers.

## CONCLUSION

60.    Based on the foregoing, the Trustee respectfully requests that the Motion to

Dismiss be denied.

Dated: December 22, 2017
         Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

*/s/ Frederick B. Rosner*
Frederick B. Rosner (DE 3995)
Jason A. Gibson (DE 6091)
824 Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
rosner@teamrosner.com
gibson@teamrosner.com

-and-

**BROWN RUDNICK LLP**
William R. Baldiga, Esq.
Sunni P. Beville, Esq.
Sharon I. Dwoskin, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
wbaldiga@brownrudnick.com
sbeville@brownrudnick.com
sdwoskin@brownrudnick.com

*Counsel for the F2 Liquidating Trust*