## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| F-SQUARED INVESTMENT | ) |
| MANAGEMENT, LLC, *et al.*, | ) Case No. 15-11469 (LSS) |
| | ) Jointly Administered |
| Debtors | ) |
| | ) |
| Craig Jalbert, in his Capacity as Trustee for F2 | ) |
| Liquidating Trust, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| Agnes Carol McClelland | ) Adv. Pro No. 17-50718-LSS |
| Ann Aghababian | ) Adv. Pro No. 17-50719-LSS |
| Charles Hart | ) Adv. Pro No. 17-50722-LSS |
| Geordie McClelland | ) Adv. Pro No. 17-50755-LSS |
| George McClelland | ) Adv. Pro No. 17-50758-LSS |
| Graham Hart | ) Adv. Pro No. 17-50767-LSS |
| Hazel McClelland | ) Adv. Pro No. 17-50772-LSS |
| Jacquelyn McClelland | ) Adv. Pro No. 17-50786-LSS |
| Lindsay Hart | ) Adv. Pro No. 17-50849-LSS |
| Lindsay McClelland | ) Adv. Pro No. 17-50850-LSS |
| McClelland Irrevocable Grantor Trust | ) Adv. Pro No. 17-50854-LSS |
| Quinn McClelland Hart | ) Adv. Pro No. 17-50859-LSS |
| | ) |
| Defendants | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF MOTION
## FOR PARTIAL SUMMARY JUDGMENT BY DEFENDANTS

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................... 1

II.   BRIEF STATEMENT ................................................................................................ 1

III.  CONCISE STATEMENT OF FACTS...................................................................... 5

      1.    F2's Corporate Structure and Tax Status.................................................. 5

IV.   ARGUMENT............................................................................................................ 10

  A.    The Court Can Properly Dispose of the Question of Reasonably Equivalent
Value of the Tax Distributions on this Summary Judgment Record.................... 10

  B.    F2's Tax Distributions Were For Reasonably Equivalent Value .......................... 11

    1.    The Trustee has the Burden to Prove the Tax Distributions Were
Made for Less than Reasonably Equivalent Value..................................... 11

    2.    Courts With Facts Similar to F2 Have Found Tax Distributions
Were Made For Reasonably Equivalent Value .......................................... 13

    3.    F2's Operating Agreement Obligated the Board of Directors to Make
the Tax Distributions if the Shareholders Incurred Tax Liabilities........... 17

    4.    Other Circuits' Decisions which Fail to Find that Distributions to Unit
Holders to Pay Tax Liability Constitute Reasonably Equivalent Value
Are Distinguishable .................................................................................... 19

V.    CONCLUSION ........................................................................................................ 23

# TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Bixler v. Cent. Pa. Teamsters Health & Welfare Fund,*
    12 F.3d 1292 (3d Cir. 1993) .............................................................. 10

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ......................................................................... 10

*Elf Atochem N. Am., Inc. v. Jaffari,*
    727 A.2d 286 (Del. 1999) .............................................................. 17, 18

*In re Amcad Holdings, LLC,*
    579 B.R. 33 (Bankr. D. Del. 2017) ................................................. 12-13

*In re Apex Automotive Warehouse, L.P.,*
    238 B.R. 758 (Bankr. N.D. Ill. 1999) .................................................. 21

*In re Aphton Corp.,*
    423 B.R. 76 (Bankr. D. Del. 2010) ..................................................... 12

*In re Carrozzella & Richardson,*
    286 B.R. 480 (D. Conn. 2002) ........................................................... 13

*In re CVEO Corp.,*
    327 B.R. 724 (Bankr. D. Del. 2005) ................................................ 10-11

*In re DBSI, Inc.,*
    561 B.R. 97 (D. Idaho 2016) ......................................................... 19, 20

*In re F-Squared Inv. Mgmt, LLC,*
    Case 17-50718-LSS, D.I. 30.............................................................. 1

*In re Gulf Fleet Holdings, Inc.,*
    491 B.R. 747 (Bankr. W.D. La. 2013) ................................................. 13

*In re Kenrob Info. Tech. Sols., Inc.,*
    474 B.R. 799 (E.D. Va. 2012) ...................................................... 15-16, 18

*In re Northlake Foods, Inc.,*
    2011 WL 4005446 (Bankr. M.D. Fla Sept. 9, 2011) ................................ 14

*In re Northlake Foods, Inc.,*
    438 B.R. 247 (M.D. Fla 2012) ....................................................... 14-15

*In re Northlake Foods, Inc.,*
    715 F.3d 1251 (11th Cir. 2012) .................................................... passim

*In re Opus E., LLC,*
    528 B.R. 30 (Bankr. D. Del. 2015) ................................................................ 12

*In re SGK Ventures, LLC,*
    2015 WL 7755525 (Bankr. N.D. Ill. Nov. 30, 2015) ............................... 21, 22

*In re TC Liquidations LLC,*
    463 B.R. 257 (Bankr. E.D.N.Y. 2011) .......................................................... 22

*In re U.S. Wireless Corp., Inc.,*
    384 B.R. 713 (Bankr. D. Del. 2008) .............................................................. 10

*Josey v. John R. Hollingsworth Corp.,*
    996 F.2d 632 (3d Cir. 1993) .......................................................................... 10

*Kline v. First Western Gov't Sec.,*
    24 F.3d 480 (3d Cir. 1994) ............................................................................ 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ....................................................................................... 10

*Mellon Bank, N.A. v. Metro Comm'ns., Inc.,*
    945 F.2d 635 (3d Cir. 1991) .......................................................................... 12

*Off. Cmte. Of Unsecured Creditors of Kaywell, LLC v. New Key Group. LLC,*
    Case No. 13-01411, D.I. 1-8 (Bankr. N.D. Ill. Dec. 17, 2013) .................... 22

