# Exhibit 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| F-SQUARED INVESTMENT MANAGEMENT, LLC, *et al.*,[1] | Case No. 15-11469 (LSS) |
| Debtors. | |
| Craig Jalbert, in his Capacity as Trustee for F2 Liquidating Trust, | |
| Plaintiff, | Adv. Pro. No. 17-50758 (LSS) |
| v. | |
| George McClelland, | |
| Defendant. | |

## [PROPOSED] AMENDED COMPLAINT

Plaintiff Craig Jalbert ("Plaintiff"), as trustee of the F2 Liquidating Trust (the "Liquidating Trust") of the estates of F-Squared Investment Management LLC and its subsidiaries (collectively, "F-Squared" or the "Debtors"), by and through undersigned counsel, files this complaint (the "Complaint") against George McClelland (the "Defendant"), and alleges as follows:

## INTRODUCTION AND NATURE OF THE ACTION

1.      F-Squared was an investment management company with a single significant

---

[1]    The Debtor in these cases, along with the last four digits of its federal tax identification number, is:  F-Squared Investment Management, LLC (9247).  The Debtor's address is Verdolino & Lowey, P.C., 124 Washington Street, Suite 101, Foxboro, Massachusetts 02035, Attn: Craig R. Jalbert.

{00026593. }

revenue-generating product that it began marketing in 2008.  As F-Squared admitted, and as found after the trial of F-Squared's CEO in the United States District Court for the District of Massachusetts, F-Squared's marketing of that product was fraudulent from the outset of that marketing in 2008 through 2013.  As F-Squared further admitted, and as also found after trial, F-Squared willfully violated the securities laws when it fraudulently marketed its product.

2.      Even though F-Squared knew that it was committing fraud at the times of the Transfers (defined below) that are the subject of this Complaint, it failed to account for the impact of this fraud on its income statements and balance sheets.

3.      With respect to F-Squared's liabilities, in addition to F-Squared's (undervalued) liabilities on its balance sheets, F-Squared's admitted fraud resulted in at least the following liabilities, none of which appeared on F-Squared's balance sheets:

- Liability to the United States government, including to the Securities and Exchange Commission (the "SEC"), for certain civil and criminal statutory penalties as of the dates of the fraud, as well as exposure to forfeiture of *all* revenue derived from, or traceable to, the willful conduct that violated the securities laws, amounting to at least $50.2 million in 2012, $132.7 million in 2013, and $263.5 million in 2014;

- Indemnification liability to F-Squared's Financial Clients (defined below) who were investigated and sanctioned by the SEC and sued by their own clients, and contractual liability to the Financial Clients for breach of the model manager agreements governing these relationships: $12.5 million in 2012, $33.2 million in 2013, $65.9 million in 2014; and

- Liability under Massachusetts state law for unfair and deceptive trade practices: at least double, up to treble actual damages suffered by F-Squared's Financial Clients.

4.      Nor did F-Squared's balance sheets properly account for the impact of F-Squared's fraud on its (overvalued) assets, as follows:

- F-Squared overvalued its property and equipment by $251,742 in 2012, $1.6 million in 2013, $1.9 million in 2014;

- F-Squared improperly booked deferred income tax assets of $1.9 million in 2012, $3.1 million in 2013, and $5 million in 2014;

- F-Squared overvalued its customer contracts by $12.3 million in 2013 and $10.2 million in 2014;

- F-Squared should have discounted, but did not discount, its accounts receivable by $1.6 million in 2012, $3.9 million in 2013, $2.6 million in 2014.

5.      After adjusting F-Squared's balance sheets for the financial effects of its fraud throughout the duration such fraud was committed, F-Squared was balance-sheet insolvent by at least $50 million in 2012, $142 million in 2013, and $277 million in 2014.

6.      The SEC commenced an investigation into F-Squared in 2013, and commenced and settled an administrative proceeding against F-Squared on December 22, 2014 in which F-Squared admitted to the fraud.  During and after the SEC's investigation, F-Squared lost nearly all of its clients (which F-Squared knew or should have known was inevitable, given its fraud), and was therefore unable to pay its debts as they came due as of the date of the settlement.

7.      Plaintiff has commenced this adversary proceeding to avoid and recover from Defendant or any other person or entity for whose benefit Transfers (later defined) were made pursuant to sections 544, 548 and 550 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and any Transfers that were fraudulent conveyances under federal and/or state law.  As described further below, the Transfers were all made to Defendant while the Debtors were insolvent and for which the Debtors did not receive reasonably equivalent (or any) value and are in the form of (i) tax distributions paid to Defendant to cover the cost of Defendant's personal income taxes related to Defendant's equity interest in F-Squared and/or profit interests paid to Defendant on account of Defendant's equity interest in the Debtors (the "Dividends") and (ii) a cash repurchase of stock initially purchased by the Defendant while the Debtors were insolvent and the stock was worthless (such repurchase, together with the Dividends, the "Transfers").  All such Transfers and each transferring Debtor are identified in **Exhibit A** hereto.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157(a) and 1334(a), Article 10.5 of the *Joint Plan of Liquidation Under Chapter 11 of the*

*Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors*

(the "Plan") [D.I 478], and the *Order Confirming Joint Plan of Liquidation Under Chapter 11 of*

*the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured*

*Creditors* (the "Confirmation Order") [D.I. 486].  This adversary proceeding is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2).

9.     Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C.

§ 1409(a).

10.    The statutory and legal predicates for the relief requested by the Complaint are

sections 544, 548, and 550 of the Bankruptcy Code and Rules 3007 and 7001 of the Federal

Rules of Bankruptcy Procedure.

11.    In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and

Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff hereby

states that it consents to the entry of final orders or judgments by the Court if it is determined

that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent

with Article III of the United States Constitution.

## PARTIES

12.    The Liquidating Trust is a liquidating bankruptcy trust established under the laws

of Delaware pursuant to the Plan and the F-Squared Liquidation Trust Agreement filed as

Exhibit A to the *Notice of Filing of Plan Supplement to Joint Plan of Liquidation Under Chapter*

*11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured*

*Creditors* [D.I. 457].

13.     Defendant George McClelland is a natural person, residing at 12 Reservoir Drive, Southboro, MA, 01772.  Defendant was an employee and a unitholder of F-Squared prior to F-Squared's bankruptcy.  Defendant was a co-founder and Director of Business Development for F-Squared, and was on F-Squared's Board of Managers from 2008 through May 2014.

## BACKGROUND

### A.     *F-Squared's Business Based On Fraud*

14.     In 2006, the Defendant (together with former CEO Howard Present, and Vadim Fishman) created F-Squared as an investment management and research firm.  F-Squared's first foray into investment management was the development of a quantitative-based investment product called AlphaCycle.  Despite years of effort, AlphaCycle failed to generate a profit or even generate meaningful revenue.  Indeed, in the first two years of F-Squared's existence, F-Squared generated less than $200 (two hundred dollars) of revenue from client fees from the use of that product.

15.     In 2008, F-Squared began to market a new product, which it called "AlphaSector," that consisted of a model portfolio of exchange-traded funds ("ETFs") that could be measured and tracked as an index.  F-Squared marketed this new product to various broker-dealers and mutual fund companies (F-Squared's "Financial Clients") who wanted to use the AlphaSector strategy to manage their own clients' assets (these assets became F-Squared's "assets under advisement" or "AUA").  F-Squared conducted business primarily by means of model manager and sub-advisory agreements with these Financial Clients, but also used AlphaSector to manage assets directly for individual customers.  From the time F-Squared began

to market AlphaSector, the sale of AlphaSector signals to its clients and Financial Clients constituted F-Squared's only material business.

16.     F-Squared's agreements with its Financial Clients contained indemnification clauses that required F-Squared to

> indemnify and hold harmless [the Financial Clients] against any and all losses, claims, damages, liabilities or expenses (including reasonable attorneys' fees and amounts paid in settlement . . .) to which such indemnified parties may become subject under any statute, regulation, at common law or otherwise, insofar as such losses, claims, damages, liabilities or expenses arise out of, or as a result of, [F-Squared's] willful misconduct, bad faith, breach of fiduciary duty or gross negligence in the performance of its services or obligations under [such agreements].

17.     F-Squared's services and obligations under these agreements included, among other things, providing information required under the Investment Advisers Act and immediately notifying the Financial Clients of any and all material facts not contained in F-Squared's Form ADV.  F-Squared admitted in the Transfer Order that it willfully misled its Financial Clients and that it willfully failed to include all relevant information on its Form ADV, in violation of Sections 204, 206(1), 206(2), 206(4), and 207 of the Investment Advisers Act of 1940 and Rules 204-2(a)(16), 206(4)-1, 206(4)-7, and 206(4)-8 thereunder, and that it willfully aided and abetted and caused certain mutual funds sub-advised by F-Squared to violate Section 34(b) of the Investment Company Act of 1940.

18.     Beginning with the outset of its use of the AlphaSector Indexes in 2008, F-Squared's marketing of the AlphaSector Indexes was fraudulent.  From October 2008 through September 2013, in multiple press releases, presentations and mailings to potential Financial Clients and customers, and postings on its website, F-Squared claimed that the sector rotation model upon which AlphaSector was based had been used on a live basis to manage client assets since 2001, and claimed that AlphaSector had outperformed the S&P 500 index since 2001.  F-

Squared also made these claims in its Forms ADV that it filed with the SEC in 2008, 2012, and 2013.

19.     These claims, however, were false.  As F-Squared later admitted to the SEC, neither AlphaSector nor the sector-rotation model upon which it was based had been used on a live basis since 2001.  Rather, back-tested data, instead of live data, was used to develop the track record for AlphaSector.

20.     Additionally, F-Squared's back-tests contained a material error (the "Backtesting Error"): in creating its back-tested track record, F-Squared incorrectly applied the ETF signals that dictated whether a particular ETF was in or out of the AlphaSector portfolio.  That is, F-Squared applied these in/out signals one week *before* the ETF price changes that caused changes in the signals.  As a result, the advertised historical performance of AlphaSector during the back-test period was based on implementing signals to sell before price drops and to buy before price increases that had occurred a week earlier.  The Backtesting Error substantially improved AlphaSector's advertised back-tested historical performance.  Indeed, F-Squared admitted that, due to the Backtesting Error, F-Squared advertised that investments made using AlphaSector would increase approximately 350% more than if F-Squared had applied the signals accurately.  See Transfer Order at ¶¶ 2-3.

21.     F-Squared generated enormous revenue from AlphaSector, at least while its fraud went undiscovered, all of which was subject to forfeiture to the United States due to the fact that the revenue was derived from its willful conduct in violation of the securities laws.  Based on the Trustee's review of F-Squared's books and records, F-Squared generated over $250 million of revenue related to the use and licensing of the AlphaSector strategy through the third quarter of 2014, with approximate yearly totals as follows: $11 million for the six months ending

December 31, 2011; $38 million in 2012; $82 million in 2013; and $130 million in (full year) 2014.

### B. F-Squared's Fraud Is Uncovered

22.    The SEC began an investigation of F-Squared in 2013.  On July 23, 2013, the SEC informed F-Squared that it would be commencing an examination, and in September 2013, the SEC advised F-Squared that it was referring the examination to the SEC's enforcement division.  Also in September 2013, F-Squared removed all pre-2008 performance history from its AlphaSector marketing materials.

23.    On October 2, 2013, the SEC issued a subpoena to F-Squared requesting documents and testimony, and provided F-Squared a formal order of investigation on October 18, 2013.  During the year that followed, F-Squared produced thousands of documents to the SEC, and many of its employees provided testimony regarding F-Squared's fraud.

24.    On August 13, 2014, the SEC issued a Wells notice to F-Squared.

25.    On December 22, 2014, the SEC and F-Squared reached a settlement to resolve F-Squared's fraud by means of an administrative cease-and-desist proceeding pursuant to Section 203(k) of the Investment Advisers Act ("IAA") and Sections 9(b) and 9(f) of the Investment Company Act ("ICA").  Under the terms of the order enacting this settlement (the "Transfer Order", a true and correct copy of which is attached hereto as **Exhibit B**), the SEC charged, and F-Squared agreed to admit, that F-Squared's performance track record for the period between April 2001 and September 2008 (which track record F-Squared used to market its only significant product up until 2013) was materially inflated, hypothetical and back-tested.  As detailed below, F-Squared also admitted to specific willful violations of the securities laws.  The Transfer Order required F-Squared to pay $30 million in disgorgement to the SEC, as well as a

$5 million fine.

26. This amount was the result of a highly negotiated settlement, and, as described below, did not reflect the full amount of the liabilities that existed to the United States, including to the SEC, at the times of the Transfers. The Trustee has also brought an action against the SEC under the Administrative Procedures Act because the SEC did not have the power to exact disgorgement under the circumstances of this case. However, the fact that the SEC exceeded its powers as to the manner in which it eventually settled the F-Squared matter in December 2014 does not reflect on the amount of the liabilities that F-Squared owed at the times of the Transfers.

27. As F-Squared admitted in December 2014, each and every time F-Squared made such a claim to each and every client, Financial Client, or prospective client, from October 2008 through September 2013, it committed the following five securities violations:

- It willfully violated Section 206(1) of the Investment Advisers Act of 1940 (the "IAA"), which prohibits any investment adviser from employing any device, scheme, or artifice to defraud any client or prospective client;

- It willfully violated Section 206(2) of the IAA, which prohibits any investment adviser from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

- It willfully violated Section 206(4) of the IAA and Rule 206(4)-1(a)(5) thereunder, which makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the IAA to, among other things, directly or indirectly publish, circulate, or distribute an advertisement which contains any untrue statement of material fact, or which is otherwise false or misleading; and

- It willfully violated Section 206(4) of the IAA and Rule 206(4)-8 thereunder, which makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the IAA for any investment adviser to a pooled vehicle to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, or to otherwise engage in any act, practice, or course of business that is fraudulent, deceptive or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

28.     Additionally, F-Squared admitted, in December 2014, to the following securities violations, which occurred continuously from October 2008 through September 2013:

- It willfully violated Section 204 of the IAA and Rule 204-2(a)(16) thereunder. Section 204 of the IAA requires investment advisers to make and keep certain records as the SEC, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors.  Rule 204-2 under the IAA requires investment advisers registered or required to be registered to make and keep true, accurate and current various books, internal working papers, and any other records or documents that are necessary to form the basis for or demonstrate the calculation of the performance or rate of return of any or all managed accounts or securities recommendations in any notice, circular, advertisement, newspaper article, investment letter, bulletin, or other communication that the investment adviser circulates or distributes, directly or indirectly, to 10 or more persons;

- It willfully violated Section 206(4) of the IAA and Rule 206(4)-7 thereunder, which, among other things, makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the IAA to fail to adopt and implement such written policies or procedures reasonably designed to prevent violation of the IAA and the rules promulgated thereunder;

- It willfully violated Section 207 of the IAA, which makes it unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the SEC, or willfully to omit to state in any such application or report any material fact which is required to be stated therein;

- It willfully aided and abetted and caused certain of its Financial Clients to violate Section 34(b) of the Investment Company Act (the "ICA"), which, among other things, makes it unlawful for any person to make any untrue or misleading statement of material fact in any registration statement, application, report, account, record, or other document filed with the SEC under the ICA.