*Peltz v. Hatten,*
    279 B.R. 710 (D. Del. 2002) .......................................................................... 12

*Pryor v. Tiffen,*
    Adv. Pro 05-3682-(DTE), D.I. 90 .............................................................. 22-23

*VFB LLC v. Campbell Soup Co.,*
    482 F.3d 624 (3d Cir.2007) ............................................................................ 12

*Williams Co.s, Inc. v. Energy Transfer Equity, L.P.,*
    159 A.3d 264 (Del. 2017) ............................................................................... 17

**STATUTES**

6 Del. Code § 18-101(7) ...................................................................... 17, 18

6 Del. Code § 1303(a) ................................................................................ 12

6 Del. Code § 1304(a)(2) ....................................................................... 11-12

6 Del. Code § 1305 ................................................................................. 11-12

11 U.S.C. § 548 ................................................................................................................11

26 U.S.C. § 11 ..................................................................................................................2

26 U.S.C. § 301 ................................................................................................................2

Mass Gen. Laws Chapter 109A, § 5(a)(2)......................................................................11

Mass Gen. Laws Chapter 109A, § 6................................................................................11

**OTHER AUTHORITIES**

I. R. C. § 1363(a) .............................................................................................................14

Fed. R. Civ. P. 56(c) .......................................................................................................10

Fed. R. Civ. P. 56(e) .......................................................................................................10

## I.    INTRODUCTION

George McClelland ("G. McClelland"), Charles Hart, Geordie McClelland, Graham Hart, Hazel McClelland, Jacquelyn McClelland, Lindsay Hart, McClelland Irrevocable Grantor Trust, Quinn McClelland Hart, Lindsay McClelland and Agnes Carol McClelland (collectively, "the McClelland Defendants") and Ann Aghababian ("Aghababian" and together with the McClelland Defendants the "Defendants") by and through their undersigned counsel, provide and states as follows:

## II.    BRIEF STATEMENT

Defendants were each unit holders of F-Squared Investment Management, LLC ("F2" or the "Company"). In these Adversary Proceedings, the Trustee seeks to avoid and recover seven payments that F2[1] made to each of the Defendants between August 29, 2013, and October 30, 2014, which together total over $6 million. Of the payments, six were designated by the Trustee as "Tax Distributions" on each Exhibit A to the Trustee's Complaints. *See e.g., Craig Jalbert v. Agnes Carol McClelland,* Adv. Pro. 17-50518, D.I. 1-1.[2] F2 paid quarterly distributions to the Defendants to cover the estimated state and federal income taxes they would owe based on the "pass through" to their personal tax returns of F2's estimated quarterly profits. The Tax Distribution payments to the Defendants totaled in excess of $5 million.

---

[1]    There were eight entities that did business under the F2 mantel. They were, along with the last four digits of each Debtor's federal tax identification number: F-Squared Investment Management, LLC (9247), F-Squared Investments, Inc. (0788), F-Squared Retirement Solutions, LLC (9247), F-Squared Alternative Investments, LLC (9247), F-Squared Solutions, LLC (9247), F-Squared Institutional Advisors, LLC (9247), F-Squared Capital, LLC (5257), AlphaSector LLS GP 1, LLC (3342), and Active Index Solutions, LLC (0788). The Debtors' address is 2221 Washington Street, Suite 201, Newton, Massachusetts 02462. In referencing "F2" below we include all of the related entities unless specifically noted otherwise.

[2]    All of the complaints, with the exception of the one against G. McClelland, are in all material respects identical. The G. McClelland Complaint includes an additional count alleging an insider preference claim, that the Trustee has since conceded is without merit. See *In re: F-Squared Investment Management, LLC, et al,* Case 17-50718-LSS, Doc. 30, fnt. 4 (12/22/17). It also differs in that he received two additional payments, one designated as a bonus and the other a units repurchase by the trustee. The two additional payments are not the subject of this Motion.

Defendants move for partial summary judgment on the basis that the Tax Distributions made by F2 to the Defendants were for "reasonably equivalent value." F2's existence as an LLC, which was to the Company's financial advantage, was in fact conditioned on those payments. To be exact, from June 30, 2008, to June 24, 2010, F2 was an Internal Revenue Service C corporation (hereinafter a "C-Corp") when it merged with and converted into an LLC (hereinafter, an "LLC").[3] The conversion was, in part, designed to make the Company more tax efficient. C-Corps are liable to pay tax on their profits at the entity level and if the profits are later distributed as dividends to its shareholders, the profits are taxed a second time. *See* 26 U.S.C. §§11 & 301. An LLC, by contrast, is, at the owner's election, usually taxed as a partnership and so does not pay tax at the entity level.

Prior to its conversion to an LLC, F2's management assured its C-Corp shareholders that the taxes the new members would incur from profits generated by F2 would be covered by cash distributions F2 would pay to each member. Critically, F2's shareholders would not have voted to approve the conversion—despite the conversion's benefits to the Company—if the shareholders believed they would become personally liable for taxes arising from F2's profits without receiving cash to pay those taxes.[4] To document its promise to make the Tax Distributions, and induce F2's shareholders to vote to approve the conversion, management prepared a Limited Liability Operating Company Agreement ("Operating Agreement") memorializing its obligation to make the payments. McClelland Decl., Ex. E, at § 5.1(a).

---

[3]    The C-Corp was merged with and into a newly formed LLC and it was the surviving entity and a new holding company was formed structured as an LLC. The holding company LLC became owned by each of the existing shareholders of the C-Corp in the same percentage amounts and classes as they had held in the C-Corp by way of an agreement and plan of merger pursuant to shareholders stock interests were converted into the right to receive interests in the holding company. See Declaration of George McClelland ("McClelland Decl.") ¶18.