29.     Such willful violations of the securities laws exposed F-Squared to criminal and civil penalties, including, but not limited to, forfeiture to the United States under 18 U.S.C. § 981 of *all* revenue F-Squared derived from its misconduct.  As the court found after Howard Present's trial (as discussed below), *all* of F-Squared's revenue was derived from its willful fraudulent conduct.

30.     Under the Transfer Order and settlement F-Squared reached with the SEC, F-Squared remained subject to such criminal sanctions, which were not released by F-Squared's settlement.

31.     Following entry of the Transfer Order, F-Squared's clients stopped using F-Squared's algorithms to manage their assets for several reasons, including:

- The negative publicity resulting from the Transfer Order;

- F-Squared's payment of $35 million to the SEC;

- F-Squared's admission that it had conducted business illegally for many years, including especially the AlphaSector Index, which F-Squared had been selling to substantially all of its clients for years;

- The realization of clients using the AlphaSector Index that they themselves were incurring liability to their own clients by doing business with F-Squared; and

- The SEC's commencement of investigative enforcement proceedings against several F-Squared clients relating to their business dealings with F-Squared.

32.     The SEC also opened investigations into certain of F-Squared's Financial Clients for securities fraud related to their use of the AlphaSector strategy.  By March 31, 2015, four of F-Squared's largest Financial Clients notified F-Squared that they were terminating their relationships, representing a loss of $4.3 billion, more than 25% of AUA.  In early May 2015, Virtus Investment Partners, Inc. ("Virtus") terminated its relationship with F-Squared, which had been a sub-advisor on several popular mutual funds from Virtus.  Virtus was itself investigated by the SEC, and entered into a settlement with the SEC on November 16, 2015.  In August 2016, the SEC announced penalties against another thirteen of F-Squared's clients, including AssetMark, Inc., BB&T Securities, and Ladenburg Thalmann Asset Management (announcement available at https://www.sec.gov/news/pressrelease/2016-167.html).

33.     In response to this substantial loss of business, in March 2015 the Debtors reduced their workforce by nearly 30% - from 162 to 117 employees.  The work force reduction resulted in the incurrence of an additional approximately $1.3 million in severance costs.  Moreover, in connection with the SEC's investigations, F-Squared incurred approximately $17.2 million in direct legal costs (plus additional amounts advanced to F-Squared's directors and

officers relating to the investigation), only $10 million of which was recovered from available insurance.

34.     The SEC also commenced a civil action against Mr. Present, who was the CEO of F-Squared from its inception through November 2014, in the U.S. District Court for the District of Massachusetts [Case No. 14-cv-14692-LTS] (the "Howard Present Action").  After years of discovery and a lengthy trial, a jury found Mr. Present responsible for securities fraud, and District Judge Leo T. Sorokin issued an order for entry of final judgment (the "Final Judgment Order") in the total amount of $12,424,604 plus interest.  A copy of the Final Judgment Order is attached hereto as **Exhibit C.**  District Judge Sorokin found that *all* of F-Squared's revenue from 2008 through 2014 was causally connected to F-Squared's fraudulent advertisements, due to "the residual influence of Present's prior misrepresentations and the significant client assets and market hype that those representations had secured for F-Squared."  Final Judgment Order at 7.  The 2014 end date is because Mr. Present left F-Squared in November 2014.  There was therefore no consideration of and no finding regarding F-Squared's post-Transfer Order profits, but the same logic applies: these revenues could be traced back to F-Squared's prior misrepresentations.

35.     However, as explained below, F-Squared's books and records were inaccurate and did not reflect the fraud, nor its connection to all of F-Squared's assets and liabilities.

**C.  F-Squared's Insolvency**

*1.  F-Squared Was Always Balance-Sheet Insolvent*

36.     F-Squared's audited income statements and balance sheets do not reflect the true financial picture of F-Squared as of the dates of the Transfers, because they do not account for, or even attempt to assess, the impact of F-Squared's securities fraud on its assets and liabilities.

37.     F-Squared's audited balance sheets display the following assets, liabilities, and purported equity value:

|  | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 |
|---|---|---|---|---|
| Total Assets | $12,291,157 | $33,318,251 | $98,102,016 | $82,344,451 |
| Total Liabilities | $(6,815,183) | $(16,894,479) | $(53,188,329) | $(45,774,246) |
| Equity Book Value | $5,475,974 | $16,423,772 | $53,188,329 | $36,570,205 |

38.     However, once the effects of F-Squared's securities fraud are factored into these balance sheets, it becomes clear that F-Squared's true liabilities significantly outweighed the fair value of its assets (resulting in zero or negative equity value) at the times of the Transfers.

*a.    F-Squared's Assets*

39.     F-Squared's historical balance sheets show that its assets consisted primarily of:

- Cash and cash equivalents;
- Accounts Receivable;
- Deferred income taxes;
- Property, equipment; and improvements;
- Investments in securities; and
- Intangible Assets.

40.     The amounts reflected on F-Squared's balance sheet for these assets far exceeded their fair value, when factoring in the fraudulent conduct.

41.     First, the fair value of F-Squared's property, equipment, and improvements was substantially less than its book value.

42.     Second, from 2011 forward, F-Squared had millions of dollars of deferred income tax assets on its balance sheet.  That asset could only have been monetized if F-Squared generated future income.  Given F-Squared's fraudulent conduct and the resulting foreseeable

exodus of its Financial Clients, F-Squared should have known that this future income was highly unlikely to arise.

43.    Third, in 2013, F-Squared acquired intangible assets totaling over $14.3 million. These intangible assets were primarily comprised of customer contracts.  F-Squared knew or should have known that these customer contracts were not marketable to third parties (and were thus valueless or nearly so) given that F-Squared was defrauding these customers.

44.    Fourth, given that F-Squared knew that it was defrauding its customers, F-Squared should have known that it would not be able to collect 100% of its accounts receivable on a go-forward basis, and should therefore have discounted its accounts receivable on its balance sheet.

45.    Thus, F-Squared's assets were always worth far less than it had represented, simply because what had always been true (and what was true at the times of the Transfers) had become known—namely, that all of F-Squared's revenues were derived from its willful unlawful conduct.  The asset side of F-Squared's balance sheets (and, thus, the equity book value) should have been adjusted for its fraud, as follows:

|  | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 |
|---|---|---|---|---|
| Assets at book value | $12,291,157 | $33,318,251 | $98,102,016 | $82,344,451 |
| Property, Equipment, and Improvements | $(220,697) | $(251,742) | $(1,599,841) | $(1,948,232) |
| Deferred Income Taxes | $(1,385,000) | $(1,885,000) | $(3,125,000) | $(5,014,000) |
| Intangible Assets | | | $(12,349,189) | $(10,263,118) |
| Accounts Receivable | $(839,056) | $(1,570,997) | $(3,934,519) | $(2,615,960) |
| Adjusted Equity Book Value (adjusting assets only) | $3,031,222 | $12,716,033 | $23,905,141 | $16,728,896 |

46.     When these adjusted assets are compared to F-Squared's adjusted liabilities, as described below, it is clear that F-Squared was insolvent on a balance-sheet basis at all times of the Transfers.

### b. F-Squared's Liabilities

47.     Just as F-Squared's assets were not accurately reflected at fair value on its balance sheets, nor were its liabilities.

48.     F-Squared's historical balance sheets list the following major liabilities:

- Accounts payable;
- Accrued expenses, compensation, and professional fees;
- Securities sold short, at fair value;
- Loans payable;
- Member unit deposits; and
- Deferred rent.

49.     However, the historical balance sheets do not account for the following categories of liabilities, which F-Squared was continuously accruing, due to its fraud, beginning in 2008.

### i.   Liabilities to the SEC

50.     F-Squared accrued statutory liabilities to the SEC for each and every instance of each of the securities violations listed above, at the times that F-Squared committed them.  Every presentation and every email that F-Squared sent to each client or potential client from 2008 through 2013 that included false statements about AlphaSector's track record constituted a violation of the ICA and the IAA.  F-Squared also issued a number of press releases containing false statements about AlphaSector's track record, put false statements on its website (which may have been viewed by many potential clients), and made false statements in its public SEC filings. Each instance of a false statement to a client or potential client constituted a separate violation of the securities laws.

51.    When enforcing the securities laws, the SEC can opt to proceed either by litigating in federal court or by instituting an administrative proceeding.  See 15 U.S.C. §§ 80a-9(d); 80a-41(e); 80b-3(i); 80b-9(e).  In a civil action in federal court, the SEC is permitted by each of the IAA and the ICA to impose a penalty of the greater of $500,000 per violation of each statute, or the gross amount of pecuniary gain resulting from such violation.  See 15 U.S.C. §§ 80a-41(e); 15 U.S.C. § 80b-9(e).  Similarly, in an administrative proceeding, the IAA and the ICA permit the SEC to impose a penalty of up to $500,000 per violation of each statute.  See 15 U.S.C. §§ 80a-9(d); 15 U.S.C. § 80b-3(i).    Additionally, the SEC is able, under certain circumstances, to seek disgorgement of ill-gotten gains.  See 15 U.S.C. §§ 80a-9(e) 80a-9(f)(5) 80b-3(j); 80b-3(k)(5).

52.    On December 22, 2014, as part of its settlement with F-Squared, the SEC opted for an administrative proceeding, rather than a civil suit, and settled with F-Squared for a total payment of $35 million, of which $5 million was characterized as a penalty and $30 million was characterized as "disgorgement."  However, at the times of all Transfers, F-Squared's balance sheet should have reflected a liability to the SEC in the amount of the penalties the SEC was entitled to extract from F-Squared, including forfeiture of the gross amount of pecuniary gain resulting from each violation.  As all of F-Squared's pecuniary gain resulted from its violations of the securities laws (see Final Judgment Order at 5-6), F-Squared's balance sheet should have included a liability equal to its profits (or, at the very least, a liability of the statutory amount for each and every instance of the violations listed above) at the times that it was committing its violations—that is, from 2008 through 2013—and carrying those liabilities forward.  Upon information and belief, F-Squared sent hundreds, if not thousands, of emails to clients and

potential clients from 2008 through September 2013 containing fraudulent statements about F-Squared's track record.

   ii. <u>Indemnification Liabilities</u>

53. F-Squared's contracts with its Financial Clients included indemnification clauses requiring F-Squared to

> indemnify and hold harmless [the Financial Clients] against any and all losses, claims, damages, liabilities or expenses (including reasonable attorneys' fees and amounts paid in settlement . . .) to which such indemnified parties may become subject under any statute, regulation, at common law or otherwise, insofar as such losses, claims, damages, liabilities or expenses arise out of, or as a result of, [F-Squared's] willful misconduct, bad faith, breach of fiduciary duty or gross negligence in the performance of its services or obligations under [such agreements].

54. F-Squared's services and obligations under these agreements included, among other things, providing information required under the Investment Advisers Act and immediately notifying the Financial Clients of any and all material facts not contained in F-Squared's Form ADV. F-Squared admitted in the Transfer Order that it willfully misled its Financial Clients and that it willfully failed to include all relevant information on its Form ADV.

55. As F-Squared understood, many if not all of F-Squared's Financial Clients relied on and used F-Squared's advertisements and securities filings in their own advertisements and securities filings in their dealings with their *own* clients. As a result, the SEC also opened investigations into many of F-Squared's Financial Clients, and charged several such clients with violations of the securities laws based on false advertising and failing to maintain accurate books and records. These investigations resulted in settlements with the SEC in 2015 and 2016, in which each charged F-Squared Financial Client admitted to violation of the securities laws, due to each entity's use of F-Squared's AlphaSector strategy as to their own clients. From public information available to the Trustee, the Trustee believes that these entities paid a total of

approximately $45 million to the SEC as penalties under the ICA and IAA relating to their relationships with F-Squared and resulting from F-Squared's fraud, as follows:

- Wells Fargo Advisors Financial Network, LLC ("Wells Fargo"): Disgorgement of $15.04 million; interest of $2.3 million.

- Virtus Investment Advisers, Inc. ("Virtus"): Disgorgement of $13.4 million; interest of $1.1 million; penalty of $2 million.

- Ameriprise Financial Services, Inc.: Disgorgement of $6.3 million; interest of $700,000; penalty of $1.75 million.

- AssetMark, Inc.: Penalty of $500,000;

- BB&T Securities, LLC: Penalty of $200,000;

- Banyan Partners, LLC: Penalty of $200,000;

- J.J.B. Hilliard, W.L. Lyons, LLC: Penalty of $200,000;

- Ladenburg Thalmann Asset Management Inc.: Penalty of $200,000;

- Shamrock Asset Management LLC: Penalty of $200,000;

- Congress Wealth Management LLC: Penalty of $100,000;

- Constellation Wealth Advisors LLC: Penalty of $100,000;

- Executive Monetary Management, LLC: Penalty of $100,000;

- HT Partners LLC: Penalty of $100,000;

- Prospera Financial Services, Inc.: Penalty of $100,000;

- Risk Paradigm Group, LLC: Penalty of $100,000; and

- Schneider Downs Wealth Management Advisors, LP: Penalty of $100,000.