[4]    Each class of shareholders combined were required to approve the conversion by at least a majority vote and the two classes of preferred shares together were required to approve the conversion by a 75% supermajority. *See id.*

3

F2 undertook the commitment to make the Tax Distributions because, without the conversion, it would have had to pay tax as a C-Corp anyway, and by converting to an LLC it was able to more easily manage its retention and investment of its profits.

Simply put, the Tax Distributions were made for reasonably equivalent value because: 1) the agreement to make the Tax Distributions induced wary shareholders to authorize the conversion to an LLC; and 2) having made the promise to pay Tax Distributions, each quarterly distribution satisfied an antecedent debt by fulfilling the contractual obligation of F2 contained in its Operating Agreement.

The Defendants are mindful that their motions to dismiss the Trustee's claims as a matter of law are still pending. Those motions are focused on the Trustee's failure to plead a plausible case for insolvency. Ordinarily, Defendants would await a ruling on the dismissal motions and then move for summary judgment in the event the Court allowed the Trustee to move forward. Here, however, it is evident based on the Trustee's responses to discovery that he has no evidence to contradict the fact that the Tax Distributions were for reasonably equivalent value. Accordingly, in order to help the case to come to a swifter conclusion so that they can move on with their lives unmolested by the threat of the Trustee's claims, the Defendants move for partial summary judgment in the hopes of curtailing the continuing needless expense (both financial and otherwise) that the Trustee is inflicting upon them.

## III.    CONCISE STATEMENT OF FACTS

### 1.    F2's Corporate Structure and Tax Status.

F2 was organized in May 2006 by three individuals, including Defendant George McClelland. McClelland Decl. ¶12. Initially, F2 was organized as an LLC. *Id.*

The Company was established for the purpose of providing management advice to institutional investors with the goal of providing institutional investment results to the retail investor. *Id.* The Company was not established to provide retail advice, or to trade individual securities for individual investors.

In June of 2008, F2 was converted to a C-Corp. The founders adopted this tax structure on the advice of an advisor promising to raise capital from sophisticated investors who insisted on the C-Corp structure to meet their investment expectations. The Company made the change, but the anticipated investment did not materialize. McClelland Decl. ¶ 13.

F2, as with many such startups, spent the first couple of years of its existence seeking its place in the marketplace, raising capital, and marketing its services. These efforts began to translate into a viable business and, by later in 2009, it became increasingly apparent that the Company's growth would soon make it profitable. McClelland Decl. ¶14.

With the business on the cusp of turning a profit, the Company's owners, accountants and lawyers turned their consideration to the possible tax savings to F2 and its owners if it converted from a C-Corp to an LLC or some other entity form that avoided duplicate taxation of profits. McClelland Decl. ¶15.

The analysis of the tax savings to the Company and its owners if its tax structure was other than a C-Corp was clear. In a letter dated June 16, 2010, to the other investors, the F2 leadership group explained:

5

> Our current structure, as a C Corporation, requires a tax at the corporate level on pre-tax profit followed by an individual tax on distributed dividends. We do not know how high the rate of either tax will go in the future, but it is fair to say, corporate taxes appear likely to increase to 39.6% with dividend taxes going to your ordinary income tax bracket.
>
> Thus, the dollar of pre-tax income would become 60 cents after Federal corporate taxation at the company level and 36 cents at the personal level when distributed dividends to the shareholders. Roughly a 64% tax cost for any profits distributed to the owners.
>
> An LLC is treated as a partnership "flow through" entity for Federal income tax purposes and therefore an LLC eliminates the corporate level income tax, thus improving the potential after tax return of a dollar of distributed earnings to 60 cents for an LLC, versus 36 cents when generated and distributed by a C Corporation.

McClelland Decl., Ex. D. It is plain from this analysis that if F2 adopted a pass through entity form then it would be able to use the money saved on taxes for other purposes such as fortifying and/or expanding its business operations. McClelland Decl. ¶16.

The downside of converting F2 to an LLC, from the perspective of the then-stockholders of F2, was that as members of an LLC, they would individually be responsible to pay taxes arising from F2's profits passed through to each member for what otherwise would have been a corporate tax owed by F2. In other words, the investors would be liable to pay the tax on F2 profits without having the cash to do so because those profits would remain with F2 unless distributed by F2. McClelland Decl. ¶17.

Although there were a total of 57 shareholders in the Company's three classes of stock, the majority of the shareholders held very small percentages of the Company: only three shareholders of common stock and only four shareholders of the two preferred classes held more than 10% of the total shares in each class. McClelland Decl. ¶21.

Members of management understood that all the investors would expect the Company to distribute to them the cash necessary to pay the tax that resulted from the Company's profits and

some of the investors with the largest holdings expressed deep reservations about the risk that the Company would not do this. McClelland Decl. ¶¶22-24.

To convince them that the risk was minimal, George McClelland, along with other members of management, assured the shareholders that if the conversion was adopted the Company would distribute to each member the funds necessary to pay the tax generated by F2's profits. *Id.* Mr. McClelland spoke with many of the shareholders directly. McClelland Decl. ¶19. In addition, Howard Present, George McClelland and Steve Ricci (the Chair of the Board) wrote a letter to shareholders that stated "there likely will be a tax liability 'passed through' to all investors....[but to] offset this, the LLC holding company currently intends to make cash distributions to all investors equal to the maximum federal tax rate plus an amount equivalent to most state tax rates, applied to the federal taxable income allocated to them by the LLC holding company." McClelland Decl. ¶ 23.

Management also documented that undertaking in the proposed Operating Agreement. McClelland Decl. ¶24. Specifically, the Operating Agreement states:

> 5.1 (a) Tax Distributions. The Members shall be entitled to receive distributions from the Company only at the following times:
>
> (1) With respect to any taxable year prior to the year in which the Company liquidates or sells all or substantially all of its assets, the Company will use reasonable efforts to distribute to each Member on an annual basis, and, in the discretion of the Management Board, quarterly, an amount of cash (calculated in accordance with the terms of this section 5.1 (a)) that is sufficient to cause each Member to have received under this Section 5.1 (a) with respect to such year aggregate distributions equal to the product of the Tax Rate multiplied by the federal taxable income allocated to such Member for such year (such distribution the "tax distributions") . . .