56.     Pursuant to F-Squared's indemnification agreements with its Financial Clients, F-Squared was liable not only for the amounts paid to the SEC, but for all losses, claims, damages, liabilities, and expenses, including legal fees, that these entities suffered due to F-Squared's

admitted misconduct (which included, for example, the expenses of any SEC investigation, lost profits, contract damages, and amounts which certain of F-Squared's Financial Clients incurred as to their *own* clients).

57.     For example, Virtus was sued in at least two separate class actions for damages resulting from Virtus' use of F-Squared's AlphaSector strategy to manage its clients' assets. One of these resulted in a settlement of $22.5 million.  Additionally, certain Wells Fargo customers filed a FINRA arbitration claim against Wells Fargo based on Wells Fargo's use of AlphaSector.

58.     Under its indemnification agreements, therefore, F-Squared's misconduct subjected it to massive unliquidated liabilities to its Financial Clients, which began accruing (of course, unbeknownst to those clients and the public generally) as of the later of F-Squared's first false advertisement in 2008 and the dates of such agreements.

59.     Thus, prior to and contemporaneously with the Transfers, F-Squared was accruing indemnification liabilities to its Financial Clients at least in the tens of millions, and potentially in the hundreds of millions of dollars.

iii.     Liabilities for Breach of Contract and Misconduct

60.     As described above, F-Squared's only material business activity was the sale of weekly trading signals to clients and Financial Clients, the vast majority of which activity was carried out pursuant to model manager agreements and subadvisory agreements between F-Squared and its clients and Financial Clients.

61.     F-Squared was contractually obligated, via these model manager and sub-advisory agreements, to immediately notify its clients and Financial Clients of material facts not contained in F-Squared's Form ADV.  As noted in the Transfer Order, F-Squared willfully made untrue

statements of material fact in its Forms ADV filed between 2008 and 2013. See Transfer Order at ¶ 38. Thus, F-Squared was in breach of each and every one of the model manager and sub-advisory agreements by which it conducted its business at all times from 2008 through September 2013, when it notified its clients and Financial Clients of its fraud and filed an updated Form ADV.

62.    F-Squared induced its clients and Financial Clients to enter into these model manager and subadvisory agreements by fraudulently advertising its track record as live-tested and (due to the Backtesting Error) as approximately 350% better than it was.

63.    F-Squared's Financial Clients and other clients paid over $100 million in fees, all of which Judge Sorokin found, after a lengthy trial, to have been causally connected to F-Squared's fraud.

64.    Additionally, due to the Backtesting Error, F-Squared's Financial Clients and other clients earned less than F-Squared led them to expect they would.

65.    Several of F-Squared's Financial Clients filed claims in these Bankruptcy Cases for damages resulting from breach of contract, fraud, fraudulent inducement, and other tortious conduct. A list of these claims is attached hereto as **Exhibit D.** Many of these have been settled in the context of these Bankruptcy Cases and using defenses only available pursuant to the Bankruptcy Code, but at the times of the Transfers, these claims (along with liabilities to clients and Financial Clients who did not file claims in these Bankruptcy Cases) should have been, but were not, reflected as liabilities on F-Squared's balance sheet.

iv.    Criminal Liabilities

66.    Willful violations of the IAA and ICA may be prosecuted criminally, and pursuant to its settlement agreement with the SEC and the Transfer Order, F-Squared admitted to

numerous willful violations of the IAA, the ICA, and rules promulgated thereunder.  In its settlement with the SEC F-Squared expressly waived any claim of double jeopardy based on the settlement, including the imposition of any remedy or criminal penalty, meaning it remained exposed to liability for its willful securities violations.  Under 18 U.S.C. § 981, forfeiture of *all* revenues derived from the willful misconduct constituting a securities violation is subject to forfeiture.  Thus, F-Squared's criminal liability exposure was equal to *all* of its revenue earned since it began its fraudulent marketing in 2008.

v.    <u>State Law Liabilities</u>

67.    Pursuant to Section 2 of Chapter 93A(2) of the Massachusetts General Laws, both the Attorney General of Massachusetts and individual consumers may take legal action against unfair or deceptive conduct in the marketplace.  Damages for committing deceptive trade practices, whether a suit is commenced by the Attorney General or a consumer, "shall be in the amount of actual damages . . . ; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two . . . ."  <u>See</u> Mass. Gen. Laws ch. 93A, § 9(2) and (3).

68.    F-Squared was headquartered in Massachusetts and conducted business in Massachusetts, and was therefore subject to Chapter 93A.

69.    F-Squared admitted that it willfully deceived its Financial Clients when it falsely advertised its track record.  <u>See</u> Transfer Order at ¶¶ 33-40.

70.    Therefore, F-Squared would have been liable for at least double, and up to treble actual damages suffered by F-Squared's Financial Clients on account of F-Squared's fraud at the times that it was committing such fraud (which began prior to the dates of the Transfers).  As described above, F-Squared's Financial Clients suffered actual damages of *at least* $67.3 million.

F-Squared's balance sheet should have, but did not, reflect the state-law liabilities it had at the times of the Transfers.

71.     Thus, F-Squared's liabilities were always far greater than it had represented.  F-Squared's balance sheets should have included *all* of the liabilities listed above; however, F-Squared's liability to the SEC alone would have rendered F-Squared insolvent at the times of each of the Transfers.  The liability side of F-Squared's balance sheets (and, thus, the equity book value) should have included *at least* the following (conservatively estimated) liabilities:

| 12 months ending: | | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 |
|---|---|---|---|---|---|
| Liabilities at book value | | $(6,815,183) | $(16,894,479) | $(53,188,329) | $(45,774,246) |
| SEC Forfeiture Liability and other governmental liabilities | | | | | |
| | Current liabilities | $(11,093,429) | $(38,428,337) | $(82,471,855) | $(130,833,336) |
| | Cumulative prior liabilities | $(730,001) | $(11,823,430) | $(50,251,767) | $(132,723,622) |
| | Settlement Paid | | | | $35,000,000 |
| Customer Indemnification and other claims | | $(2,955,857) | $(12,562,942) | $(33,180,905) | $(65,889,239) |
| Total Unrecorded Liabilities | | $(14,779,287) | $(62,814,709) | $(165,904,527) | $(294,446,197) |
| Adjusted Equity Book Value (adjusting assets and liabilities) | | $(11,748,065) | $(50,098,676) | $(141,999,386) | $(277,717,302) |

72.     In this chart, for the period ending 12/31/2011, the current year's forfeiture liability only includes revenue for the 6-month period ending 12/31/2011, and the prior year's liability only includes revenue for the year ending 6/30/2010.  Additionally, this chart estimates customer indemnification and contract claims at 25% of F-Squared's governmental liability.  Finally, the Trustee assumes that forfeiture of revenue related to F-Squared's fraud is the most conservative estimation of F-Squared's liability to the SEC (as the amount would otherwise be $500,000 per violation for the hundreds or thousands of violations F-Squared committed).

73.     Given the purported equity values on F-Squared's audited balance sheets, as listed above, along with the necessary adjustments to the asset values, even a conservative estimate of the additional liabilities rendered F-Squared insolvent on a balance-sheet basis at each of the times of the Transfers.

**D.     F-Squared's Bankruptcy Filing**

74.     On July 8, 2015 (the "<u>Petition Date</u>"), filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") to sell its remaining assets and liquidate.

75.     On October 28, 2015, F-Squared and the official committee of unsecured creditors appointed in the case by the Office of the United States Trustee filed a joint plan of reorganization (the "<u>Plan</u>"), which was confirmed by the Bankruptcy Court on January 14, 2016 and soon thereafter became effective.

76.     Pursuant to the Plan, the Trust was established for the purpose of, among other things, pursuing all causes of action not released, compromised and/or settled under the Terms of the Plan (the "<u>Retained Causes of Action</u>").  <u>See</u> Plan Arts. I(A)(73), IV(B)(1).

77.     The Trustee was given power under the Plan and the F-Squared Liquidation Trust Agreement [Docket No. 457-1] (the "<u>Trust Agreement</u>") to "prosecute, settle, abandon or compromise the Retained Causes of Action."  Plan Art. IV(C), <u>see</u> Trust Agreement § 2.2.  The Trustee has received all necessary authorization from the Oversight Committee (as defined in the Trust Agreement) to bring the Complaint.

**E.     The Debtors Pay Defendant Certain Dividends**

78.     Defendant also owned equity in F-Squared.

79.     F-Squared was organized as a limited liability company that incurred no income

taxes of its own: rather, income taxes were incurred by each individual or entity with an ownership interest in F-Squared, on a ratable basis.

80.     During the two years prior to the Petition Date, F-Squared distributed certain Dividends to Defendant in the amount set forth in **Exhibit A** to pay Defendant's personal income taxes related to Defendant's equity interest in F-Squared and/or as profit interests in F-Squared.

81.     F-Squared received no value in consideration for the Dividends, and were not obliged to pay the Dividends by the Debtors' LLC agreement or any other document.

## CLAIMS FOR RELIEF

## COUNT I

### Constructive Fraudulent Transfer (11 U.S.C. § 548)

82.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

83.     The Transfers constituted an interest of one or more of the Debtors in property.

84.     The Debtors received less than reasonably equivalent value in exchange for the Transfers.

85.     The Debtors: (i) were insolvent on the date that the Transfers was made, or became insolvent as a result of the Transfers; (ii) were engaged in a business or a transaction, or where about to engage in a business or transaction, for which any property remaining with the Debtors was an unreasonably small capital; or (iii) intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

86.     As a result of the foregoing, Plaintiff demands an entry of judgment avoiding the Transfers pursuant to Section 548 of the Bankruptcy Code.

## COUNT II

## 11 U.S.C. § 544, MASS. GEN. LAWS 109A § 5, Delaware Uniform Fraudulent Transfer Act § 1304(a)(1)

87.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

88.     Pursuant to § 544(b) of the Bankruptcy Code, Plaintiff may avoid any transfer of an interest of the Debtor in property that is voidable under applicable state law.

89.     The Transfers were made within four years of the Petition Date. The Transfers are more fully described in **Exhibit A** hereto.

90.     The Debtors received less than reasonably equivalent value in exchange for the Transfers.

91.     At the time of the Transfers, the Debtors: (i) were engaged or were about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

92.     As a result of the foregoing, Plaintiff demands entry of judgment avoiding the transfer under 11 U.S.C. § 544(b)(1) and applicable state law; provided, however, it is Plaintiff's intent to avoid and recover any Transfer only once, either pursuant to this Count II or Count I.

## COUNT III

## (11 U.S.C. § 550)

93.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

94.     Defendant was the original transferee of the Transfers, or the entity for whose benefit the Transfer was made, or the immediate or mediate transferee of the original transferee receiving such Transfer.

95.     Plaintiff is entitled to recover the value of the Transfers pursuant to Section 550(a) of the Bankruptcy Code, plus interest thereon to the date of payment and the costs of this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendant: (a) awarding Plaintiff the amount of the Transfers; (b) awarding Plaintiff prejudgment interest at the legally allowed applicable rate; (c) awarding Plaintiff its costs, fees, and expenses associated with the prosecution of this action; and (d) granting such other and further relief as is just and proper.

Dated: October __, 2019
      Wilmington, Delaware

**THE ROSNER LAW GROUP LLC**

*/s/ Draft*
_____
Frederick B. Rosner, Esq. (DE 3995)
Scott J. Leonhardt, Esq. (DE 4885)
Jason A. Gibson, Esq. (DE 6091)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
rosner@teamrosner.com
leonhardt@teamrosner.com
gibson@teamrosner.com

    *-and-*

**BROWN RUDNICK LLP**

William R. Baldiga, Esq.
Sunni P. Beville, Esq.
Sharon I. Dwoskin, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
wbaldiga@brownrudnick.com
sbeville@brownrudnick.com
sdwoskin@brownrudnick.com

    *-and-*

D. Cameron Moxley, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
cmoxley@brownrudnick.com

# Exhibit A

Exhibit A

## F-Squared Investment Management, LLC et al
## Statement of Payments Issued

**PAID TO:**

George McClelland
12 Reservoir Drive
Southboro, MA 01772

| Date Paid | Check # | Bonus | 401K Match | Total Bonus Payout | Tax Distribution | Profit Distribution | Total Tax & Profit Distributions | Paid During Preference Period | Units Repurchase | Total Payments |
|---|---|---|---|---|---|---|---|---|---|---|
| Transferring Debtor: | F-Squared Investment Management, LLC | | | | | | | | | |
| 8/29/2013 | 1407 | | | 0.00 | 206,021.00 | | 206,021.00 | | | 206,021.00 |
| 12/5/2013 | 1028 | | | 0.00 | 206,021.00 | | 206,021.00 | | | 206,021.00 |
| 1/16/2014 | 1104 | | | 0.00 | | 399,861.90 | 399,861.90 | | | 399,861.90 |
| 3/25/2014 | 1161 | | | 0.00 | 851,089.00 | | 851,089.00 | | | 851,089.00 |
| 4/3/2014 | 1233 | | | 0.00 | 103,299.00 | | 103,299.00 | | | 103,299.00 |
| 6/5/2014 | 1360 | | | 0.00 | 383,592.00 | | 383,592.00 | | | 383,592.00 |
| 9/4/2014 | 1433 | | | 0.00 | 383,592.00 | | 383,592.00 | | | 383,592.00 |
| 10/30/2014 | 1459 | | | 0.00 | | | 0.00 | | 86,184.00 | 86,184.00 |
| Transferror Total: | | | | 0.00 | 2,133,614.00 | 399,861.90 | 2,533,475.90 | | 86,184.00 | 2,619,659.90 |
| | | | | | | | | | | |
| Transferring Debtor: | F-Squared Investments Inc | | | | | | | | | |
| 2/6/2014 | 2530 | 75,000.00 | | 75,000.00 | | | 0.00 | | | 75,000.00 |
| Transferror Total: | | 75,000.00 | | 75,000.00 | | | 0.00 | | | 75,000.00 |
| | | | | | | | | | | |
| Overall Totals: | | 75,000.00 | | 75,000.00 | 2,133,614.00 | 399,861.90 | 2,533,475.90 | | 86,184.00 | 2,694,659.90 |

{Ex.A Amended. }

# Exhibit B

**UNITED STATES OF AMERICA**
Before the
**SECURITIES AND EXCHANGE COMMISSION**

**Investment Advisers Act of 1940**
**Release No. 3988 / December 22, 2014**

**Investment Company Act of 1940**
**Release No. 31393 / December 22, 2014**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-16325**

| | |
|---|---|
| In the Matter of<br><br>     **F-SQUARED INVESTMENTS, INC.,**<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against F-Squared Investments, Inc. ("Respondent" or "F-Squared").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Respondent admits the facts set forth in Appendix A attached hereto, and acknowledges that its conduct as set forth in Appendix A violated the federal securities laws, admits the Commission's jurisdiction over it and the subject matter of these proceedings, and consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### A. Summary

1.        This matter arises from a registered investment adviser's advertising of a materially inflated, and hypothetical and back-tested, performance track record for the period of April 2001 to September 2008 in connection with an exchange-traded fund ("ETF") sector rotation strategy.  In September 2008, F-Squared and its co-founder and former CEO Howard Present created an investment strategy they called "AlphaSector" and used data they were at least reckless in not knowing was back-tested to create hypothetical performance of AlphaSector. From September 2008 to September 2013, F-Squared advertised the hypothetical historical performance as "not backtested" and based on an actual strategy that had been used to manage live assets from April 2001 to September 2008.