*See* McClelland Decl., Ex. E.

Since it would be unlikely that tax liability would pass through to the unit holders unless there were funds on hand to make the Tax Distributions, F2's undertaking in the LLC Operating

7

Agreement to use reasonable efforts to distribute funds to the unit holders to cover the pass-through tax liability was sufficient to win the shareholders' narrow approval of the conversion. McClelland Decl. ¶25.

The conversion from a C-Corp to an LLC was completed effective June 24, 2010. McClelland Decl. ¶24. The Operating Agreement was approved as of June 24, 2010. *See* McClelland Decl., Ex. E.

F2 would not have received the votes necessary to authorize the conversion under Delaware law had the Company failed to agree to make the Tax Distributions as specified in the Operating Agreement. Each of the then C-Corp's classes of stock voting together needed to vote by a majority to authorize the conversion; each class of convertible preferred stock voting separately would need to approve the conversion by a majority; and each class of preferred convertible shares together would need to vote by a super majority of 75% to authorize the merger. McClelland Decl. ¶18. F2 was a start-up, and so investors understood they were putting their entire investment at risk. Asking investors to also shoulder the risk that they would be saddled with a tax liability without cash to pay it would have been untenable. McClelland Decl. ¶27.

When the Company became profitable, the board authorized the Company's CFO, Deborah Deskavich, to distribute to F2 unit holders amounts necessary to pay the taxes that would flow through to them based on the Company's profits. Ms. Deskavich sent checks to each investor, along with a letter explaining the distribution. McClelland Decl. ¶¶28, 29.

The letters evolved so that by 2014, they memorialized the more or less exact basis upon which the distributions were calculated. For example, the second quarter tax distribution for 2014, conveyed by letter dated June 6, 2014, recounted that:

> [T]his distribution is based on 110% of the 2013 tax liability divided by one-fourth.
> The total tax rate used in this calculation was 51.65% representing the 2013

8

maximum federal tax rate of 39.60%, state of Massachusetts rate of 5.25%, additional state rate of 3%, and net investment income tax of 3.80%. To calculate the amount of this distribution for federal and state, weight the payment 84% for federal, 10.20% for state of Massachusetts and 5.80% for other states, if applicable.

The additional 3% state tax distribution is a result of F-Squared's understanding that we have investors who live outside of Massachusetts and as a result have higher state tax.

McClelland Decl., Ex. G. In other words, the amounts distributed were tied to the amount of tax passed through to the unit holders.

F2 did not make Tax Distributions when its business operations produced no taxable income. For example, in the latter part of tax year 2014, when F2 had no taxable profit because it deducted the $30 million disgorgement penalty paid to the Securities and Exchange Commission ("SEC"), it made no distribution. By letter dated June 15, 2015, to the F2 unit holders, management declared that F2 would make "no additional tax distribution payment . . . for 2014," explaining "the Company has met the tax liability of its unitholders with tax distributions remitted during the year. In fact, the Company over distributed approximately $0.04 per unit, which will be reclassified as a profit distribution." McClelland Decl., Ex. H.

Notably, F2 characterized amounts distributed in excess of the unit holders' pass through tax liability as profit distribution. In January of 2013 and 2014, during the same years it was distributing sufficient funds to the unit holder to enable them to pay the pass through tax liability, F2 was also making separate profits distributions.[5] McClelland Decl. ¶32.

---

[5]    This motion does not seek summary judgment as to the actual profit distribution. While other grounds exist to contest the Trustee's attempt to recover that distribution—primarily the fact the company was solvent—the motion does not argue that "reasonably equivalent value" was exchanged for the profit distribution.

9

## IV.    ARGUMENT

### A.    The Court Can Properly Dispose of the Question of Reasonably Equivalent Value of the Tax Distributions on this Summary Judgment Record.

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993); *In re U.S. Wireless Corp., Inc.*, 384 B.R. 713, 717 (Bankr. D. Del. 2008). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citations omitted).

When considering a motion for summary judgment, the court must view the evidence in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1297 (3d Cir. 1993). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323; *In re CVEO Corp.*, 327 B.R. 724, 727 (Bankr. D. Del. 2005). Once this burden is met, the non-moving party must demonstrate specific facts that indicate a genuine material issue for trial. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324. In particular, the non-moving party must be able to produce evidence that, "when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *Kline v. First Western Gov't Sec.*, 24 F.3d 480, 485 (3d Cir. 1994); *see also In re CVEO Corp.*, 327 B.R. at 727 ("A party may not defeat a motion for summary judgment unless

10

it sets forth specific facts, in a form that 'would be admissible in evidence,' establishing the existence of a genuine issue of material fact for trial.") (citation omitted).

Here, the sole admissible evidence establishes that: 1) the vote to convert would not have succeeded absent the Company's representation it would distribute funds sufficient to pay the pass through tax; 2) the LLC agreement, in the undisputed circumstances of this case, created a liability on F2's part to pay the Tax Distributions—a liability that was extinguished once those Tax Distributions were made; 3) F2 made, and the unit holders received, the Tax Distributions in good faith; and, 4) the general unsecured creditors would have been in roughly the same position had the Company remained as a C-Corp paying taxes as it was with F2 providing the unit holders the means to pay the tax on F2's profit.[6]

### B.    F2's Tax Distributions Were For Reasonably Equivalent Value

### 1.    The Trustee has the Burden to Prove the Tax Distributions Were Made for Less than Reasonably Equivalent Value.

The Trustee seeks to avoid F2's Tax Distributions to the Defendants on the grounds those payments were constructively fraudulent transfers within the meaning of the Bankruptcy Code (11 U.S.C. § 548) and the Delaware Uniform Fraudulent Transfer Act or the Massachusetts Fraudulent Transfer Act.[7] To make out a claim under any of these statutes, the Trustee must prove F2 received less than reasonably equivalent value for the Tax Distributions. If he cannot do so, the Trustee's action fails. *See* 11 U.S.C. § 548(a)(1)(B)(i); Mass. Gen. Laws ch. 109A, §§5(a)(2), 6.; 6 Del. Code

---

[6]    Indeed, were the Trustee to succeed in recovering the Tax Distributions, then the unit holders would have both lost their investment in F2 and personally paid the company's taxes that would otherwise have been paid from operating income, a situation that would severely penalize those investors for their investment—the exact opposite of what they were promised would happen if they agreed to the conversion of F2 from its C-Corp status.