2.        In addition, F-Squared incorrectly applied ETF trend data – which were detecting price momentum – that dictated whether an ETF was in or out of the AlphaSector portfolio (the "in/out signals").  In creating its back-tested track record, F-Squared  systematically applied the in/out signals one week before the ETF price changes that caused changes in signals (*i.e.*, a change from invested in the ETF to out of the ETF or vice-versa).  As a result, the advertised historical performance of the AlphaSector strategy from April 2001 to September 2008 was based on implementing signals to sell before price drops and to buy before price increases that had occurred a week earlier.  F-Squared at least recklessly compiled the historical data to implement a hypothetical trade (that F-Squared advertised as an actual trade) one week before the trade could have occurred.

3.        The inaccurate compilation of historical data substantially improved the AlphaSector strategy's advertised hypothetical and back-tested historical performance.  If an investor made a hypothetical investment of $100,000 on April 1, 2001 (assuming a reinvestment of dividends and no further contributions or withdrawals), the investment would have been worth approximately $128,000 on August 24, 2008 if invested in the S&P 500 Index.  With accurately timed (but still hypothetical and back-tested) signal implementation, the same investment in F-Squared's hypothetical ETF sector rotation strategy would have been worth $138,000.  However, by implementing the hypothetical and back-tested signals one week early, F-Squared  advertised the investment as worth $235,000 – an increase of approximately 350% more than if F-Squared had applied the signals accurately.

---

[1] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in this or any other proceeding.

4.      As described below, virtually all of F-Squared's claimed outperformance relative to the S&P 500 Index for the period before October 2008 is attributable to its data compilation error.  By 2014, F-Squared's ETF strategy was the largest in the market, with approximately $28.5 billion in assets following the strategy.

## B.  Respondent

5.      **F-Squared Investments, Inc.** (SEC File No. 801-69937) is an investment adviser registered with the Commission since March 2009 and is headquartered in Wellesley, Massachusetts.  In October 2008, F-Squared launched its first AlphaSector index.  Today, F-Squared sub-licenses its approximately 75 AlphaSector indexes to unaffiliated third parties who manage assets pursuant to these indexes.  As of June 30, 2014, there were approximately $28.5 billion invested pursuant to AlphaSector indexes including $13 billion in mutual fund assets sub-advised by F-Squared.[2]  Since June 2010, F-Squared Investments, Inc. has been a wholly-owned subsidiary of F-Squared Investment Management, LLC.

## C.  Other Relevant Person

6.      **Howard Brian Present** ("Present"), age 53, resides in Wellesley, Massachusetts.  In 2006, Present co-founded F-Squared.  Present was the President and CEO of F-Squared until his separation in 2014.  Present owns approximately 22% of F-Squared Investment Management, LLC.

## D.  Facts

### AlphaSector Background

7.      From October 2008 to September 2013, F-Squared marketed an ETF sector rotation strategy called AlphaSector that was based on an algorithm that yields a "signal" indicating whether to buy or sell nine industry ETFs.[3]  As of June 30, 2014, there was approximately $28.5 billion

---

[2] In August 2010, F-Squared Institutional Advisors, LLC (SEC File No. 801-71753), a registered investment adviser and an affiliate of F-Squared Investments, Inc., was created and became the sub-adviser of the registered mutual funds.

[3] F-Squared has created several AlphaSector strategies and sub-licenses approximately 75 AlphaSector indexes.  The AlphaSector indexes that are the subject of this matter, including the AlphaSector Premium Index and the AlphaSector Rotation Index, are based on investments in U.S. Equity ETFs.  As with all indexes, the performance of the AlphaSector Premium and AlphaSector Rotation indexes are inherently hypothetical in the sense that the index does not purport to reflect the performance of any particular client or account.  However, as described below, F-Squared advertised that the AlphaSector Premium Index and AlphaSector Rotation Index were based on a strategy that had been in place since 2001 and therefore the performance of these indexes was "not backtested" when in fact the performance *was* backtested.

3

invested pursuant to the AlphaSector indexes.  The bulk of these assets are invested through registered mutual funds or other funds or through separately managed accounts managed by advisers or brokers who implement the strategy based on information they receive periodically from F-Squared.  Today, AlphaSector is the largest active ETF strategy in the market.

8.    F-Squared and Present began advertising the AlphaSector strategy via an index in September 2008.  From inception,  F-Squared stated in advertisements  that AlphaSector is an ETF sector rotation strategy that (i) invests in as many as nine U.S. equities industry ETFs, with an algorithm or quantitative engine determining whether, based on ETF sector trends and volatility, the portfolio would invest in none, some, or all of the nine ETFs; (ii) holds equal ownership of any of the nine ETFs with a positive trend and no ownership of any of the nine ETFs with a negative or neutral trend; (iii) rebalances periodically, either weekly or monthly, and only when at least one of the nine ETFs show a change in trend; and (iv) applies a 25% cap per ETF (*i.e.*, no ETF would hold more than 25% of the total assets in the strategy) at the time of rebalancing, with the remainder of the portfolio invested in a short-term treasury ETF (representing cash).

9.    Present created and was responsible for all of F-Squared's AlphaSector advertisements, which included PowerPoint presentations describing the strategy and its past performance, including for the period April 2001 to September 2008.  The relevant slides from F-Squared's August 2013 standard presentation for the AlphaSector Premium Index, which was available on F-Squared's public website until the end of September 2013, are attached as Exhibit 1.  F-Squared posted the presentations and other AlphaSector performance advertisements and marketing materials on its public website and sent them to numerous prospective and current clients from September 2008 to September 2013.

10.    From AlphaSector's inception in October 2008 through September 2013, F-Squared advertised AlphaSector's past performance as index performance.  Even though F-Squared did not create AlphaSector until late 2008, F-Squared made two materially false claims in its AlphaSector advertisements and Forms ADV, namely that:

- the in/out ETF signals that formed the basis of the AlphaSector index returns had been used to manage client assets from April 2001 to September 2008; and

- the in/out ETF signals resulted in a track record that significantly outperformed the S&P 500 Index from April 2001 to September 2008.

F-Squared was at least reckless in advertising both of these statements.

<u>F-Squared and Present Used Back-Tested Data to Create a Seven-Year Track Record</u>

11.    According to Present, in early 2008, Present and a proprietor of a private wealth advisory firm (hereinafter, "Private Wealth Advisor") discussed a sector rotation investment strategy using ETFs.  According to Present, in the context of these discussions, the Private Wealth Advisor

claimed to have used a sector rotation strategy to manage client assets.  Present never saw records showing that the Private Wealth Advisor had invested advisory clients in a sector rotation strategy. Present was encouraged to get such documentation – for instance, in mid-2008, F-Squared's co-founder and former Vice Chairman reports that he told Present to get account records to confirm the historical performance of the Private Wealth Advisor's sector rotation strategy.

12.     Present also understood that the Private Wealth Advisor had a college intern who was developing an algorithm to use in conjunction with the sector rotation strategy.  The algorithm could generate a momentum-based signal that could be used to determine whether to invest or not invest in a particular sector ETF.  As discussions between Present and the Private Wealth Advisor moved forward in summer 2008, the Private Wealth Advisor decided to co-found a signal provider company (the "Data Provider") with his intern.  The Data Provider would send data with in/out signals to F-Squared that F-Squared would then use to determine whether AlphaSector would own or not own an ETF.

13.     In late August and early September 2008, as F-Squared and the Data Provider were finalizing a contract for signal delivery to F-Squared, the Private Wealth Advisor's intern sent Present three sets of hypothetical, back-tested weekly trends for each of the ETFs.  A positive trend was a signal to be "in" (buy or own) the ETF, and a negative trend was a signal to be "out" (sell or do not own) of the ETF.  The first two data sets of trends were based on whether the simple moving average of each ETF had increased or decreased from the previous week.  One of the two sets of trends was based on a 41-week simple moving average and the other set was based on a 61-week simple moving average.[4]  The intern's third set of signals were from his own algorithm.

14.     After he received the three sets of signals from the Private Wealth Advisor's intern, Present instructed an F-Squared employee to divide the three sets of weekly ETF trend or signal data among three different time periods, which, according to Present, corresponded to the periods the Private Wealth Advisor had claimed each set of signals had been used to manage his clients' assets, and then calculate AlphaSector's back-tested and hypothetical historical performance for the period April 2001 to September 2008.  The 61-week simple moving average trends were used for the period April 2001 to June 2006, the 41-week simple moving average trends were used for the period July 2006 to June 2008, and the signals from the intern's algorithm were used for the period July 2008 to September 2008.

15.     To convert the in/out ETF signals into an index "track record," F-Squared and Present tested the performance of various portfolio construction methodologies – which convert the ETF

---

[4] In this instance, the simple moving average is the sum of the weekly closing prices of an ETF for either 41 or 61 weeks divided by either 41 or 61.  The trends the intern sent Present showed each ETF's simple moving average at the end of each week for the period 2001-2008.  A positive ETF trend, for example, meant that week's simple moving average for the particular ETF was higher than the prior week's simple moving average.

signals into performance – and ultimately Present created the rules, described in paragraph 8, that are central to the AlphaSector strategy.

16.    F-Squared's AlphaSector advertisements emphasized algorithmic-based models that purportedly supported both the hypothetical and actual track record beginning in July 2008, but in reality the AlphaSector track record for the period April 2001 to June 2008 was based on changes in 41-week and 61-week simple moving averages.  An example of the model description underlying AlphaSector is at page 14 of Exhibit 1.

17.    The Private Wealth Advisor never used a sector rotation strategy.  His client and customer trades were ad hoc, client-by-client, non-discretionary, and were not uniform across clients. Before mid-2008, the Private Wealth Advisor and his business partner traded the ETFs that form the basis of AlphaSector only infrequently, and they did not trade some of the ETFs at all.  To the extent that the Private Wealth Advisor ever attempted to use moving average data to make trades, the trades were not consistent with the trend data F-Squared and Present used to create AlphaSector's performance.

### F-Squared and Present Ignored a Material Performance Calculation Error

18.    F-Squared created the pre-October 2008 "historical track record" incorrectly by implementing all the purchases and sales dictated by the ETF trend signals one week before they should have been implemented.  Because the signals were detecting price momentum, F-Squared's incorrectly implementing the signals one week early meant that AlphaSector's "historical track record" was based on its selling before price drops that had already occurred and buying before price increases that had already occurred.  As described below, virtually all of AlphaSector's claimed outperformance relative to the S&P 500 Index for the pre-October 2008 period is attributable to this erroneous calculation.

19.    The now former F-Squared employee who constructed the AlphaSector track record realized the error by late September 2008, shortly after F-Squared started advertising the strategy, and alerted Present.  Nevertheless, F-Squared and Present continued to advertise the inflated track record until September 2013.

20.    The inaccurate compilation of historical data substantially improved the AlphaSector's strategy's advertised back-tested and hypothetical historical performance for the pre-October 2008 period.  If an investor made a hypothetical investment of $100,000 on April 1, 2001 (assuming a reinvestment of dividends and no further contributions or withdrawals), the investment would have been worth approximately $128,000 on August 24, 2008 if invested in the S&P 500 Index.  With accurately timed (but still hypothetical and back-tested) signal implementation, the same investment in F-Squared's hypothetical ETF sector rotation strategy would have been worth $138,000.  However, by implementing the hypothetical and back-tested signals one week early, F-Squared advertised the investment as worth $235,000.

<u>After 2008, Present and F-Squared Continued to Advertise AlphaSector's Hypothetical and Back-
Tested and Substantially Improved Track Record</u>

21.     On multiple occasions after September 2008, Present requested back-up
documentation from the Private Wealth Advisor to support AlphaSector's track record.  Present never
received back-up from the Private Wealth Advisor.  Despite the lack of documentation of live assets
supporting AlphaSector's performance for the period prior to September 2008, F-Squared and Present
continued to advertise the false track record until September 2013.

22.     In January 2009, Present contacted the Private Wealth Advisor and his business
partner to obtain an audited track record for the Private Wealth Advisor's accounts that had
supposedly tracked the AlphaSector methodology.  Present did not receive one.  During these
discussions, the Private Wealth Advisor told Present that the Private Wealth Advisor did not have a
specific track record because he considered the sector rotation strategy to be a client-by-client trading
strategy and not a specific product.

23.     In October 2009, F-Squared began sub-advising mutual funds using the AlphaSector
strategies.  In connection with that effort, Present assured the mutual fund adviser that AlphaSector's
performance was constructed based on "actual investment philosophy, trading patterns and portfolio
strategy that was employed for the client assets."  Present stated that the portfolio construction rules
used to create AlphaSector were all "consistent elements of the AlphaSector Strategy during its entire
existence, and critical to its performance returns."  Present also stated that the AlphaSector Index was
"based on investment decisions that were generated on a live basis since 2001" and "the Index
therefore explicitly does not reflect backtested data, but instead represents live, historical data."  The
mutual fund adviser, working with Present, amended the funds' prospectus to include the inflated
historical performance of the AlphaSector indexes from April 2001 to September 2008.