[7]    There is no allegation in the complaints that the Tax Distributions constitute intentionally fraudulent transfers. In addition, as noted above, F2 was careful to distinguish between tax and profits distributions, for instance re-characterizing the fourth quarter of 2014 Tax Distribution as a profit distribution when the facts required it. In short, there is, and can be, no contention that F2 and its unit holders acted other than in good faith in, respectively, paying and receiving the Tax Distributions.

IMPAC 5972132v.2

§§1304(a)(2), 1305.

"The burden of proof is on the Trustee to establish that less than reasonably equivalent value was received by the Debtor for the allegedly fraudulent transfers." *In re Opus E., LLC*, 528 B.R. 30, 83 (Bankr. D. Del. 2015), *aff'd sub nom.*, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom.*, 698 F. App'x 711 (3d Cir. 2017). The Bankruptcy Code does not define the term "reasonably equivalent value." However, the Third Circuit has noted that a party receives reasonably equivalent value if the consideration received approximates the value it gave. *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991).

"The term 'reasonably equivalent value' is not defined in the Bankruptcy Code, however, the Third Circuit has noted that 'a party receives reasonably equivalent value for what it gives up if it gets "roughly the value it gave."'" *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007). To determine reasonably equivalent value, the Third Circuit requires a "totality of the circumstances" analysis, taking into account "the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arms-length." *Peltz v. Hatten*, 279 B.R. 710, 736-37 (D. Del. 2002) (citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 148 (3d Cir. 1996)). When making this analysis, there is no requirement of mathematical equivalence of what is paid and received by the company, only a requirement of "reasonableness." *In re Aphton Corp.*, 423 B.R. 76, 89 (Bankr. D. Del. 2010).

Satisfying an antecedent contractual obligation of the company is a classic example of a reasonably equivalent value. *See* 6 Del. Code § 1303(a) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation . . . an antecedent debt is secured or satisfied . . ."); *see also In re Amcad Holdings, LLC*, 579 B.R. 33, 41 (Bankr. D. Del. 2017)

("A transfer made by a Debtor to reimburse a party for a pre-existing obligation, without further explanation, does not show a lack of reasonably equivalent value."); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 766 (Bankr. W.D. La. 2013) (finding that payments imposed by pre-existing professional and consulting services agreements with majority shareholder were for reasonably equivalent value because they constituted an antecedent debt); *In re Carrozzella & Richardson*, 286 B.R. 480, 491 (D. Conn. 2002) ("In exchange for the interest paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a contractual debt. This satisfaction of an antecedent debt is 'value,' . . . and in this case 'reasonably equivalent value.' To the extent that these Defendants had not been paid the interest owed, they would have been creditors of the Debtor's bankruptcy estate, asserting claims for unpaid interest.") (analyzing identical Connecticut statute).

**2.      Courts With Facts Similar to F2 Have Found Tax Distributions Were Made For Reasonably Equivalent Value**

Few courts have considered whether cash distribution made for taxes due by a shareholder of an "S" corporation or member of an LLC arising from the entity's profits are made for reasonably equivalent value. In the cases with facts most similar to F2, the courts have found that such distributions were indeed made for reasonably equivalent value.

In *In re Northlake Foods, Inc.*, 715 F.3d 1251 (11th Cir. 2012) the Eleventh Circuit considered whether cash distribution made to the owner of Waffle House restaurants to cover taxes generated by income passed through to his tax return were avoidable as constructively fraudulent transfers. The distributions were made pursuant per the terms of Northlake's shareholder agreement, which specified:

> If the Corporation's income ever becomes taxable to the Shareholders, rather than to the Corporation, the Corporation shall pay a dividend at least annually in an amount and at a time sufficient for each shareholder to pay out of the dividend all

13

> income tax, state and federal, attributable to the portion of the Corporation's income
> included in such Shareholder's income in the year preceding the year of payment
> of the dividend.

*Id.* at 1253. This provision was included in the shareholder agreement at the company's start when

it was classified as a C-Corp in the early 1990s. *Id.* In 2005, Northlake elected tax treatment as

an S-corporation. *Id.* An S-corporation, like an LLC, does not pay tax at the entity level, but

instead the company's tax attributes flow through the entity to the shareholders' tax returns. *See*

I. R. C. § 1363(a). Subsequent to the conversion, Northlake's Board of Directors authorized the

payment of a cash dividend to the company's chief executive officer in the approximate amount

of the tax he would be required to pay on the Waffle House income. *Northlake*, 715 F.3d at 1253-

54. Later, the company incurred financial challenges and filed for bankruptcy. *Id.* at 1254. After

plan confirmation, the distribution trustee brought an action seeking to avoid the tax distributions

as fraudulent transfers. *Id.*

The *Northlake* Bankruptcy Court dismissed the trustee's fraudulent conveyance Complaint

ruling that, on the face of it, the company received reasonably equivalent value when it satisfied

its obligation to cover the CEO's flow through tax obligations. *Id.* In particular, the court

concluded that the debtor's distribution, "satisfied an antecedent debt owed to the [CEO]

pursuant to the Shareholder's Agreement." *See In re Northlake Foods, Inc.*, 2011 WL 4005446, at

\*1 (Bankr. M.D. Fla. Sept. 9, 2011).