24.     In June 2012, F-Squared retained an outside attorney to perform a mock audit.  One of
the recommendations from the mock audit was that F-Squared "should ensure that it has books and
records to support its performance disclosed for years prior to the year 2006."  Present sent several
communications in June and July 2012 to the Private Wealth Advisor and officers of the Data
Provider co-founded by the Private Wealth Advisor in 2008, seeking the required records.  F-
Squared's then-CCO also prepared a document by which the Data Provider and/or the Private Wealth
Advisor would certify that they had records to support the advertised historical performance.  These
efforts proved unsuccessful.  Present's effort to elicit information from the Data Provider also
prompted the Data Provider's CEO and COO to tell Present that: (i) the Private Wealth Advisor's
former intern (now the Chief Technology Officer (CTO) of the Data Provider) was only 14 years old
in 2001; and (ii) the data the former intern sent Present would have been back-tested for the period
before either 2007 or 2008, when the former intern started working on the algorithm.

25.     In October 2012, Present received a copy of a September 2008 email from a then F-
Squared employee to a then employee of the Private Wealth Advisor concerning the implementation
of historical signals.  That email concerned the dating convention associated with the Data Provider's

7

signals and should have called into question whether F-Squared implemented the signals one week early in creating AlphaSector's pre-October 2008 track record. Nonetheless, Present and F-Squared continued to advertise that inflated track record.

26.    By May 2013, F-Squared had decided to replace the Data Provider's ETF signals with signals generated by its own proprietary model. During this process, the Data Provider's CEO and CTO told Present that the Private Wealth Advisor was not responsible for F-Squared's pre-October 2008 track record. In addition, on July 1, 2013, the Data Provider's CEO and CTO told Present that they could not replicate AlphaSector's pre-October 2008 advertised performance when they used the signals they understood were the basis of the AlphaSector track record. In September 2013, F-Squared removed all performance track records and advertising materials for the time period April 2001 to September 2008 from its website.

<u>F-Squared's Inaccurate Advertisements</u>

27.    F-Squared's advertisements stated that the inception date of the AlphaSector indices "is based on an active strategy with an inception date of April 2001. Inception date is defined as the date as of which investor assets began tracking the strategy." This disclosure is located in Exhibit 1 at page 18.

28.    Starting in late 2009, F-Squared's AlphaSector advertisements also explicitly claimed that the track record for the period April 2001 to September 2008 was not back-tested. For example, even as of September 2013, F-Squared's advertisements stated: "The process of converting the active strategy to an index implies that the returns presented, while not backtested, reflect theoretical performance an investor would have obtained had it invested in the manner shown and does not represent returns that an investor actually attained, as investors cannot invest directly in an index." This disclosure is located in Exhibit 1 at page 18.

29.    From September 2008 to September 2013, F-Squared advertised that AlphaSector indices had outperformed the S&P 500 Index, particularly for the period from April 2001 to September 2008. Attached at pages 10 and 11 of Exhibit 1 are examples of AlphaSector performance advertisements.

30.    F-Squared also claimed that it was responsible for AlphaSector's buy and sell decisions for the pre-October 2008 period. For example, in September 2013, F-Squared's public website featured news articles with statements such as:

- "Back in mid-2007, well before the financial debacle that began with the collapse of the investment bank Bear Stearns, Howard Present, co-founder, president and CEO of F-Squared Investments in Boston, had a strategy that determined that financial stocks were becoming too risky. But they didn't just sell down the financial holdings, which at the time represented one-ninth of his strategy's investments. He sold *all* his financial holdings."

8

- "We eventually dropped the tech sector in 2001," says Present.

- "Financials in 2006, [Present] notes, had moved from a historic average of about 15% of the S&P to 28%, or nearly double, which was another sign of a bubble that F-Squared was able to avoid. . . And when [Financials] started to show signs of decline, F-Squared dropped its entire financials allocation like a hot potato."

### F-Squared's Inaccurate Forms ADV

31.     F-Squared's various Forms ADV filed during the period October 2008 to September 2013 inaccurately claimed that the investment models underlying the index had been used to manage actual client assets between April 2001 and September 2008.

### F-Squared's Policies and Procedures Were Inadequately Designed and Implemented

32.     During the October 2008 to October 2013 time period, F-Squared failed to adopt and implement policies reasonably designed to prevent violations of the Advisers Act and its rules.  For example, F-Squared did not have policies reasonably designed to prevent the use of performance advertising materials that were false or misleading.   Furthermore, F-Squared published performance advertisements without back-up for the performance, even after the issue was identified in a mock audit in 2012.

**E. Violations**

33.     Based on the conduct described above, Respondent willfully[5] violated Section 206(1) of the Advisers Act, which prohibits any investment adviser from employing any device, scheme, or artifice to defraud any client or prospective client.

34.     Based on the conduct described above, Respondent willfully violated Section 206(2) of the Advisers Act, which prohibits any investment adviser from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

35.     Based on the conduct described above, Respondent willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-1(a)(5) thereunder, which makes it a fraudulent, deceptive, or

---

[5]A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" <u>Wonsover v. SEC</u>, 205 F.3d 408, 414 (D.C. Cir. 2000) (<u>quoting Hughes v. SEC</u>, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "'also be aware that he is violating one of the Rules or Acts.'" Id. (<u>quoting Gearhart & Otis, Inc. v. SEC</u>, 348 F.2d 798, 803 (D.C. Cir. 1965)).

manipulative act, practice, or course of business within the meaning of Section 206(4) of the Advisers Act to, among other things, directly or indirectly publish, circulate, or distribute an advertisement which contains any untrue statement of material fact, or which is otherwise false or misleading.

36.     Based on the conduct described above, Respondent willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, which, among other things, makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the Advisers Act to fail to adopt and implement such written policies or procedures reasonably designed to prevent violation of the Advisers Act and the rules promulgated thereunder.

37.     Based on the conduct described above, Respondent willfully violated Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder, which makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the Advisers Act for any investment adviser to a pooled vehicle to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, or to other wise engage in any act, practice, or course of business that is fraudulent, deceptive or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

38.     Based on the conduct described above, Respondent willfully violated Section 207 of the Advisers Act which makes it unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission, or willfully to omit to state in any such application or report any material fact which is required to be stated therein.

39.     Based on the conduct described above, Respondent willfully violated Section 204 of the Advisers Act and Rule 204-2(a)(16) thereunder.  Section 204 of the Advisers Act requires investment advisers to make and keep certain records as the Commission, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors.  Rule 204-2 under the Advisers Act requires investment advisers registered or required to be registered to make and keep true, accurate and current various books and records relating to their investment advisory business, including all accounts, books, internal working papers, and any other records or documents that are necessary to form the basis for or demonstrate the calculation of the performance or rate of return of any or all managed accounts or securities recommendations in any notice, circular, advertisement, newspaper article, investment letter, bulletin or other communication that the investment adviser circulates or distributes, directly or indirectly, to 10 or more persons.

40.     Based on the conduct described above, Respondent willfully aided and abetted and caused certain mutual funds sub-advised by F-Squared to violate Section 34(b) of the Investment Company Act which, among other things, makes it unlawful for any person to make any untrue or misleading statement of material fact in any registration statement, application, report, account, record, or other document filed with the Commission under the Investment Company Act.

### F. Respondent's Remedial Efforts and Cooperation

41.     In determining to accept Respondent's Offer, the Commission considered the remedial acts undertaken by Respondent and Respondent's cooperation with the Commission staff in its investigation of this matter.  Among other things, F-Squared hired an Independent Compliance Consultant in January 2014, and separated its Chief Executive Officer (Howard Present) in 2014. The Independent Compliance Consultant has already undertaken and completed a review of F-Squared's compliance policies and procedures and submitted a report (the "Initial Report") to F-Squared and the Commission staff.

### G. Undertakings

42.     Independent Compliance Consultant.  F-Squared retained the services of an Independent Compliance Consultant in January 2014, and the Independent Compliance Consultant submitted an Initial Report to the Commission staff in September 2014.  F-Squared undertakes to maintain the engagement of the Independent Compliance Consultant as follows:

a.     Within 30 days of the date of the issuance of this Order, F-Squared shall retain the services of the Independent Compliance Consultant who submitted the Initial Report.  The Independent Compliance Consultant's compensation and expenses shall be borne exclusively by F-Squared.  F-Squared shall require the Independent Compliance Consultant to conduct a second review of the F-Squared compliance policies and procedures that the Independent Compliance Consultant deems relevant with respect to the creation, publication, circulation, or distribution of performance advertisements or other marketing material;

b.     At the end of the review, which in no event shall be more than three months after the date of the issuance of this Order, F-Squared shall require the Independent Compliance Consultant to submit a Second Report to F-Squared and to the Commission staff.  The Second Report shall describe the review performed, the conclusions reached, and shall include any recommendations deemed necessary to make the policies and procedures adequate.  F-Squared may suggest an alternative procedure designed to achieve the same objective or purpose as that of the recommendation of the Independent Compliance Consultant.  The Independent Compliance Consultant shall evaluate any alternative procedure proposed by F-Squared.  However, F-Squared shall abide by the Independent Compliance Consultant's final recommendation;

c.     Within six months after the date of issuance of this Order, F-Squared shall, in writing, advise the Independent Compliance Consultant and the Commission staff of the recommendations it is adopting;

d.     Within nine months after the date of issuance of this Order, F-Squared shall require the Independent Compliance Consultant to complete its review and submit a written final report to Commission staff. The Final Report shall describe the review made of F-Squared's compliance policies and procedures relating to the publication, circulation, or distribution of

11

performance advertisements or other marketing material containing historical (hypothetical or actual) performance information; set forth the conclusions reached and the recommendations made by the Independent Compliance Consultant, as well as any proposals made by F-Squared; and describe how F-Squared is implementing the Independent Compliance Consultant's final recommendations;

       e.      F-Squared shall take all necessary and appropriate steps to adopt and implement all recommendations contained in the Independent Compliance Consultant's Final Report;

       f.      For good cause shown and upon timely application by the Independent Compliance Consultant or F-Squared, the Commission's staff may extend any of the deadlines set forth in these undertakings;

       g.      F-Squared shall require the Independent Compliance Consultant to enter into an agreement providing that for the period of the engagement and for a period of two years from completion of the engagement, the Independent Compliance Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with F-Squared, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. The agreement will also provide that the Independent Compliance Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Compliance Consultant in the performance of his or her duties under this Order shall not, without prior written consent of the Commission staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with F-Squared, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

43.     F-Squared shall certify, in writing, compliance with the undertakings set forth above. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission's staff may make reasonable requests for further evidence of compliance, and F-Squared agrees to provide such evidence. The certification and supporting material shall be submitted to Kevin M. Kelcourse, Boston Regional Office, Securities and Exchange Commission, 33 Arch Street, Suite 2300, Boston, MA 02110, with a copy to the Office of the Chief Counsel of the Enforcement Division, no later than sixty days from the date of completion of the undertakings.

44.     Respondent shall cooperate fully with the Commission in any and all investigations, litigations or other proceedings relating to or arising from the matters described in the Order.  In connection with such cooperation, Respondent shall: (i) produce, without service of a notice or subpoena, any and all non-privileged documents and other information requested by the Commission staff subject to any restrictions under the law of any foreign jurisdiction; (ii) use its best efforts to cause their officers, employees, and directors to be interviewed by the Commission staff at such time as the staff reasonably may direct; and (iii) use its best efforts to cause their officers, employees, and directors to appear and testify without service of a notice or subpoena in such investigations, depositions, hearings or trials as may be requested by the Commission staff.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Sections 203(e) and 203(k) of the Advisers Act and Sections 9(b) and 9(f) of the Investment Company Act, it is hereby ORDERED that:

A.      Respondent shall cease and desist from committing or causing any violations and any future violations of Sections 204(a), 206(1), 206(2), 206(4), 207 of the Advisers Act and Rules 204-2(a)(16), 206(4)-1, 206(4)-7, and 206(4)-8 thereunder and Section 34(b) of the Investment Company Act.

B.      F-Squared Investments, Inc. is censured.

C.      F-Squared Investments, Inc. shall, within 10 days of the entry of this Order, pay disgorgement of $30 million ($30,000,000.00) to the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600.  Payment must be made in one of the following ways:

(1)     F-Squared Investments, Inc. may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     F-Squared Investments, Inc. may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     F-Squared Investments, Inc. may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169 17

Payments by check or money order must be accompanied by a cover letter identifying F-Squared Investments, Inc. as the Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Kevin M. Kelcourse, Boston Regional Office, Securities and Exchange Commission, 33 Arch Street, Suite 2300, Boston, MA 02110.

D.      F-Squared Investments, Inc. shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $5 million ($5,000,000.00) to the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. 3717.  Payment must be made in one of the following ways:

(1)      F-Squared Investments, Inc. may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)      F-Squared Investments, Inc. may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)      F-Squared Investments, Inc. may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169 17

Payments by check or money order must be accompanied by a cover letter identifying F-Squared Investments, Inc. as the Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Kevin M. Kelcourse, Boston Regional Office, Securities and Exchange Commission, 33 Arch Street, Suite 2300, Boston, MA 02110.

E.      Respondent F-Squared Investments, Inc. shall comply with the undertakings enumerated in Section III.G. above.

By the Commission.

Brent J. Fields
Secretary

14

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-16325**

| | |
|---|---|
| In the Matter of<br><br>    F-SQUARED INVESTMENTS, INC.<br><br>Respondent. | **APPENDIX A TO ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

<u>**APPENDIX A**</u>

Respondent F-Squared Investments, Inc., admits the facts set forth below (the "Admissions") and acknowledges that its conduct violated the federal securities laws:

<u>AlphaSector Background</u>

1.      From October 2008 to September 2013, F-Squared marketed an ETF sector rotation strategy called AlphaSector that was based on an algorithm that yields a "signal" indicating whether to buy or sell nine industry ETFs.  As of June 30, 2014, there was approximately $28.5 billion invested pursuant to the AlphaSector indexes.  The bulk of these assets are invested through registered mutual funds or other funds or through separately managed accounts managed by advisers or brokers who implement the strategy based on information they receive periodically from F-Squared.  Today, AlphaSector is the largest active ETF strategy in the market.