The trustee appealed and the District Court affirmed. *See In re Northlake Foods, Inc.*, 438

B.R. 247 (M.D. Fla. 2012). The trustee appealed again and the Eleventh Circuit Court of Appeals

affirmed, noting:

> The purpose of voiding transfers unsupported by reasonably equivalent value is to
> protect creditors against the depletion of a bankrupt's estate. Therefore, this
> provision does not authorize the voiding a transfer which confers an economic
> benefit upon the debtor. Where an economic benefit is present, "the debtor's net

14

worth has been preserved, and the interests of the creditors will not have been injured by the transfer.
\*\*\*
In exchange for taking on this tax liability, the Shareholders Agreement obligated Northlake to reimburse [the Waffle House CEO] for the personal income tax liability he incurred that was attributable to the tax liability of Northlake. This agreement benefitted Northlake because it secured shareholder consent for Northlake to shift to S-corporation status whenever it determined it was advantageous to do so. Not only did the Shareholders Agreement grant Northlake greater flexibility to shift its tax status, when it did decide to shift status, Northlake enjoyed the added benefit of freeing up cash that otherwise would have been dedicated to paying Northlake's tax liability. Though Northlake incurred a financial obligation to its shareholders under the agreement, it did not need to satisfy that obligation until a year after the shareholders had incurred Northlake's tax liability. This had the effect of providing Northlake with another valuable benefit: time.

*Northlake*, 715 F.3d at 1255-56 (citations omitted).

As here, the Waffle House CEO's agreement to invest in a company that could convert to a pass through tax entity was predicated on the company's promise to distribute to him sufficient funds to pay the tax in the event of such a conversion. This "agreement," the Bankruptcy Court, District Court and Eleventh Circuit all found, was to the company's advantage since it allowed it to avoid duplicate taxation, and thereby facilitated the company's retention of capital. *Id.* at 1256. Because "reasonably equivalent value" does not require a "dollar-for-dollar transaction," *id.* at 1257, and because the benefit to the company in being able to transfer its tax liability to its shareholders was plain, the Eleventh Circuit upheld the lower courts' findings of reasonable equivalence. *Id.* at 1256-57. This ruling was further fortified by the conclusion that the company's creditors were no worse off for making a distribution to pay the CEO's tax because it would have had to pay anyway if it remained as a C-Corp. *See id.* at 1256 ("The concept of reasonably equivalent value does not require a dollar-for-dollar transaction."); *see also Northlake*, 438 B.R. at 253.

On similar facts, the court in *In re Kenrob Information Technology Solutions, Inc.*, 474 B.R. 799 (E.D. Va. 2012), also concluded tax distributions were made for reasonably equivalent

15

value. *Id.* The dispute in the *Kenrob* case was between the trustee who sought to recover the tax payments made directly to the IRS to cover the shareholders' pass through liability and the company that sought to uphold those payments as having been made for reasonably equivalent value. *Id.* at 801. Although the shareholders in *Kenrob* were unable to produce any written documentation, the court found based on their testimony that there was an agreement to make tax distributions, that the shareholders and the corporation acted in accordance with that agreement over a number of years, and the shareholders would not have allowed the company to elect S-corporation status (or continued as investors of an S-corporation) absent the Tax Distributions. *Id.* at 802. Considering these facts, the bankruptcy court denied the trustee's motion for summary judgment and granted the IRS's. Similar to *Northlake*, the court reasoned that the tax company would have paid the tax anyway had it been a C-Corp, and, consequently the company's creditors were no worse off, making it improper to label the transaction as "fraudulent." *Id.*

F2's Tax Distributions to the Defendants were similarly made for reasonably equivalent value and, as a result, the Trustee cannot meet its burden to avoid these transactions. The Company only undertook the obligation to pay the Tax Distributions after analyzing the financial impact and advantages to F2. Likewise, the C-Corp shareholders who were asked to approve the conversion and become unit holders only agreed after F2's management assured them that post conversion, the Company would make distributions adequate to meet the tax liability each would incur, and then memorialized that agreement in the Operating Agreement. The Operating Agreement contractually commits the Company to use "reasonable efforts to distribute" at least annually—or in the discretion of the management quarterly—an amount of cash intended to pay each member's tax liability arising from the profits generated by F2.

IMPAC 5972132v.2

3.    **F2's Operating Agreement Obligated the Board of Directors to Make the Tax Distributions if the Shareholders Incurred Tax Liabilities.**

The Trustee may attempt to distinguish the holding in *Northlake* by claiming that while Northlake's operating agreement used mandatory language concerning tax distribution, F2's does not. It is true that the Northlake limited liability agreement uses "shall" in reference to the tax distributions and F2's agreement only specifies that the Company "will use reasonable efforts to distribute" the funds necessary to pay the flow through tax. While the difference at first blush may appear material, it is not.

Under Delaware law, an operating agreement is binding on an LLC. *See* 6 Del. Code § 18-101(7) ("A limited liability company is bound by its limited liability company agreement whether or not the limited liability company executes the limited liability company agreement."); *see also Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 287 (Del. 1999) (holding that an operating agreement "is binding on the LLC as well as the members."). F2 was thereby statutorily and contractually bound by the terms of the Operating Agreement.