2.      F-Squared and Present began advertising the AlphaSector strategy via an index in September 2008.  From inception,  F-Squared stated in advertisements  that AlphaSector is an ETF sector rotation strategy that (i) invests in as many as nine U.S. equities industry ETFs, with an algorithm or quantitative engine determining whether, based on ETF sector trends and volatility, the portfolio would invest in none, some, or all of the nine ETFs; (ii) holds equal ownership of any of the nine ETFs with a positive trend and no ownership of any of the nine ETFs with a negative or neutral trend; (iii) rebalances periodically, either weekly or monthly, and only when at least one of the nine ETFs show a change in trend; and (iv) applies a 25% cap per ETF (*i.e.*, no ETF would hold more than 25% of the total assets in the strategy) at the time of rebalancing, with the remainder of the portfolio

invested in a short-term treasury ETF (representing cash).

3.      Present created and was responsible for all of F-Squared's AlphaSector advertisements, which included PowerPoint presentations describing the strategy and its past performance, including for the period April 2001 to September 2008.  The relevant slides from F-Squared's August 2013 standard presentation for the AlphaSector Premium Index, which was available on F-Squared's public website until the end of September 2013, are attached as Exhibit 1. F-Squared posted the presentations and other AlphaSector performance advertisements and marketing materials on its public website and sent them to numerous prospective and current clients from September 2008 to September 2013.

4.      From AlphaSector's inception in October 2008 through September 2013, F-Squared advertised AlphaSector's past performance as index performance.  Even though F-Squared did not create AlphaSector until late 2008, F-Squared made two materially false claims in its AlphaSector advertisements and Forms ADV, namely that:

- the in/out ETF signals that formed the basis of the AlphaSector index returns had been used to manage client assets from April 2001 to September 2008; and

- the in/out ETF signals resulted in a track record that significantly outperformed the S&P 500 Index from April 2001 to September 2008.

F-Squared was at least reckless in advertising both of these statements.

<u>F-Squared and Present Used Back-Tested Data to Create a Seven-Year Track Record</u>

5.      According to Present, in early 2008, Present and a proprietor of a private wealth advisory firm (hereinafter, "Private Wealth Advisor") discussed a sector rotation investment strategy using ETFs.  According to Present, in the context of these discussions, the Private Wealth Advisor claimed to have used a sector rotation strategy to manage client assets.  Present never saw records showing that the Private Wealth Advisor had invested advisory clients in a sector rotation strategy.

6.      Present also understood that the Private Wealth Advisor had a college intern who was developing an algorithm to use in conjunction with the sector rotation strategy.  The algorithm could generate a momentum-based signal that could be used to determine whether to invest or not invest in a particular sector ETF.  As discussions between Present and the Private Wealth Advisor moved forward in summer 2008, the Private Wealth Advisor decided to co-found a signal provider company (the "Data Provider") with his intern.  The Data Provider would send data with in/out signals to F-Squared that F-Squared would then use to determine whether AlphaSector would own or not own an ETF.

7.      In late August and early September 2008, as F-Squared and the Data Provider were finalizing a contract for signal delivery to F-Squared, the Private Wealth Advisor's intern sent Present three sets of hypothetical, back-tested weekly trends for each of the ETFs.  A positive trend was a signal to be "in" (buy or own) the ETF, and a negative trend was a signal to be "out" (sell or do not own) of the ETF.  The first two data sets of trends were based on whether the simple moving average of each ETF had increased or decreased from the previous week.  One of the two sets of trends was based on a 41-week simple moving average and the other set was based on a 61-week simple moving average.[6]  The intern's third set of signals were from his own algorithm.

8.      After he received the three sets of signals from the Private Wealth Advisor's intern, Present instructed an F-Squared employee to divide the three sets of weekly ETF trend or signal data among three different time periods, which, according to Present, corresponded to the periods the Private Wealth Advisor had claimed each set of signals had been used to manage his clients' assets, and then calculate AlphaSector's back-tested and hypothetical historical performance for the period April 2001 to September 2008.  The 61-week simple moving average trends were used for the period April 2001 to June 2006, the 41-week simple moving average trends were used for the period July 2006 to June 2008, and the signals from the intern's algorithm were used for the period July 2008 to September 2008.

9.      To convert the in/out ETF signals into an index "track record," F-Squared and Present tested the performance of various portfolio construction methodologies – which convert the ETF signals into performance – and ultimately Present created the rules, described in paragraph 2, that are central to the AlphaSector strategy.

10.     F-Squared's AlphaSector advertisements emphasized algorithmic-based models that purportedly supported both the hypothetical and actual track record beginning in July 2008, but in reality the AlphaSector track record for the period April 2001 to June 2008 was based only on changes in 41-week and 61-week simple moving averages.  An example of the model description underlying AlphaSector is at page 14 of Exhibit 1.

11.     The Private Wealth Advisor never used a sector rotation strategy.  His client and customer trades were ad hoc, client-by-client, non-discretionary, and were not uniform across clients.  Before mid-2008, the Private Wealth Advisor and his business partner traded the ETFs that form the basis of AlphaSector only infrequently, and they did not trade some of the ETFs at all.  To the extent that the Private Wealth Advisor ever attempted to use moving average data to make trades, the trades were not consistent with the trend data F-Squared and Present used to create AlphaSector's performance.

---

[1] In this instance, the simple moving average is the sum of the weekly closing prices of an ETF for either 41 or 61 weeks divided by either 41 or 61.  The trends the intern sent Present showed each ETF's simple moving average at the end of each week for the period 2001-2008.  A positive ETF trend, for example, meant that week's simple moving average for the particular ETF was higher than the prior week's simple moving average.

<u>The Track Record Contained a Substantial Performance Calculation Error</u>

12.      F-Squared created the pre-October 2008 "historical track record" incorrectly by implementing all the purchases and sales dictated by the ETF trend signals one week before they should have been implemented.  Because the signals were detecting price momentum, F-Squared's incorrectly implementing the signals one week early meant that AlphaSector's "historical track record" was based on its selling before price drops that had already occurred and buying before price increases that had already occurred.  As described below, virtually all of AlphaSector's claimed outperformance relative to the S&P 500 Index for the pre-October 2008 period is attributable to this erroneous calculation.

13.      The inaccurate compilation of historical data substantially improved the AlphaSector's strategy's advertised back-tested and hypothetical historical performance for the pre-October 2008 period.  If an investor made a hypothetical investment of $100,000 on April 1, 2001 (assuming a reinvestment of dividends and no further contributions or withdrawals), the investment would have been worth approximately $128,000 on August 24, 2008 if invested in the S&P 500 Index.  With accurately timed (but still hypothetical and back-tested) signal implementation, the same investment in F-Squared's hypothetical ETF sector rotation strategy would have been worth $138,000.  However, by implementing the hypothetical and back-tested signals one week early, F-Squared advertised the investment as worth $235,000.

<u>After 2008, Present and F-Squared Continued to Advertise AlphaSector's Hypothetical and Back-Tested and Substantially Improved Track Record</u>

14.      On multiple occasions after September 2008, Present requested back-up documentation from the Private Wealth Advisor to support AlphaSector's track record.  Present never received back-up from the Private Wealth Advisor.  Despite the lack of documentation of live assets supporting AlphaSector's performance for the period prior to September 2008, F-Squared and Present continued to advertise the false track record until September 2013.

15.      In January 2009, Present contacted the Private Wealth Advisor and his business partner to obtain an audited track record for the Private Wealth Advisor's accounts that had supposedly tracked the AlphaSector methodology.  Present did not receive one.  During these discussions, the Private Wealth Advisor told Present that the Private Wealth Advisor did not have a specific track record because he considered the sector rotation strategy to be a client-by-client trading strategy and not a specific product.

16.      In October 2009, F-Squared began sub-advising mutual funds using the AlphaSector strategies.  In connection with that effort, Present assured the mutual fund adviser that AlphaSector's performance was constructed based on "actual investment philosophy, trading patterns and portfolio strategy that was employed for the client assets."  Present stated that the portfolio construction rules used to create AlphaSector were all "consistent elements of the AlphaSector Strategy during its entire existence, and critical to its performance returns."  Present also stated that the AlphaSector Index was

"based on investment decisions that were generated on a live basis since 2001" and "the Index therefore explicitly does not reflect backtested data, but instead represents live, historical data." The mutual fund adviser, working with Present, amended the funds' prospectus to include the inflated historical performance of the AlphaSector indexes from April 2001 to September 2008.

17.    In June 2012, F-Squared retained an outside attorney to perform a mock audit. One of the recommendations from the mock audit was that F-Squared "should ensure that it has books and records to support its performance disclosed for years prior to the year 2006." Present sent several communications in June and July 2012 to the Private Wealth Advisor and officers of the Data Provider co-founded by the Private Wealth Advisor in 2008, seeking the required records. F-Squared's then-CCO also prepared a document by which the Data Provider and/or the Private Wealth Advisor would certify that they had records to support the advertised historical performance. These efforts proved unsuccessful. Present's effort to elicit information from the Data Provider also prompted the Data Provider's CEO and COO to tell Present that: (i) the Private Wealth Advisor's former intern (now the Chief Technology Officer (CTO) of the Data Provider) was only 14 years old in 2001; and (ii) the data the former intern sent Present would have been back-tested for the period before either 2007 or 2008, when the former intern started working on the algorithm.

18.    In October 2012, Present received a copy of a September 2008 email from a then F-Squared employee to a then employee of the Private Wealth Advisor concerning the implementation of historical signals. That email concerned the dating convention associated with the Data Provider's signals and should have called into question whether F-Squared implemented the signals one week early in creating AlphaSector's pre-October 2008 track record. Nonetheless, Present and F-Squared continued to advertise that inflated track record.

19.    By May 2013, F-Squared had decided to replace the signal provider company's ETF signals with signals generated by its own proprietary model. On July 1, 2013, Data Provider's CEO and CTO told Present that they could not replicate AlphaSector's pre-October 2008 advertised performance when they used the signals they understood were the basis of the AlphaSector track record. In September 2013, F-Squared removed all performance track records and advertising materials for the time period April 2001 to September 2008 from its website.

<u>F-Squared's Inaccurate Advertisements</u>

20.    F-Squared's advertisements stated that the inception date of the AlphaSector indices "is based on an active strategy with an inception date of April 2001. Inception date is defined as the date as of which investor assets began tracking the strategy." This disclosure is located in Exhibit 1 at page 18.

21.    Starting in late 2009, F-Squared's AlphaSector advertisements also explicitly claimed that the track record for the period April 2001 to September 2008 was not back-tested. For example, even as of September 2013, F-Squared's advertisements stated: "The process of converting the active strategy to an index implies that the returns presented, while not backtested, reflect theoretical performance an investor would have obtained had it invested in the manner shown and does not

represent returns that an investor actually attained, as investors cannot invest directly in an index." This disclosure is located in Exhibit 1 at page 18.

22.     From September 2008 to September 2013, F-Squared advertised that AlphaSector indices had outperformed the S&P 500 Index, particularly for the period from April 2001 to September 2008.  Attached at pages 10 and 11 of Exhibit 1 are examples of AlphaSector performance advertisements.

23.     F-Squared also claimed that it was responsible for AlphaSector's buy and sell decisions for the pre-October 2008 period.  For example, in September 2013, F-Squared's public website featured news articles with statements such as:

- "Back in mid-2007, well before the financial debacle that began with the collapse of the investment bank Bear Stearns, Howard Present, co-founder, president and CEO of F-Squared Investments in Boston, had a strategy that determined that financial stocks were becoming too risky.  But they didn't just sell down the financial holdings, which at the time represented one-ninth of his strategy's investments.  He sold *all* his financial holdings."

- "We eventually dropped the tech sector in 2001," says Present.

- "Financials in 2006, [Present] notes, had moved from a historic average of about 15% of the S&P to 28%, or nearly double, which was another sign of a bubble that F-Squared was able to avoid. . . And when [Financials] started to show signs of decline, F-Squared dropped its entire financials allocation like a hot potato."

### F-Squared's Inaccurate Forms ADV

24.     F-Squared's various Forms ADV filed during the period October 2008 to September 2013 inaccurately claimed that the investment models underlying the index had been used to manage actual client assets between April 2001 and September 2008.

### F-Squared's Policies and Procedures Were Inadequately Designed and Implemented

25.     During the October 2008 to October 2013 time period, F-Squared failed to adopt and implement policies reasonably designed to prevent violations of the Advisers Act and its rules.  For example, F-Squared did not have policies reasonably designed to prevent the use of performance advertising materials were false or misleading.  Furthermore, F-Squared published performance advertisements without back-up for the performance, even after the issue was identified in a mock audit in 2012.

## Conclusion

26.    In connection with the violations described in the foregoing Admissions, F-Squared Investment, Inc.'s actions were, at a minimum, reckless.

# EXHIBIT 1

# Strategies Tracking the AlphaSector® Series of Indices:



## AlphaSector Premium Index



AUGUST 2013

# AlphaSector was designed to meet the real needs of investors: risk controls for down markets, participation in up markets[1]

● **Powerful but simple story, and uses NO derivatives, leverage, or shorting**

**Growth of $100k:  Comparison vs. S&P 500 TR**                    **Data as of June 30, 2013**



|  | AlphaSector Premium Index | S&P 500 |
|---|---|---|
| *Cumulative Return* | 368.2% | 76.0% |
| *1 Year Return* | 21.3% | 20.6% |
| *3 Yr Return (Annualized)* | 19.3% | 18.5% |
| *5 Yr Return (Annualized)* | 13.8% | 7.0% |
| *10 Yr Return (Annualized)* | 14.8% | 7.3% |
|  |  |  |
| *Standard Deviation* | 10.4% | 15.5% |
| *Annual Excess Return* | 8.7% | N/A |
| *R-Squared* | 53.0% | N/A |
| *Maximum Drawdown* | -13.4% | -51.0% |
|  |  |  |
| A�す MMETRY Rᴀᴛɪᴏ* | **70%** | **0%** |
| *Up Capture Ratio(Bull)* | 85% | 0% |
| *Down Capture Ratio (Bear)* | 15% | 0% |

*Source: Morningstar, F-Squared Investments.  ¹April 2001– June 2013*

*\* See final pages for definition of Asymmetry Ratio*

Copyright 2013.  Please see "Important Information" on final pages for disclosures that are an integral part of this presentation.