Section 5.1 of the F2 Operating Agreement does not provide and did not grant the Company's Management Board with unfettered discretion whether to make a Tax Distribution. Instead, it placed upon the Board an affirmative obligation to make "reasonable efforts" to make Tax Distributions at least annually and also granted the Management Board the discretion to make the distributions quarterly if it chose to do so. The term "reasonable efforts" is not specifically defined in the Operating Agreement. However, in analogous circumstances, the Delaware Supreme Court concluded the term "reasonable efforts" requires more than just a nod of the head to satisfy the duty imposed. In *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 273 (Del. 2017), the court construed the meaning of the terms "commercially reasonable efforts" and "reasonable best efforts" in connection with the duty to take actions to satisfy the

IMPAC 5972132v.2

conditions of a merger agreement and ruled that those duties impose, as to each, an obligation to take all reasonable steps to solve problems that arise and consummate a transaction. Applied here, "reasonable efforts" to make tax distributions must be read to mean that if there is cash available the Tax Distributions must be made.

Of course, the reasonable expectation of F2 and its unit holders was that if a tax was generated, the Company would be, by definition, profitable, and under ordinary business conditions cash for tax distributions should be available.[8] Pertinent here, F2's affirmative obligation to exercise reasonable efforts created a right enforceable by the F2 unit holders. *Cf.* 6 Del. Code § 18-101(7); *Elf Atochem*, 727 A.2d at 287. F2's fulfillment of the unit holders' enforceable right by making a Tax Distribution therefore constituted the exchange of reasonable value—it satisfied an antecedent debt as the bankruptcy court found in *Northlake* and *Kenrob*.

As was true in *Kenrob* and *Northlake*: 1) the Tax Distributions promised were made to induce the then-shareholders to approve the conversion of F2 to an LLC; 2) the conversion to a pass through entity—an LLC—benefited F2; 3) had the shareholders not approved the conversion F2 would have had to pay tax on its profits at the entity level anyway; and 4) the Tax Distributions paid, in fact, fulfilled a contractual obligation contained in the Operating Agreement which required F2 to "use reasonable efforts to distribute" sufficient funds to enable the unit holders to pay the flow through tax where those funds are available. The *Kenrob* and *Northlake* courts' considerations honor the purpose behind the Trustee's power to set aside distributions made to the disadvantage of creditors. In fact, absent this careful weighing of the facts, the Trustee's power to

---

[8] Obviously, events out of the ordinary course, like unanticipated litigation leading to an order freezing assets or an uninsured catastrophic might arise. In such circumstances, even using reasonable efforts to solve the problem, management might not be able to make Tax Distributions.

avoid transfers would likely favor trade and other general creditors over parties having specific contractual obligations from the debtor.

### 4. Other Circuits' Decisions which Fail to find that Distributions to Unit Holders to Pay Tax Liability Constitute Reasonably Equivalent Value are Distinguishable.

It is true that other courts have failed to find tax distributions constitute reasonably equivalent value. However, each of these decisions dealt with fact patterns that are materially distinguishable from that before this Court. The United States District Court for the District of Idaho in *In re DBSI, Inc.* considered whether a $14 million payment to the IRS on behalf of its owner/member was for reasonably equivalent value. 561 B.R. 97 (D. Idaho 2016), *rev'd in part*, 697 F. App'x 493 (9th Cir. 2017). The dispute in *DBSI* was between the IRS, which wanted to retain the taxes paid on behalf of the felonious owner/member, and the Trustee, who wanted to recover those tax payments for the benefit of the parties the owner/member had defrauded. *Id.* at 99-100. The IRS admitted that all of the tax payments had been made by DBSI "with the actual intent to hinder, delay, and/or defraud present or future creditors of [the debtor]." *Id.* at 99. In addition, "[the debtor] was never taxed as a C corporation, and at no time was [the debtor] subject to federal income tax at the entity level." *Id.* at 99-100.

The *DBSI* court began its analysis of whether the $14 million tax payment was for reasonably equivalent value by acknowledging that the parties had agreed that the test was whether the unsecured creditors were "better or worse off after the transaction." *Id.* at 100. In answering this question, the IRS argued that the debtor would have paid $20 million in taxes on its declared income as a C-Corp, whereas as an S-corporation it paid only $17 million. *Id.* The $3 million difference, according to the IRS's theory, constituted a savings to the debtor entity making the debtor's creditors "better off" as a consequence. *Id.*

19

The court disagreed. *Id.* It reasoned that since the S-corporation was at no time subject to taxation at the entity level, there could be no "savings" to it in distributing the tax to the owner/member because the owner/member had been liable for the tax from the inception. *Id.* at 100-101. Critical here, the *DBSI* court noted that the cases cited by the IRS involved companies that had gained a tax advantage by electing to change their status from one taxable at the entity level to one where the tax was passed through to the owner/member/shareholder. *Id.* Accordingly, given that DBSI was never taxed at the entity level, there was not, in the Idaho court's view, any benefit to the company of distributing funds to its owner/member to pay a pass-through tax. *Id.* In addition, the court found that the argument that the entity could have chosen a taxable entity status, such that its election to avoid that potential tax by adopting a pass-through status, was "speculative and meaningless." *Id.* at 101. Further, the court pointed out that since the $14 million had been "'made by [the Debtor] with the actual intent to hinder, delay, and/or defraud present or future creditors of [the Debtor]' the transaction could not possibly leave the unsecured creditors better off than had the taxes been paid based on a different legal status." *Id.*

Unlike the company in *DBSI*, F2 converted from a company taxed at the entity level to one that passed its taxable income through to the unit holders. Likewise, the Trustee cannot even remotely claim that F2 intended to defraud its creditors in making the Tax Distributions. Indeed, F2's Tax Distributions were made only when the Company was generating substantial profits, meaning both that the Company would have had to pay at least as much in tax had it continued as a C-Corp, and that the Company's creditors were at least no worse off because F2 structured its business as an LLC. In fact, the retention of cash allowed the Company to grow without selling more stock.