# AlphaSector Premium Index has historically delivered consistent returns across multiple market cycles[1]



**Annual Returns by Calendar Year**

- S&P 500 TR
- AlphaSector Premium Index

**Relative Volatility (Green = API Standard Deviation versus S&P 500 Standard Deviation)**

*Source: Morningstar, F-Squared Investments.   [1]April 2001– December 2012*

Copyright 2013.  Please see "Important Information" on final pages for disclosures that are an integral part of this presentation.



# AlphaSector Premium: Construction methodology

- **Investments include:**
  - ➢ Nine exchange traded funds (ETFs) reflecting the primary sectors of the U.S. economy
  - ➢ Short-term Treasuries ETF, used for downside protection

        

| Consumer Discr | Consumer Staples | Energy | Financials | Healthcare | Industrials | Materials | Tech | Utilities | S-T Treasury |
|---|---|---|---|---|---|---|---|---|---|

- **Index is re-evaluated weekly**

- **Sector ETFs are traded using a binary model – either IN or OUT of the portfolio**
  - ➢ Sectors forecasted for positive return are left in; sectors forecasted to lose money are removed entirely
  - ➢ Decisions are based on a proprietary quantitative model in operation and development since 2001

- **All sectors remaining IN the index are <u>equal weighted</u> at the time of rebalancing**
  - ➢ There is a maximum cap of 25% for any sector ETF at time of rebalance

- **When 6 or more sectors are OUT, the model reduces exposure to equities**
  - ➢ Begin to build "cash" position using Short-term Treasury ETF:
    - 3 sectors IN = 25% cash; 2 sectors IN = 50% cash; 1 sector IN = 75% cash
  - ➢ Can go to 100% in S-T Treasuries if all 9 sectors are eliminated

Copyright 2013.  Please see "Important Information" on final pages for disclosures that are an integral part of this presentation.

**Alph α Sector**™
An F-Squared® Solution

# AlphaSector Indices periodically decide to either eliminate or include a sector from the Index (binary option)[1]



**Historical Monthly Model Allocations
with Cumulative Return of AlphaSector Premium Index and S&P 500**

*Source: Morningstar, F-Squared Investments.* [1]*April 2001– June 2013*

Copyright 2013. Please see "Important Information" on final pages for disclosures that are an integral part of this presentation.

AlphɑSector™
An F-Squared Solution

# AlphaSector Premium: Model description

- **Model objective**
  - ➤ Makes a probabilistic determination of the risk of loss for each component ETF

- **Primary factors**
  - ➤ Volatility
    - ➤ Volatility trends
    - ➤ Rate of change
  - ➤ Price momentum

- **Key aspects**
  - ➤ Price momentum modified by volatility through use of a "Dynamic Volatility Window"
  - ➤ Utilizes intra-day volatility
  - ➤ Proprietary volatility measure featuring "True Volatility"
    - ➤ Volatility transformed into step function versus traditional rolling measure

Copyright 2013. Please see "Important Information" on final pages for disclosures that are an integral part of this presentation.



## Important Information

Past performance is no guarantee of future results.

"AlphaSector®" is a registered trademark of F-Squared Investments, Inc. and is used with permission. This material is proprietary and being provided on a confidential basis, and may not be reproduced, transferred or distributed in any form without prior written permission from F-Squared Investment Management, LLC or one of its subsidiaries (collectively, "F-Squared Investments" or "F-Squared"). F-Squared reserves the right at any time and without notice to change, amend, or cease publication of the information. This material has been prepared solely for informative purposes. The information contained herein includes information that has been obtained from third party sources and has not been independently verified. It is made available on an "as is" basis without warranty.

Investment products that may be based on AlphaSector Indexes may not be sponsored by F-Squared, and F-Squared does not make any representation regarding the advisability of investing in them. F-Squared serves as the model provider to various investment advisers. There is no guarantee that an investor's account will achieve its objectives or avoid losses. Inclusion of a mutual fund or an exchange traded fund in an index does not in any way reflect an opinion of F-Squared regarding the investment merits of such a fund, nor should it be interpreted as an offer of such a fund's securities. None of the mutual funds or exchange traded funds included in an index has given any real or implied endorsement or support to F-Squared or to this index. One cannot invest directly in an index.

All AlphaSector Indexes represented in this material do not reflect the actual trading of any client account. No representation is being made that any client will or is likely to achieve results similar to those presented herein.

Most AlphaSector Indexes are evaluated for rebalancing on both a monthly basis ("Rotation") or evaluated for rebalancing on a weekly basis ("Premium"). The following is a summary of the core AlphaSector strategies:

The *AlphaSector U.S. Equity Index* is based on an active strategy with an inception date of April 2001. Inception date is defined as the date as of which investor assets began tracking the strategy. Returns provided prior to 2008 were generated from data received under a third party licensing agreement and are provided on an as is basis. The process of converting the active strategy to an index implies that the returns presented, while not backtested, reflect theoretical performance an investor would have obtained had it invested in the manner shown and does not represent returns that an investor actually attained, as investors cannot invest directly in an index.

The *AlphaSector International Index* returns provided herein were restated in August 2013 and therefore returns presented may differ from previously published returns.

The *AlphaSector Global Index* is a blend of two Indexes, AlphaSector U.S. Equity Index and AlphaSector International Index. Both are based on active strategies, with the AlphaSector U.S. Equity Index having an inception date of April 2001 and the AlphaSector International Index having an inception date of May 2009. Any returns shown in the AlphaSector Global Index prior to May 2009 reflect partially backtested, simulated data.

The *AlphaSector Allocator Index* is a blend of four Indexes: AlphaSector U.S. Equity Index ("U.S. Equity"), AlphaSector International Index ("International"), AlphaSector INFInity Index ("Fixed Income"), and AlphaSector Alternatives Index ("Alternatives"). All are based on active strategies, with the U.S. Equity Index having an inception date of April 2001, the International Index having an inception date of May 2009, and the Fixed Income and Alternative Indexes having an inception date of December 2009. Any returns in the AlphaSector Allocator Index shown prior to December 2009 reflect partially backtested, simulated data.



# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
SECURITIES AND EXCHANGE COMMISSION, )
                                                )
                          Plaintiff,            )
                                                )
v.                                              )        Case No. 14-cv-14692-LTS
                                                )
HOWARD B. PRESENT,                              )
                                                )
                          Defendant.            )
_____)

<u>ORDER ON MOTION FOR ENTRY OF FINAL JUDGMENT (DOC. NO. 357)</u>

March 20, 2018

SOROKIN, D.J.

The Securities and Exchange Commission ("SEC") brought a civil enforcement action

against Defendant Howard Present for violations of the Investment Advisers Act of 1940 (the

"Advisers Act") and rules thereunder.  Following a trial, the jury returned a verdict on October 5,

2017 in favor of the SEC.  Doc. No. 353.  Pending before the Court is the SEC's motion for entry

of final judgment.  Doc. No. 357.  The SEC's motion is ALLOWED.  For the reasons that

follow, the Court enjoins Present from future violations of the Advisers Act and orders Present to

pay (i) disgorgement in the amount of $10,849,604, (ii) pre-judgment interest on the

disgorgement amount, and (iii) a civil penalty in the amount of $1,575,000.


I.       INJUNCTIVE RELIEF

The SEC urges the Court to enjoin Present permanently from violating the Advisers Act

provisions and related rules at issue in this action.  Section 209(d) of the Advisers Act provides

that, upon a showing that a person has engaged in an act or practice that violates the Act, a

permanent injunction "shall be granted without bond." 15 U.S.C. § 80b-9(d). Injunctive relief is appropriate where there is a "reasonable likelihood of recidivism[.]" SEC v. Sargent, 329 F.3d 34, 39 (1st Cir. 2003). In determining whether future violations are reasonably likely, courts consider, among other factors, the nature of the violation (including its "egregiousness and its isolated or repeated nature"), whether the defendant will be in a position to violate the law again, and whether the defendant has recognized the wrongfulness of his conduct. Id.

These factors weigh in favor of injunctive relief. Based on the evidence presented at trial, the Court finds that Present's conduct was egregious. While AlphaSector was not a sham product (a fact weighing against injunctive relief), Present secured AlphaSector's success through false statements over a substantial period of time. Far from isolated instances, Present's misstatements were consistent in message, broadly disseminated, and increasingly bold. Moreover, the false statements multiplied due to Present's persistent disinterest in whether what he was advertising was truthful. The jury found that Present acted with scienter in the form of recklessness, defined as "an extreme departure from the standards of ordinary care, which presents a danger of misleading other persons that is either known to the defendant or is so obvious that the defendant must have been aware of it." Present's recklessness lasted for most of the sales life of the AlphaSector strategy. It persisted in the face of pointed inquiry from investment professionals, among others. It arose despite his extensive familiarity with due diligence. Yet, only after Corey Hoffstein and Tom Rosedale raised the specter of legal action in July 2013 did Present inquire into whether the advertised pre-2008 returns were accurate and whether real client assets had in fact followed the strategy before AlphaSector's inception. Doc. No. 363 ¶ 10.

Even now, Present declines to take responsibility for years of misleading clients and

potential clients.  He fails to understand the wrongfulness of having misrepresented the strategy.

See, e.g., Present Affidavit, Doc. No. 363 ¶ 14 ("based on the live performance of the

[AlphaSector] Indexes, this was a 'victimless' violation").  Further, he blames his violations on

Jay Morton.  Id. ¶ 16 ("it was an isolated event, triggered by a third-party's fraud, and there were

never any clients harmed"); id. ¶ 5 (characterizing his violations as "not engaging in enough due

diligence to have discovered the truth of the matter"); id. ("my false statements were the direct

result of fraudulent statements made to me verbally, in writing, and through contractual language

from Jay Morton and his colleagues at NFR").  Nonetheless, Present bears independent, personal

responsibility for his own independent conduct.  Among other things, he recklessly made

repeated false statements that lured cautious investors to trust their savings to an untested product

that he represented as battle-hardened through two bear markets.  His failure to recognize the

harm of his misrepresentations, his sustained willingness to make ever-bolder statements without

any support, and his inability to appreciate his own role in misleading investors now all indicate

a reasonable likelihood of further violations.[1]  A permanent injunction is therefore appropriate.[2]


II.    DISGORGEMENT

The SEC seeks disgorgement by Present of $11,524,614, representing Present's earnings

from F-Squared after 2009,[3] reduced by (i) an annual amount equal to Present's pre-AlphaSector

compensation (approximately $115,000 a year) and (ii) a "percentage arguably attributable to

---

[1] Although Present notes that he has not worked in the securities industry since 2014, Present Aff., Doc. No. 363 ¶ 17, the Court finds it reasonably likely that Present will seek to resume what he characterizes as his "long, unblemished career … in the securities area[,]" id. ¶ 3.
[2] In no way does the Court view an injunction as punishment for Present's proceeding to trial.
[3] 28 U.S.C. § 2462 bars disgorgement of payments received more than five years before the SEC's filing of its enforcement case (here, December 22, 2014).  See Kokesh v. SEC, 137 S.Ct. 1635 (2017).

continued sales of AlphaCycle," assuming that the AlphaCycle product would have sustained F-Squared absent the intervening success of AlphaSector.  Doc. No. 358 at 11.

As an initial matter, Present contends that disgorgement is a penalty outside of the Court's equitable authority to order, in light of the Supreme Court's holding in Kokesh that disgorgement is a penalty for purposes of Section 2462.  However, Kokesh's holding on the scope of Section 2462 does not undermine First Circuit precedent supporting a court's equitable power to prevent unjust enrichment by ordering disgorgement.  See SEC v. Sargent, 329 F.3d 34, 41 (1st Cir. 2003) (distinguishing statutory civil penalties, which "are intended to penalize the defendant for illegal conduct," from equitable disgorgement, which "merely restores a defendant to his original position without extracting a real penalty for his illegal behavior" (internal citations omitted)).  Moreover, no court has understood Kokesh to call such authority into question.  See, e.g., SEC v. Metter, 706 Fed.Appx. 699, 702 (2d Cir. 2017) (addressing Kokesh and upholding disgorgement order); SEC v. Jammin Java Corp., 2017 WL 4286180 at *2-4 (declining "to upset decades of settled jurisprudence" supporting courts' equitable power to order disgorgement).  This Court likewise concludes that its equitable power to order disgorgement remains intact.

The Court has discretion to enter an order of disgorgement in an amount reflecting "a reasonable approximation of the profits causally connected to" Present's violations.  SEC v. Happ, 392 F.3d 12, 31 (1st Cir. 2004) (quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  Disgorgement forces the defendant to give up the amount by which he was unjustly enriched, "even if it exceeds actual damages to victims."  SEC v. Cavanagh, 445 F.3d 105, 117 (2d Cir. 2006) (internal citation omitted).  "The risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty."

Happ, 392 F.3d at 31 (internal citations omitted).  "Once the SEC shows that the disgorgement is a reasonable approximation, the burden shifts to the defendant to demonstrate that the amount of disgorgement is not a reasonable approximation."  Id. (internal citations omitted).

Having considered the parties' briefs and heard argument at a hearing on the SEC's motion, the Court concludes that the SEC's proposed disgorgement amount is a "reasonable approximation of profits causally connected to" Present's violations.  Id.  For purposes of its analysis, the Court considers separately (a) proceeds from AlphaSector from before September 2013, during which time F-Squared promoted AlphaSector using the misstatements and erroneous performance history, and (b) proceeds from AlphaSector since September 2013, when F-Squared removed the misrepresentations from marketing materials.