IMPAC 5972132v.2

Two cases from the Bankruptcy Court for the Northern District of Illinois also failed to conclude that the tax distributions in those cases were for reasonably equivalent value. In the first, *In re Apex Automotive Warehouse, L.P.*, the debtor's owner caused the debtor to pay him $96,038.12, labeled as reimbursement for income taxes the owner had paid that were attributable to pass through income from the debtor. 238 B.R. 758, 766 (Bankr. ND Ill. 1999). The action involved a multi-count complaint involving a number of claims against the owner. *Id.* at 762. Further, the tax distributions were made at a time the company was very tight on cash, had difficulty making payroll, and was holding over $1 million in vendor checks. *Id.* at 766. Stating that the first step to determine whether there is reasonably equivalent value requires a palpable benefit to the debtor, the court concluded a tax distribution did not meet that test. *Id.* at 773. The extent of the court's analysis was to say that "the [debtor] gained no palpable benefit from the transaction. Only [the owner] received benefits." *Id.* at 773. Among other distinctions, F2 was thriving at the time Tax Distributions were made, whereas any reasonable manager would have recognized Apex was facing significant financial problems.

In the second case, *In re SGK Ventures, LLC*, the court, as in *Apex,* reasoned that the tax payments at issue could not have been for reasonably equivalent value because they were for the individual owner's tax liabilities, not a corporate tax liability. 521 B.R. 842, 859 (Bankr. N.D. Ill. 2014). Again, that was the extent of the court's analysis. The Court rejected the defendants' assertion that because the LLC was contractually obligated to pay the tax, value was present. *Id.* Notably, however, the court also found the assertion that any contractual obligation was present was factually incorrect. *Id.* The court held that even if the company derived a benefit from a commitment to pay their taxes, the SGK operating agreement made it clear that payments were made in the absolute discretion of SGK's management; there was no legal obligation to do so. *Id.*

21

Unlike the F2 Operating Agreement, the SGK operating agreement contained no obligation to make distributions for tax liabilities. It permitted a cash distribution to pay tax, but left it to the Manager to decide whether or not to do so. Specifically, the operating agreement provided:

> In any Fiscal Year in which the Manager, in its sole discretion, determines that distributions of Available Cash are necessary to assist Members in payment of taxes resulting from the ownership of Shares, the Manager shall distribute to Members such amounts of Available Cash as it deems necessary, in its sole judgment.

*See Off. Cmte. of Unsecured Creditors of Keywell, LLC v. New Key Group, LLC,* Case No. 13-01411, D.I. 1-8, at 19 (Bankr. N.D. Ill. Dec. 17, 2013).

The recipients did not appeal this ruling because the court later ruled after trial that at the time of the tax payments the company was not insolvent, thereby vitiating the trustee's claims of fraudulent conveyance with regard to the tax payments. *In re SGK Ventures, LLC,* 2015 WL 7755525, at *9 (Bankr. N.D. Ill. Nov. 30, 2015), *aff'd in part, rev'd in part,* 2017 WL 2683686 (N.D. Ill. June 20, 2017).

In a third case, out of the Eastern District of New York, the bankruptcy court also summarily concluded that since the debt was that of the owner, not the company, it amounted to a fraudulent conveyance for the company to pay it when it was insolvent. *See In re TC Liquidations LLC,* 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011). The court undertook no analysis of whether there was an advantage to the company to have adopted an entity structure that allowed it to pass through its tax liabilities to its owners, whether the obligation to make Tax Distributions was compulsory or whether the company's unsecured creditors were any worse off because of the payments—and with good reason. From pleadings filed in the case as well as a review of the decision, it does not appear that the company had a legal obligation to make the payments. Instead, defendants argued that the distribution made to the members was "to pay certain tax authorities to pay tax obligation *of the Company* incurred in the Defendants' names . . ." *See Pryor v. Tiffen,*

Adv. Pro. 05-8682-(DTE), D.I. 90, "Proposed Findings of Fact and Conclusions of Law," ¶50 (Bankr. E.D.N.Y. Apr. 8, 2010) (emphasis in original).  In essence, the only argument made was that the taxes paid were the Company's, not the members' taxes, which the court appropriately rejected.

## V.  CONCLUSION

F2's Tax Distributions to the Unit Holders were calculated to cover the tax liability associated with the Company's income.  As a *quid pro quo* for voting for the conversion to an LLC and thereby accepting the Company's tax liability as part of their continued investment, the unit holders were assured the Company would distribute to them the means to pay the tax from the profit that generated the tax.  Now, if the Trustee had his way, those unfortunate enough to have invested in F2 will lose not only their entire investment, but will be made to pay the tax due on the Company's income for 2013 and 2014—two years in which the Company generated large profits.  The four courts that have concluded that this result is appropriate did so on facts very different than those before the court.  In each case there was no contractual obligation by the debtor to make the distributions so for each the decision was easy to reach.  Here, a promise was extended and, in reliance thereon, the conversion from a C-Corp to an LLC was made.  Courts facing facts more like those before this Court have found reasonably equivalent value was given, and rejected a claim that the transfer constitutes a fraudulent conveyance.

For the forgoing reasons, the Court should grant the Defendants' Motion for Summary Judgement and dismiss with prejudice the Trustee's claims that the Tax Distributions are recoverable as fraudulent transfers.

IMPAC 5972132v.2

Dated: October 23, 2018
         Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ R. Stephen McNeill*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: jryan@potteranderson.com
       rmcneill@potteranderson.com
       rslaugh@potterandercon.com

-and-

Joseph A. Foster
**MCLANE MIDDLETON, PROFESSIONAL
ASSOCIATION**
900 Elm Street, P.O. Box 326
Manchester, NH 03105-0326
Telephone: (603) 628-1175
Facsimile: (603) 625-5650
Email: joseph.foster@mclane.com

*Counsel for George McClelland, Charles Hart,
Geordie McClelland, Graham Hart, Hazel
McClelland, Jacquelyn McClelland, Lindsay Hart,
McClelland Irrevocable Grantor Trust, Quinn
McClelland Hart, Lindsay McClelland, Agnes
Carol McClelland and Ann Aghababian*

24