*Pre-September 2013 Proceeds*

At trial, the SEC presented ample evidence of the marketing significance of Present's claims about the strategy's pre-2008 track record.  Present specifically touted the strategy's supposed response to market downturns in August 2001 and October 2007.  These assurances about AlphaSector's "airbag" were particularly salient for F-Squared's clients, especially given the post-meltdown era in which the statements were made.  Present marketed the strategy as shock-tested live during previous downturns.  Present points out that almost all of the revenue that F-Squared generated from AlphaSector arose after the index's first full year in use. However, all of the proceeds during this period are causally connected to his misstatements.  For instance, between October 2009 and September 2010, in its second full year in use, AlphaSector raised the vast majority of its new assets from clients that already had invested in AlphaSector before that period.  Those assets are traceable to the misrepresentations that initially inspired confidence in the strategy.  Further, later clients sought confirmation from Present that the

5

advertised pre-2008 performance was genuine.  Thus, Present fails to demonstrate any "clear

break in or considerable attenuation of the causal connection between" his misstatements and

any of the assets raised prior to September 2013.  Happ, 392 F.3d at 32.  Accordingly, the Court

orders Present to disgorge all compensation that he earned in relation to AlphaSector before that

time.

*Post-September 2013 Proceeds*

The SEC opened its investigation of F-Squared and Present in September 2013.

Subsequently, F-Squared removed all pre-2008 performance history from its AlphaSector

marketing materials.  The parties dispute whether the steps that Present took effected full

disclosure to existing clients.[4]  Doc. No. 363 ¶ 37; Doc. No. 365 at 4.  Present sent a letter dated

October 10, 2013 letter to F-Squared's clients sharing updated marketing materials and asking

clients to disregard all previous material going forward.  Doc. No. 365-3.  The letter announced

that "the SEC staff has been conducting an *examination* of F-Squared."  Id. (emphasis added).  In

no place did the letter reference the Division of Enforcement, an investigation, or any potential

enforcement proceedings.  While Present's letter noted that the SEC's "questions relate to

advertising, and the focus appears to be on the use of historic data in advertising materials and

clarity around our role as an index manager[,]" id., the letter failed to recant prior statements

representing that actual clients had tracked the AlphaSector strategy before 2008 and providing

overstated returns for the index.  The letter further obscured the disclosure by noting that the new

materials reflected "an already planned change that will present the Index performance record for

the most recent five years of performance."  Id.  The bulk of the letter sought to assure clients

that the AlphaSector strategy remained an appealing investment.  The Court does not consider

---

[4] Besides a *Wall Street Journal* article that referenced the investigation, which Present cites, Doc. No. 363 ¶ 37, the parties' memoranda discuss no remedial disclosures that Present or F-Squared made to the investing public.

such an obscuring and incomplete disclosure to have broken any causal link between prior misrepresentations and post-2013 investments.

While F-Squared's retiring of the backtested performance data in September 2013 raises some doubt that all asset inflows from clients not previously invested with AlphaSector[5] stemmed from Present's violations, the Court recognizes that factors beyond the then-current disclosures were material in these investment decisions. These factors included the residual influence of Present's prior misrepresentations and the significant client assets and market hype that those representations had secured for F-Squared. For these reasons, and given that "[t]he risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty," Happ, 392 F.3d at 31, the Court finds it reasonable to include all of Present's post-September 2013 earnings in the approximation of profits causally connected to Present's violations.

### Adjustment to SEC's Requested Disgorgement

The Court makes one adjustment to the SEC's calculation of the disgorgement amount. With respect to his base salary, Present states that F-Squared's board of directors approved base compensation of $250,000 per annum and that the $115,000 figure represents a partial-year payment. Doc. No. 363 ¶ 24. The SEC does not explain why disgorgement should be reduced by that partial-year payment rather than by the yearly salary of $250,000 that Present had been authorized to receive. Doc. No. 365 at 4. The Court considers an adjustment based on the authorized annual figure over five years to be appropriate.[6]

---

[5] Sales data submitted by Present indicates that only a small portion of F-Squared clients made initial investments with the AlphaSector index after September 2013. Doc. No. 363-3.

[6] F-Squared also offered other AlphaSector-titled index products "that were not solely based on the AlphaSector U.S. equity product." See Doc. No. 358 at 12-13; Doc. No. 358-1 ¶ 9b. Proceeds from the sale of these products is included in the disgorgement amount, since Present's misrepresentations about AlphaSector taint products for which AlphaSector was a key component.

Thus, disgorgement is ordered in the amount of $10,849,604.[7]

## III.   PREJUDGMENT INTEREST

The SEC also asks the Court to award prejudgment interest on the disgorgement amount.
Like disgorgement, prejudgment interest "is intended to deprive wrongdoers of profits they
illegally obtained by violating the securities laws"—specifically, any "interest-free loan" on the
unjust enrichment.  Sargent, 329 F.3d at 40-41.  The Court has "broad discretion" to determine
whether to award prejudgment interest.  Id. at 41.

Present enjoyed the use of proceeds from his violations since 2009.  The Court therefore
orders payment of prejudgment interest on the disgorgement amount, calculated at the rate used
by the Internal Revenue Service to calculate underpayment penalties.  See SEC v. Druffner, 802
F.Supp.2d 293, 298 (D. Mass. 2011).  The Court directs the SEC to submit a revised
prejudgment interest amount for the relevant time period using as principal the amount of
disgorgement determined by the Court herein.

## IV.   CIVIL PENALTY

Finally, the SEC requests that the Court order Present to pay "an appropriate third-tier
civil penalty," Doc. No. 358 at 17, as authorized under Section 209(e) of the Advisers Act, 15
U.S.C. § 80b-9(e).  Section 209(e) establishes three tiers of civil penalties.  A third-tier penalty is
warranted if "the violation involved fraud, deceit, manipulation, or deliberate or reckless
disregard of a regulatory requirement" and if the defendant's conduct "directly or indirectly

---

[7] This amount reflects Present's post-2009 earnings ($12,102,748), minus a *pro rata* amount of earnings attributable
to sales of the AlphaCycle product (totaling $3,144) and Present's authorized, annual salary ($1,250,000 over five
years).

resulted in substantial losses or created a significant risk of substantial loss to other persons." 15

U.S.C. § 80b-9(e)(2)(C).  In determining an appropriate civil penalty, courts have considered

factors including the egregiousness of the violation, the defendant's willingness or failure to

admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter

involved, and the defendant's current financial condition.  SEC v. Esposito, 260 F.Supp.3d 79, 93

(D. Mass. 2017).

Here, the facts show that Present's misrepresentations exposed clients to "a significant

risk of substantial losses."  In the wake of a major financial crisis, F-Squared targeted investors

who were seeking to avoid losses during periods of severe market decline.  Present claimed to

these investors that AlphaSector had avoided losses for real clients in prior economic downturns.

AlphaSector in fact had not been tested in these conditions.  Present now trumpets AlphaSector's

loss avoidance at the outset of the financial crisis; however, at that time, the AlphaSector index

was already 50% invested in cash.  Doc. No. 365-5.  The post-crash real performance of

AlphaSector fits the story of the market's steady recovery since 2009 and does not erase any risk

of substantial loss that Present created by inducing an especially risk-averse segment of investors

into following an actually-untested strategy.  Additionally, as noted, Present was reckless, his

conduct was repeated, and he has never meaningfully acknowledged or appreciated his own

misconduct.

These factors warrant a third-tier civil penalty under 15 U.S.C. § 80b-9(e)(2).  The Court

determines that the number of misrepresentations that Present made is the appropriate measure of

his violations.  This is so because the gravamen of his offense was the repeated and increasingly

bolder misrepresentations that he made.  In evaluating Present's misconduct here, the Court finds

that it does not merit a per-violation penalty near the statutory maximum (i.e., $150,000 or

9

$160,000) established by Congress, largely because the AlphaSector product itself was not fraudulent.  However, the Court considers Present's conduct sufficiently egregious to warrant a per-violation penalty well above the lower range available (e.g., $0 to $25,000).

Present asserts that he is effectively insolvent.  Doc. No. 18.  Assuming and accepting, without deciding, that he is presently insolvent, the Court finds that Present retains substantial earning capacity, in large part because of his experience in the financial industry.  Accordingly, the Court finds further information regarding Present's current financial status unnecessary.

Considering the totality of the facts and circumstances, the nature of Present's conduct, his assumed insolvency, and his present earnings potential, the Court finds that a civil penalty of $75,000 is warranted for each of the 21 violations identified in the SEC's memorandum in support of its motion, Doc. No. 358 at 16-17, for a total civil penalty of $1,575,000.

## IV.    FINAL JUDGMENT

Pursuant to the jury's verdict (Doc. No. 353), and having considered the SEC's Motion for Entry of Final Judgment (Doc. No. 357), the Court ALLOWS the SEC's Motion as described herein.  The SEC shall submit, by close of business on March 26, 2018, a conforming order of final judgment for the record.


SO ORDERED.

  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

# Exhibit D

**Exhibit A**

| Claim Number | Claimant | Claim Amount | Claim Description |
|---|---|---|---|
| 8 | Cantella & Co., Inc. | $198,152.02 | Indemnification by contract for professional services rendered |
| 63 | Howard Present | $8,495,941.00 | Indemnification pursuant to LLC agreement, company bylaws, D&O insurance policies, indemnification agreement, employment separation agreement, non-compete agreements, employment agreement, and bounced check for tax liability distribution |
| 64 | Howard Present | $2,809,524.00 | Indemnification pursuant to LLC agreement, company bylaws, D&O insurance policies, indemnification agreement, employment separation agreement, non-compete agreements, employment agreement, and bounced check for tax liability distribution |
| 65 | Mark Youngers, individually and on behalf of all investors in Virtus AlphaSector Funds | $500,000,000.00 | Amounts owed as result of lawsuit by Virtus customer against Virtus and F-Squared |
| 77 | Ladenburg Thalman Asset Management Inc. | $384,069.97 | Claims for fraudulent inducement and breach of contract |

| 78 | James T. Celico | $1,000,000.00 | Claims for fraud in connection with the sale of securities and fraudulent misrepresentation in connection with employment |
| 79 | James T. Celico | $1,000,000.00 | Claims for fraud in connection with the sale of securities and fraudulent misrepresentation in connection with employment |
| 80 | James T. Celico | $1,000,000.00 | Claim for fraud in connection with the sale of securities and fraudulent misrepresentation in connection with employment |
| 82 | Richard Tomney | Unliquidated | Indemnification claim |
| 83 | Richard Tomney | Unliquidated | Indemnification claim |
| 100 | Dawn Darnell | Unliquidated | Indemnification of manager pursuant to company LLC agreement |
| 102 | Betsy Amenta | Unliquidated | Indemnification of manager pursuant to company LLC agreement |
| 104 | Betsy Amenta | Unliquidated | Indemnification of manager pursuant to company LLC agreement |
| 106 | Dawn Darnell | Unliquidated | Indemnification of manager pursuant to company LLC agreement |

| 109 | Mark Youngers, individually and on behalf of all investors in Virtus AlphaSector Funds | $500,000,000.00 | Amounts owed as result of lawsuit by Virtus customer against Virtus and F-Squared |
|---|---|---|---|
| 110 | Frances Briggs, individually and on behalf of all investors in Virtus AlphaSector Funds | $500,000,000.00 | Amounts owed as result of lawsuit by Virtus customer against Virtus and F-Squared |
| 111 | Kimball Lloyd, individually and on behalf of all investors in Virtus AlphaSector Funds | $500,000,000.00 | Amounts owed as result of lawsuit by Virtus customer against Virtus and F-Squared |
| 123 | Laura P. Dagan | Unliquidated | Indemnification of manager pursuant to company bylaws |
| 124 | Laura P. Dagan | Unliquidated | Indemnification of manager pursuant to company LLC agreement |
| 126 | Deborah Deskavich | Unliquidated | Indemnification of manager pursuant to company LLC agreement |
| 127 | Deborah Deskavich | Unliquidated | Indemnification of manager pursuant to company bylaws |
| 128 | Stephen Ricci | Unliquidated | Indemnification of manager pursuant to company bylaws |
| 129 | Stephen Ricci | Unliquidated | Indemnification of manager pursuant to company LLC agreement |
| 130 | Thomas Mann | Unliquidated | Indemnification of manager pursuant to company LLC agreement |

| 131 | Thomas Mann | Unliquidated | Indemnification of manager pursuant to company bylaws |
| 132 | Ferdinand L.J. Vredonck | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 133 | Geraldine M. McNamara | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 134 | James. M. Oates | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 135 | Leroy Keith Jr. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 136 | Philip R. McLoughlin | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 137 | Richard E. Segerson | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 138 | Ferdinand L.J. Vredonck | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |

| 139 | Geraldine M. McNamara | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 140 | James. M. Oates | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 141 | Leroy Keith Jr. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 142 | Philip R. McLoughlin | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 143 | Richard E. Segerson | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 144 | Ferdinand L.J. Vredonck | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 145 | Geraldine M. McNamara | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |

| 146 | James. M. Oates | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 147 | Leroy Keith Jr. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 148 | Philip R. McLoughlin | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 149 | Richard E. Segerson | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 150 | Ferdinand L.J. Vredonck | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 151 | Geraldine M. McNamara | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 152 | James. M. Oates | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |

| 153 | Leroy Keith Jr. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 154 | Philip R. McLoughlin | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 155 | Richard E. Segerson | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against, among others, Virtus and F-Squared |
| 156 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 157 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 158 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 159 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |

| 160 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 161 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 162 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 163 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 164 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 165 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 166 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |

| 167 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 168 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 169 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 170 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 171 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 172 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 173 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |

| 174 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 175 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 176 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 177 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 178 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 179 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 180 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |

| 181 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 182 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 183 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 184 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 185 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 186 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 187 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |

| 188 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 189 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 190 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 191 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 192 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 193 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 194 | Virtus Investment Partners, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |

| 195 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 196 | Euclid Advisors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 197 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 198 | Virtus Investment Advisers, Inc. | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 199 | Virtus Opportunities Trust | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |
| 200 | VP Distributors, LLC | Unliquidated | Contribution and indemnity claim for lawsuit by Virtus customer against Virtus, Euclid, VP, and F-Squared |