# Exhibit 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F-SQUARED INVESTMENT MANAGEMENT, LLC, *et al.*,[1] | Case No. 15-11469 (LSS) |
| Debtors. | |
| Craig Jalbert, in his Capacity as Trustee for F2 Liquidating Trust, | |
| Plaintiff, | Adv. Pro. No. ~~REFER TO SUMMONS~~17-50758 (LSS) |
| v. | |
| George McClelland, | |
| Defendant. | |

### [PROPOSED] AMENDED **COMPLAINT** ~~TO AVOID AND RECOVER TRANSFERS~~

Plaintiff Craig Jalbert ("Plaintiff"), as trustee of the F2 Liquidating Trust (the "Liquidating Trust") of the estates of F-Squared Investment Management LLC and its subsidiaries (collectively, "F-Squared" or the "Debtors"), by and through undersigned counsel, files this complaint (the "Complaint") against George McClelland (the "Defendant"), and alleges as follows:

---

[1]  __The Debtor~~s~~ in these cases, along with the last four digits of ~~each Debtor's~~ its federal tax identification number, ~~are~~is:   F-Squared Investment Management, LLC (9247~~), F-Squared Investments, Inc. (0788), F-Squared Retirement Solutions, LLC (9247), F-Squared Alternative Investments, LLC (9247), F-Squared Solutions, LLC (9247), F-Squared Institutional Advisors, LLC (9247), F-Squared Capital, LLC (5257), AlphaSector LLS GP 1, LLC (3342), and Active Index Solutions, LLC (0788).~~.).  The Debtor~~s~~'s address is ~~2221~~Verdolino & Lowey, P.C., 124 Washington Street, Suite ~~201, Newton~~101, Foxboro, Massachusetts ~~02462~~02035, Attn: Craig R. Jalbert.

---

## INTRODUCTION AND NATURE OF THE ACTION

1.      F-Squared was an investment management company with a single significant revenue-generating product that it began marketing in 2008.  As F-Squared admitted, and as found after the trial of F-Squared's CEO in the United States District Court for the District of Massachusetts, F-Squared's marketing of that product was fraudulent from the outset of that marketing in 2008 through 2013.  As F-Squared further admitted, and as also found after trial, F-Squared willfully violated the securities laws when it fraudulently marketed its product.

2.      Even though F-Squared knew that it was committing fraud at the times of the Transfers (defined below) that are the subject of this Complaint, it failed to account for the impact of this fraud on its income statements and balance sheets.

3.      With respect to F-Squared's liabilities, in addition to F-Squared's (undervalued) liabilities on its balance sheets, F-Squared's admitted fraud resulted in at least the following liabilities, none of which appeared on F-Squared's balance sheets:

- Liability to the United States government, including to the Securities and Exchange Commission (the "SEC"), for certain civil and criminal statutory penalties as of the dates of the fraud, as well as exposure to forfeiture of *all* revenue derived from, or traceable to, the willful conduct that violated the securities laws, amounting to at least $50.2 million in 2012, $132.7 million in 2013, and $263.5 million in 2014;

- Indemnification liability to F-Squared's Financial Clients (defined below) who were investigated and sanctioned by the SEC and sued by their own clients, and contractual liability to the Financial Clients for breach of the model manager agreements governing these relationships: $12.5 million in 2012, $33.2 million in 2013, $65.9 million in 2014; and

- Liability under Massachusetts state law for unfair and deceptive trade practices: at least double, up to treble actual damages suffered by F-Squared's Financial Clients.

4.      Nor did F-Squared's balance sheets properly account for the impact of F-Squared's fraud on its (overvalued) assets, as follows:

- F-Squared overvalued its property and equipment by $251,742 in 2012, $1.6

{00020803. }

million in 2013, $1.9 million in 2014;

- F-Squared improperly booked deferred income tax assets of $1.9 million in 2012, $3.1 million in 2013, and $5 million in 2014;
- F-Squared overvalued its customer contracts by $12.3 million in 2013 and $10.2 million in 2014;
- F-Squared should have discounted, but did not discount, its accounts receivable by $1.6 million in 2012, $3.9 million in 2013, $2.6 million in 2014.

5.      After adjusting F-Squared's balance sheets for the financial effects of its fraud throughout the duration such fraud was committed, F-Squared was balance-sheet insolvent by at least $50 million in 2012, $142 million in 2013, and $277 million in 2014.

6.      The SEC commenced an investigation into F-Squared in 2013, and commenced and settled an administrative proceeding against F-Squared on December 22, 2014 in which F-Squared admitted to the fraud.  During and after the SEC's investigation, F-Squared lost nearly all of its clients (which F-Squared knew or should have known was inevitable, given its fraud), and was therefore unable to pay its debts as they came due as of the date of the settlement.

7.      Plaintiff has commenced this adversary proceeding to avoid and recover from Defendant or any other person or entity for whose benefit Transfers (later defined) were made pursuant to sections 544, 548 and 550 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and any Transfers that were fraudulent conveyances under federal and/or state law.  As described further below, the Transfers were all made to Defendant while the Debtors were insolvent and for which the Debtors did not receive reasonably equivalent (or any) value and are in the form of (i) tax distributions paid to Defendant to cover the cost of Defendant's personal income taxes related to Defendant's equity interest in F-Squared and/or profit interests paid to Defendant on account of Defendant's equity interest in the Debtors (the "Dividends") and (ii) a cash repurchase of stock initially purchased by the Defendant while the Debtors were insolvent and the stock was worthless (such repurchase, together with the

{00020803. }

Dividends, the "Transfers").  All such Transfers and each transferring Debtor are identified in **Exhibit A** hereto.

## JURISDICTION AND VENUE

~~1.~~8.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a), Article 10.5 of the *Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* (the "Plan") [D.I 478], and the *Order Confirming Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* (the "Confirmation Order") [D.I. 486].  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  ~~Venue is proper in this Court pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1409(a).~~

~~2.~~9.    Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a).

~~3.~~10.   The statutory and legal predicates for the relief requested by the Complaint are sections 544, ~~547~~, 548, and 550 of the Bankruptcy Code and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure.

~~4.~~11.   In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiff hereby states that it consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## PARTIES

~~5.~~12.   The Liquidating Trust is a liquidating bankruptcy trust established under the laws

of Delaware pursuant to the Plan and the F-Squared Liquidation Trust Agreement filed as Exhibit A to the *Notice of Filing of Plan Supplement to Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [D.I. 457].

6.13.   Defendant George McClelland is a natural person, residing at 12 Reservoir Drive, Southboro, MA, 01772.  Defendant was an employee and/or a unitholder of F-Squared prior to F-Squared's bankruptcy.  Defendant was a co-founder and Director of Business Development for F-Squared, and was on F-Squared's Board of Managers from 2008 through May 2014.  ~~As such, Defendant is a statutory insider pursuant to 11 U.S.C. § 101(31).~~

~~**INTRODUCTION AND NATURE OF THE ACTION**~~

~~7.      On July 8, 2015 (the "Petition Date"), the Debtors filed their respective voluntary Chapter 11 petitions in this Court.~~

~~8.      Prior to the Petition Date, and for some time thereafter, the Debtors were SEC registered investment management and research firms with corporate headquarters in Wellesley, Massachusetts and a research and development team located in New Jersey.  The Debtors' clients generally were investment advisors who sold the Debtors' investment portfolio model services to their own clients.~~

~~9.      Plaintiff has commenced this adversary proceeding to avoid and recover from Defendant or any other person or entity for whose benefit Transfers (later defined) were made pursuant to sections 544, 548 and 550 of the Bankruptcy Code any Transfers that may have been federal and/or state fraudulent conveyances.  As described further below, the Transfers were all made to Defendant while the Debtors were insolvent and for which the Debtors did not receive reasonably equivalent (or any) value and are in the form of (i) tax distributions paid to Defendant~~

to cover the cost of Defendant's personal income taxes related to Defendant's equity interest in F-Squared and/or profit interests paid to Defendant on account of Defendant's equity interest in the Debtors (the "Dividends") and (ii) a cash repurchase of stock initially purchased by the Defendant while the Debtors were insolvent and the stock was worthless (such repurchase, together with the Dividends, the "Transfers"). All such Transfers and each transferring Debtor are identified in **Exhibit A**.

10. In addition, and pled in the alternative, to the extent the Transfers were made to Defendant pursuant to an Agreement (later defined), Plaintiff seeks to avoid and recover from Defendant, or from any other person or entity for whose benefit the transfers were made, all preferential transfers of property that occurred during the ninety (90) day period or, in the case of Insiders[2] or non-statutory Insiders, the one year period, prior to the commencement of the bankruptcy cases, pursuant to sections 547 and 550 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

## **BACKGROUND**

### A.    The Debtors

11. As discussed more fully in the *Declaration of David N. Phelps in Support of Chapter 11 Petitions and First Day Motions* [D.I. 3], incorporated herein by reference, F-Squared was an investment management firm that served clients in the advisory, institutional, retail and retirement markets. F-Squared was organized as a limited liability company that paid no income taxes of its own; rather, income taxes were paid by each individual or entity with an ownership interest in F-Squared, on a ratable basis.

### B.    The Debtors' Cash Management System

---

[2] The term "Insider" is defined in 11 U.S.C. § 101(31).

{00020803. }

12.     As of July 8, 2015 (the "Petition Date"), the Debtors utilized a cash management system (the "Cash Management System") for the collection, concentration, management, and disbursement of funds in the Debtors' business.[3]   The Cash Management System consisted of eighteen bank accounts comprised of several account types, including depository, concentration, payroll, accounts payable, and investment accounts, which were maintained at People's United Bank ("People's"), Folio Investments ("Folio"), and Charles Schwab & Co. Inc. ("Schwab", and together with People's and Folio, the "Banks") [D.I. 5].

13.     Among these bank accounts, disbursements to Defendant were made from two People's accounts ending in 0499 held by debtor F-Squared Investment Management, LLC, and 0504 held by debtor F-Squared Investments, Inc. (the "Disbursement Accounts").   The Disbursement Accounts were used to pay the debts incurred by the Debtors.   The Debtors engaged in intercompany transactions to maintain control over funds moving within the Debtors' corporate group.  Further, the Debtors were able to accurately and carefully trace and account for all intercompany transactions.   Upon information and belief, based upon the Debtors' intercompany transactions and the tracking and tracing of these transactions, the Debtor incurring each debt directed and caused the payments on each of its debts issuing from the Disbursement Accounts.

C.      Circumstances Leading to Bankruptcy Filing

14.     F-Squared provided various index products to unaffiliated third parties, and also provided investment advisory services based on those index products to clients.  In order to provide these index products and services, F-Squared created and licensed a series of specialty

---

[3] More information on the cash management system can be found in the *Debtors' Motion (I) to Continue to Use Existing Cash Management System, Including Maintenance of Existing Investment Accounts, Bank Accounts, Checks and Business Forms, (II) for Waiver of Certain Requirements of the United States Trustee, and (III) for Extension of Time to Comply with Section 345 of the Bankruptcy Code.* [D.I. 5].

indexes (the "AlphaSector Indexes") covering a range of asset classes.  The AlphaSector Indexes were based on sector rotation strategies that used quantitative models, programmed to measure the volatility and price movements of exchange traded funds as criteria for inclusion and weighting in the indexes.  As of June 30, 2014, there were approximately $28.5 billion invested by F-Squared clients pursuant to F-Squared's AlphaSector Indexes, including $13 billion in mutual fund assets sub-advised by F-Squared.

A.    The Securities*F-Squared's Business Based On Fraud*

14.    In 2006, the Defendant (together with former CEO Howard Present, and Vadim Fishman) created F-Squared as an investment management and research firm.  F-Squared's first foray into investment management was the development of a quantitative-based investment product called AlphaCycle.  Despite years of effort, AlphaCycle failed to generate a profit or even generate meaningful revenue.  Indeed, in the first two years of F-Squared's existence, F-Squared generated less than $200 (two hundred dollars) of revenue from client fees from the use of that product.

15.    In 2008, F-Squared began to market a new product, which it called "AlphaSector," that consisted of a model portfolio of exchange-traded funds ("ETFs") that could be measured and tracked as an index.  F-Squared marketed this new product to various broker-dealers and mutual fund companies (F-Squared's "Financial Clients") who wanted to use the AlphaSector strategy to manage their own clients' assets (these assets became F-Squared's "assets under advisement" or "AUA").  F-Squared conducted business primarily by means of model manager and sub-advisory agreements with these Financial Clients, but also used AlphaSector to manage assets directly for individual customers.  From the time F-Squared began

to market AlphaSector, the sale of AlphaSector signals to its clients and Financial Clients constituted F-Squared's only material business.

16.    F-Squared's agreements with its Financial Clients contained indemnification clauses that required F-Squared to

> indemnify and hold harmless [the Financial Clients] against any and all losses, claims, damages, liabilities or expenses (including reasonable attorneys' fees and amounts paid in settlement . . .) to which such indemnified parties may become subject under any statute, regulation, at common law or otherwise, insofar as such losses, claims, damages, liabilities or expenses arise out of, or as a result of, [F-Squared's] willful misconduct, bad faith, breach of fiduciary duty or gross negligence in the performance of its services or obligations under [such agreements].

17.    F-Squared's services and obligations under these agreements included, among other things, providing information required under the Investment Advisers Act and immediately notifying the Financial Clients of any and all material facts not contained in F-Squared's Form ADV.  F-Squared admitted in the Transfer Order that it willfully misled its Financial Clients and that it willfully failed to include all relevant information on its Form ADV, in violation of Sections 204, 206(1), 206(2), 206(4), and 207 of the Investment Advisers Act of 1940 and Rules 204-2(a)(16), 206(4)-1, 206(4)-7, and 206(4)-8 thereunder, and that it willfully aided and abetted and caused certain mutual funds sub-advised by F-Squared to violate Section 34(b) of the Investment Company Act of 1940.

18.    Beginning with the outset of its use of the AlphaSector Indexes in 2008, F-Squared's marketing of the AlphaSector Indexes was fraudulent.  From October 2008 through September 2013, in multiple press releases, presentations and ~~Exchange Commission (the "SEC")~~mailings to potential Financial Clients and customers, and postings on its website, F-Squared claimed that the sector rotation model upon which AlphaSector was based had been

used on a live basis to manage client assets since 2001, and claimed that AlphaSector had outperformed the S&P 500 index since 2001. F-Squared also made these claims in its Forms ADV that it filed with the SEC in 2008, 2012, and 2013.

19.     These claims, however, were false. As F-Squared later admitted to the SEC, neither AlphaSector nor the sector-rotation model upon which it was based had been used on a live basis since 2001. Rather, back-tested data, instead of live data, was used to develop the track record for AlphaSector.

20.     Additionally, F-Squared's back-tests contained a material error (the "Backtesting Error"): in creating its back-tested track record, F-Squared incorrectly applied the ETF signals that dictated whether a particular ETF was in or out of the AlphaSector portfolio. That is, F-Squared applied these in/out signals one week *before* the ETF price changes that caused changes in the signals. As a result, the advertised historical performance of AlphaSector during the back-test period was based on implementing signals to sell before price drops and to buy before price increases that had occurred a week earlier. The Backtesting Error substantially improved AlphaSector's advertised back-tested historical performance. Indeed, F-Squared admitted that, due to the Backtesting Error, F-Squared advertised that investments made using AlphaSector would increase approximately 350% more than if F-Squared had applied the signals accurately. See Transfer Order at ¶¶ 2-3.

21.     F-Squared generated enormous revenue from AlphaSector, at least while its fraud went undiscovered, all of which was subject to forfeiture to the United States due to the fact that the revenue was derived from its willful conduct in violation of the securities laws. Based on the Trustee's review of F-Squared's books and records, F-Squared generated over $250 million of revenue related to the use and licensing of the AlphaSector strategy through the third quarter of

2014, with approximate yearly totals as follows: $11 million for the six months ending December 31, 2011; $38 million in 2012; $82 million in 2013; and $130 million in (full year) 2014.

### B.  F-Squared's Fraud Is Uncovered

22.    The SEC began an investigation of F-Squared in 2013.  On July 23, 2013, the SEC informed F-Squared that it would be commencing an examination, and in September 2013, the SEC advised F-Squared that it was referring the examination to the SEC's enforcement division.  Also in September 2013, F-Squared removed all pre-2008 performance history from its AlphaSector marketing materials.

23.    On October 2, 2013, the SEC issued a subpoena to F-Squared requesting documents and testimony, and provided F-Squared a formal order of investigation on October 18, 2013.  During the year that followed, F-Squared produced thousands of documents to the SEC, and many of its employees provided testimony regarding F-Squared's fraud.

24.    On August 13, 2014, the SEC issued a Wells notice to F-Squared.

15.25.  On December 22, 2014, the SEC and F-Squared agreedreached a settlement to resolve F-Squared's fraud by means of an administrative cease-and-desist proceeding brought by the SEC pursuant to Section 203(k) of the Investment Advisers Act ("IAA") and Sections 9(b) and 9(f) of the Investment Company Act ("ICA").  Under the terms of the order enacting this resolutionsettlement (the "Transfer Order").", a true and correct copy of which is attached hereto as **Exhibit B**), the SEC charged, and F-Squared agreed to admit, that F-Squared's performance track record for the period between April 2001 and September 2008 (which track record F-Squared used to market its only significant product up until 2013) was materially inflated, hypothetical and back-tested.  As detailed below, F-Squared also admitted to specific willful

violations of the securities laws.  The Transfer Order required F-Squared to pay $30 million in disgorgement to the SEC, as well as a $5 million fine.

16.     On the same day, the SEC also commenced a civil action against Howard Present, who had been the CEO of F-Squared until his departure in November 2014.

17.     F-Squared's ability to make its payroll and pay its debts as they came due following the transfer of $35 million to the SEC was limited and depended on continued payment of asset management fees by clients.  By 2014, a substantial majority of F-Squared's revenues, however, were on account of fees paid by F-Squared's clients to F-Squared to permit them to manage their client investments based on the AlphaSector Indexes.  Thus, at all relevant times, F-Squared generated a great majority of its revenue by means of illegal activity almost certain to give rise, at some point, to massive liabilities on account of that activity, and so F-Squared was insolvent from the inception of its use of the AlphaSector Index strategy.

26.     This amount was the result of a highly negotiated settlement, and, as described below, did not reflect the full amount of the liabilities that existed to the United States, including to the SEC, at the times of the Transfers.  The Trustee has also brought an action against the SEC under the Administrative Procedures Act because the SEC did not have the power to exact disgorgement under the circumstances of this case.  However, the fact that the SEC exceeded its powers as to the manner in which it eventually settled the F-Squared matter in December 2014 does not reflect on the amount of the liabilities that F-Squared owed at the times of the Transfers.

27.     As F-Squared admitted in December 2014, each and every time F-Squared made such a claim to each and every client, Financial Client, or prospective client, from October 2008 through September 2013, it committed the following five securities violations:

- It willfully violated Section 206(1) of the Investment Advisers Act of 1940 (the "IAA"), which prohibits any investment adviser from employing any device, scheme, or artifice to defraud any client or prospective client;

- It willfully violated Section 206(2) of the IAA, which prohibits any investment adviser from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

- It willfully violated Section 206(4) of the IAA and Rule 206(4)-1(a)(5) thereunder, which makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the IAA to, among other things, directly or indirectly publish, circulate, or distribute an advertisement which contains any untrue statement of material fact, or which is otherwise false or misleading; and

- It willfully violated Section 206(4) of the IAA and Rule 206(4)-8 thereunder, which makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the IAA for any investment adviser to a pooled vehicle to make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle, or to otherwise engage in any act, practice, or course of business that is fraudulent, deceptive or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

28.    Additionally, F-Squared admitted, in December 2014, to the following securities violations, which occurred continuously from October 2008 through September 2013:

- It willfully violated Section 204 of the IAA and Rule 204-2(a)(16) thereunder. Section 204 of the IAA requires investment advisers to make and keep certain records as the SEC, by rule, may prescribe as necessary or appropriate in the public interest or for the protection of investors.  Rule 204-2 under the IAA requires investment advisers registered or required to be registered to make and keep true, accurate and current various books, internal working papers, and any other records or documents that are necessary to form the basis for or demonstrate the calculation of the performance or rate of return of any or all managed accounts or securities recommendations in any notice, circular, advertisement, newspaper article, investment letter, bulletin, or other communication that the investment adviser circulates or distributes, directly or indirectly, to 10 or more persons;

- It willfully violated Section 206(4) of the IAA and Rule 206(4)-7 thereunder, which, among other things, makes it a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of Section 206(4) of the IAA to fail to adopt and implement such written policies or procedures reasonably designed to prevent violation of the IAA and the rules promulgated thereunder;

- It willfully violated Section 207 of the IAA, which makes it unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the SEC, or willfully to omit to state in any such application or report any material fact which is required to be stated therein;

- It willfully aided and abetted and caused certain of its Financial Clients to violate Section 34(b) of the Investment Company Act (the "ICA"), which, among other things, makes it unlawful for any person to make any untrue or misleading statement of material fact in any registration statement, application, report, account, record, or other document filed with the SEC under the ICA.

29.    Such willful violations of the securities laws exposed F-Squared to criminal and civil penalties, including, but not limited to, forfeiture to the United States under 18 U.S.C. § 981 of *all* revenue F-Squared derived from its misconduct.  As the court found after Howard Present's trial (as discussed below), *all* of F-Squared's revenue was derived from its willful fraudulent conduct.

30.    Under the Transfer Order and settlement F-Squared reached with the SEC, F-Squared remained subject to such criminal sanctions, which were not released by F-Squared's settlement.

18.31.  Following entry of the Transfer Order, F-Squared's clients stopped using F-Squared's algorithms to manage their assets for several reasons, including:

- The negative publicity resulting from the Transfer Order;

- F-Squared's payment of $35 million to the SEC;

- F-Squared's admission that it had conducted business illegally for many years, including especially the AlphaSector Index, which F-Squared had been selling to substantially all of its clients for years;

- The realization of clients using the AlphaSector Index that they themselves might incurwere incurring liability to their own clients if they continuedby doing business with F-Squared; and

- The SEC's commencement of investigative enforcement proceedings against several F-Squared clients relating to their business dealings with F-Squared.

19.    As a result, The SEC also opened investigations into certain of F-Squared's revenues dropped precipitously.  For example, byFinancial Clients for securities fraud related to their use of the AlphaSector strategy.  By March 31, 2015, four of itsF-Squared's largest clientsFinancial Clients notified F-Squared that they were terminating their relationships, representing a loss of $4.3 billion, more than 25% of assets under management.  Thereafter, F-Squared's clients continued to flee.

20.32.  The SEC also opened investigations into certain of the Debtors' clients for securities fraud related to their use of the AlphaSector strategy, which gave further incentives for these clients to leave F-Squared.  For example, inAUA.  In early May 2015, Virtus Investment Partners, Inc. ("Virtus") terminated its relationship with F-Squared, which had been a sub-advisor on several popular mutual funds from Virtus.  Virtus was itself investigated by the SEC, and entered into a settlement with the SEC on November 16, 2015.  In August 2016, the SEC announced penalties against another thirteen of F-Squared's clients, including AssetMark, Inc., BB&T Securities, and Ladenburg Thalmann Asset Management.  See U.S. Sec. and Exch. Comm'n, Investment Advisers Paying Penalties for Advertising False Performance Claims (Aug. 25, 2016), (announcement available at https://www.sec.gov/news/pressrelease/2016-167.html.).

21.33.  In response to this substantial loss of business, in March 2015 the Debtors reduced their workforce by nearly 30% - from 162 to 117 employees.  The work force reduction resulted in the incurrence of an additional approximately $1.3 million in severance costs.  Moreover, in connection with the SEC's investigations, F-Squared incurred approximately $17.2 million in direct legal costs, (plus millions moreadditional amounts advanced to DirectorsF-Squared's directors and Officers pre-petitionofficers relating to the investigation, of which), only $10 million of which was recovered from available insurance.

34.   ~~As a result of the Transfer Order, F-Squared was no longer a viable business and was no longer able to operate with its remaining capital, and on~~The SEC also commenced a civil action against Mr. Present, who was the CEO of F-Squared from its inception through November 2014, in the U.S. District Court for the District of Massachusetts [Case No. 14-cv-14692-LTS] (the "Howard Present Action").  After years of discovery and a lengthy trial, a jury found Mr. Present responsible for securities fraud, and District Judge Leo T. Sorokin issued an order for entry of final judgment (the "Final Judgment Order") in the total amount of $12,424,604 plus interest.  A copy of the Final Judgment Order is attached hereto as **Exhibit C.**  District Judge Sorokin found that *all* of F-Squared's revenue from 2008 through 2014 was causally connected to F-Squared's fraudulent advertisements, due to "the residual influence of Present's prior misrepresentations and the significant client assets and market hype that those representations had secured for F-Squared."  Final Judgment Order at 7.  The 2014 end date is because Mr. Present left F-Squared in November 2014.  There was therefore no consideration of and no finding regarding F-Squared's post-Transfer Order profits, but the same logic applies: these revenues could be traced back to F-Squared's prior misrepresentations.

35.   However, as explained below, F-Squared's books and records were inaccurate and did not reflect the fraud, nor its connection to all of F-Squared's assets and liabilities.

**C.  F-Squared's Insolvency**

***1.   F-Squared Was Always Balance-Sheet Insolvent***

36.   F-Squared's audited income statements and balance sheets do not reflect the true financial picture of F-Squared as of the dates of the Transfers, because they do not account for, or even attempt to assess, the impact of F-Squared's securities fraud on its assets and liabilities.

37.    F-Squared's audited balance sheets display the following assets, liabilities, and purported equity value:

|  | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 |
|---|---|---|---|---|
| Total Assets | $12,291,157 | $33,318,251 | $98,102,016 | $82,344,451 |
| Total Liabilities | $(6,815,183) | $(16,894,479) | $(53,188,329) | $(45,774,246) |
| Equity Book Value | $5,475,974 | $16,423,772 | $53,188,329 | $36,570,205 |

38.    However, once the effects of F-Squared's securities fraud are factored into these balance sheets, it becomes clear that F-Squared's true liabilities significantly outweighed the fair value of its assets (resulting in zero or negative equity value) at the times of the Transfers.

    *a.    F-Squared's Assets*

39.    F-Squared's historical balance sheets show that its assets consisted primarily of:

- Cash and cash equivalents;
- Accounts Receivable;
- Deferred income taxes;
- Property, equipment; and improvements;
- Investments in securities; and
- Intangible Assets.

40.    The amounts reflected on F-Squared's balance sheet for these assets far exceeded their fair value, when factoring in the fraudulent conduct.

41.    First, the fair value of F-Squared's property, equipment, and improvements was substantially less than its book value.

42.    Second, from 2011 forward, F-Squared had millions of dollars of deferred income tax assets on its balance sheet.  That asset could only have been monetized if F-Squared generated future income.  Given F-Squared's fraudulent conduct and the resulting foreseeable

exodus of its Financial Clients, F-Squared should have known that this future income was highly unlikely to arise.

43.    Third, in 2013, F-Squared acquired intangible assets totaling over $14.3 million. These intangible assets were primarily comprised of customer contracts.  F-Squared knew or should have known that these customer contracts were not marketable to third parties (and were thus valueless or nearly so) given that F-Squared was defrauding these customers.

44.    Fourth, given that F-Squared knew that it was defrauding its customers, F-Squared should have known that it would not be able to collect 100% of its accounts receivable on a go-forward basis, and should therefore have discounted its accounts receivable on its balance sheet.

45.    Thus, F-Squared's assets were always worth far less than it had represented, simply because what had always been true (and what was true at the times of the Transfers) had become known—namely, that all of F-Squared's revenues were derived from its willful unlawful conduct.  The asset side of F-Squared's balance sheets (and, thus, the equity book value) should have been adjusted for its fraud, as follows:

| | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 |
|---|---|---|---|---|
| Assets at book value | $12,291,157 | $33,318,251 | $98,102,016 | $82,344,451 |
| Property, Equipment, and Improvements | $(220,697) | $(251,742) | $(1,599,841) | $(1,948,232) |
| Deferred Income Taxes | $(1,385,000) | $(1,885,000) | $(3,125,000) | $(5,014,000) |
| Intangible Assets | | | $(12,349,189) | $(10,263,118) |
| Accounts Receivable | $(839,056) | $(1,570,997) | $(3,934,519) | $(2,615,960) |
| Adjusted Equity Book Value (adjusting assets | $3,031,222 | $12,716,033 | $23,905,141 | $16,728,896 |

| only) | | | | |
|---|---|---|---|---|

46.     When these adjusted assets are compared to F-Squared's adjusted liabilities, as described below, it is clear that F-Squared was insolvent on a balance-sheet basis at all times of the Transfers.

### b.   F-Squared's Liabilities

47.     Just as F-Squared's assets were not accurately reflected at fair value on its balance sheets, nor were its liabilities.

48.     F-Squared's historical balance sheets list the following major liabilities:

- Accounts payable;
- Accrued expenses, compensation, and professional fees;
- Securities sold short, at fair value;
- Loans payable;
- Member unit deposits; and
- Deferred rent.

49.     However, the historical balance sheets do not account for the following categories of liabilities, which F-Squared was continuously accruing, due to its fraud, beginning in 2008.

### i.     Liabilities to the SEC

50.     F-Squared accrued statutory liabilities to the SEC for each and every instance of each of the securities violations listed above, at the times that F-Squared committed them.  Every presentation and every email that F-Squared sent to each client or potential client from 2008 through 2013 that included false statements about AlphaSector's track record constituted a violation of the ICA and the IAA.  F-Squared also issued a number of press releases containing false statements about AlphaSector's track record, put false statements on its website (which may have been viewed by many potential clients), and made false statements in its public SEC filings.  Each instance of a false statement to a client or potential client constituted a separate violation of the securities laws.

51.     When enforcing the securities laws, the SEC can opt to proceed either by litigating in federal court or by instituting an administrative proceeding.  See 15 U.S.C. §§ 80a-9(d); 80a-41(e); 80b-3(i); 80b-9(e).  In a civil action in federal court, the SEC is permitted by each of the IAA and the ICA to impose a penalty of the greater of $500,000 per violation of each statute, or the gross amount of pecuniary gain resulting from such violation.  See 15 U.S.C. §§ 80a-41(e); 15 U.S.C. § 80b-9(e).  Similarly, in an administrative proceeding, the IAA and the ICA permit the SEC to impose a penalty of up to $500,000 per violation of each statute.  See 15 U.S.C. §§ 80a-9(d); 15 U.S.C. § 80b-3(i).  Additionally, the SEC is able, under certain circumstances, to seek disgorgement of ill-gotten gains.  See 15 U.S.C. §§ 80a-9(e) 80a-9(f)(5) 80b-3(j); 80b-3(k)(5).

52.     On December 22, 2014, as part of its settlement with F-Squared, the SEC opted for an administrative proceeding, rather than a civil suit, and settled with F-Squared for a total payment of $35 million, of which $5 million was characterized as a penalty and $30 million was characterized as "disgorgement."  However, at the times of all Transfers, F-Squared's balance sheet should have reflected a liability to the SEC in the amount of the penalties the SEC was entitled to extract from F-Squared, including forfeiture of the gross amount of pecuniary gain resulting from each violation.  As all of F-Squared's pecuniary gain resulted from its violations of the securities laws (see Final Judgment Order at 5-6), F-Squared's balance sheet should have included a liability equal to its profits (or, at the very least, a liability of the statutory amount for each and every instance of the violations listed above) at the times that it was committing its violations—that is, from 2008 through 2013—and carrying those liabilities forward.  Upon information and belief, F-Squared sent hundreds, if not thousands, of emails to clients and

potential clients from 2008 through September 2013 containing fraudulent statements about F-Squared's track record.

ii.      Indemnification Liabilities

53.     F-Squared's contracts with its Financial Clients included indemnification clauses requiring F-Squared to

> indemnify and hold harmless [the Financial Clients] against any and all losses, claims, damages, liabilities or expenses (including reasonable attorneys' fees and amounts paid in settlement . . .) to which such indemnified parties may become subject under any statute, regulation, at common law or otherwise, insofar as such losses, claims, damages, liabilities or expenses arise out of, or as a result of, [F-Squared's] willful misconduct, bad faith, breach of fiduciary duty or gross negligence in the performance of its services or obligations under [such agreements].

54.     F-Squared's services and obligations under these agreements included, among other things, providing information required under the Investment Advisers Act and immediately notifying the Financial Clients of any and all material facts not contained in F-Squared's Form ADV.  F-Squared admitted in the Transfer Order that it willfully misled its Financial Clients and that it willfully failed to include all relevant information on its Form ADV.

55.     As F-Squared understood, many if not all of F-Squared's Financial Clients relied on and used F-Squared's advertisements and securities filings in their own advertisements and securities filings in their dealings with their *own* clients.  As a result, the SEC also opened investigations into many of F-Squared's Financial Clients, and charged several such clients with violations of the securities laws based on false advertising and failing to maintain accurate books and records.  These investigations resulted in settlements with the SEC in 2015 and 2016, in which each charged F-Squared Financial Client admitted to violation of the securities laws, due to each entity's use of F-Squared's AlphaSector strategy as to their own clients.  From public

information available to the Trustee, the Trustee believes that these entities paid a total of approximately $45 million to the SEC as penalties under the ICA and IAA relating to their relationships with F-Squared and resulting from F-Squared's fraud, as follows:

- Wells Fargo Advisors Financial Network, LLC ("Wells Fargo"): Disgorgement of $15.04 million; interest of $2.3 million.

- Virtus Investment Advisers, Inc. ("Virtus"): Disgorgement of $13.4 million; interest of $1.1 million; penalty of $2 million.

- Ameriprise Financial Services, Inc.: Disgorgement of $6.3 million; interest of $700,000; penalty of $1.75 million.

- AssetMark, Inc.: Penalty of $500,000;

- BB&T Securities, LLC: Penalty of $200,000;

- Banyan Partners, LLC: Penalty of $200,000;

- J.J.B. Hilliard, W.L. Lyons, LLC: Penalty of $200,000;

- Ladenburg Thalmann Asset Management Inc.: Penalty of $200,000;

- Shamrock Asset Management LLC: Penalty of $200,000;

- Congress Wealth Management LLC: Penalty of $100,000;

- Constellation Wealth Advisors LLC: Penalty of $100,000;

- Executive Monetary Management, LLC: Penalty of $100,000;

- HT Partners LLC: Penalty of $100,000;

- Prospera Financial Services, Inc.: Penalty of $100,000;

- Risk Paradigm Group, LLC: Penalty of $100,000; and

- Schneider Downs Wealth Management Advisors, LP: Penalty of $100,000.

56.    Pursuant to F-Squared's indemnification agreements with its Financial Clients, F-Squared was liable not only for the amounts paid to the SEC, but for all losses, claims, damages,

liabilities, and expenses, including legal fees, that these entities suffered due to F-Squared's admitted misconduct (which included, for example, the expenses of any SEC investigation, lost profits, contract damages, and amounts which certain of F-Squared's Financial Clients incurred as to their *own* clients).

57.     For example, Virtus was sued in at least two separate class actions for damages resulting from Virtus' use of F-Squared's AlphaSector strategy to manage its clients' assets. One of these resulted in a settlement of $22.5 million.  Additionally, certain Wells Fargo customers filed a FINRA arbitration claim against Wells Fargo based on Wells Fargo's use of AlphaSector.

58.     Under its indemnification agreements, therefore, F-Squared's misconduct subjected it to massive unliquidated liabilities to its Financial Clients, which began accruing (of course, unbeknownst to those clients and the public generally) as of the later of F-Squared's first false advertisement in 2008 and the dates of such agreements.

59.     Thus, prior to and contemporaneously with the Transfers, F-Squared was accruing indemnification liabilities to its Financial Clients at least in the tens of millions, and potentially in the hundreds of millions of dollars.

iii.     Liabilities for Breach of Contract and Misconduct

60.     As described above, F-Squared's only material business activity was the sale of weekly trading signals to clients and Financial Clients, the vast majority of which activity was carried out pursuant to model manager agreements and subadvisory agreements between F-Squared and its clients and Financial Clients.

61.     F-Squared was contractually obligated, via these model manager and sub-advisory agreements, to immediately notify its clients and Financial Clients of material facts not contained

in F-Squared's Form ADV. As noted in the Transfer Order, F-Squared willfully made untrue statements of material fact in its Forms ADV filed between 2008 and 2013. See Transfer Order at ¶ 38. Thus, F-Squared was in breach of each and every one of the model manager and sub-advisory agreements by which it conducted its business at all times from 2008 through September 2013, when it notified its clients and Financial Clients of its fraud and filed an updated Form ADV.

62.      F-Squared induced its clients and Financial Clients to enter into these model manager and subadvisory agreements by fraudulently advertising its track record as live-tested and (due to the Backtesting Error) as approximately 350% better than it was.

63.      F-Squared's Financial Clients and other clients paid over $100 million in fees, all of which Judge Sorokin found, after a lengthy trial, to have been causally connected to F-Squared's fraud.

64.      Additionally, due to the Backtesting Error, F-Squared's Financial Clients and other clients earned less than F-Squared led them to expect they would.

65.      Several of F-Squared's Financial Clients filed claims in these Bankruptcy Cases for damages resulting from breach of contract, fraud, fraudulent inducement, and other tortious conduct. A list of these claims is attached hereto as **Exhibit D.** Many of these have been settled in the context of these Bankruptcy Cases and using defenses only available pursuant to the Bankruptcy Code, but at the times of the Transfers, these claims (along with liabilities to clients and Financial Clients who did not file claims in these Bankruptcy Cases) should have been, but were not, reflected as liabilities on F-Squared's balance sheet.

       iv.      Criminal Liabilities

66.      Willful violations of the IAA and ICA may be prosecuted criminally, and

pursuant to its settlement agreement with the SEC and the Transfer Order, F-Squared admitted to numerous willful violations of the IAA, the ICA, and rules promulgated thereunder.  In its settlement with the SEC F-Squared expressly waived any claim of double jeopardy based on the settlement, including the imposition of any remedy or criminal penalty, meaning it remained exposed to liability for its willful securities violations.  Under 18 U.S.C. § 981, forfeiture of *all* revenues derived from the willful misconduct constituting a securities violation is subject to forfeiture.  Thus, F-Squared's criminal liability exposure was equal to *all* of its revenue earned since it began its fraudulent marketing in 2008.

### v.        State Law Liabilities

67.     Pursuant to Section 2 of Chapter 93A(2) of the Massachusetts General Laws, both the Attorney General of Massachusetts and individual consumers may take legal action against unfair or deceptive conduct in the marketplace.  Damages for committing deceptive trade practices, whether a suit is commenced by the Attorney General or a consumer, "shall be in the amount of actual damages . . . ; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two . . . ."  See Mass. Gen. Laws ch. 93A, § 9(2) and (3).

68.     F-Squared was headquartered in Massachusetts and conducted business in Massachusetts, and was therefore subject to Chapter 93A.

69.     F-Squared admitted that it willfully deceived its Financial Clients when it falsely advertised its track record.  See Transfer Order at ¶¶ 33-40.

70.     Therefore, F-Squared would have been liable for at least double, and up to treble actual damages suffered by F-Squared's Financial Clients on account of F-Squared's fraud at the times that it was committing such fraud (which began prior to the dates of the Transfers).  As

described above, F-Squared's Financial Clients suffered actual damages of *at least* $67.3 million. F-Squared's balance sheet should have, but did not, reflect the state-law liabilities it had at the times of the Transfers.

71.    Thus, F-Squared's liabilities were always far greater than it had represented.  F-Squared's balance sheets should have included *all* of the liabilities listed above; however, F-Squared's liability to the SEC alone would have rendered F-Squared insolvent at the times of each of the Transfers.  The liability side of F-Squared's balance sheets (and, thus, the equity book value) should have included *at least* the following (conservatively estimated) liabilities:

| 12 months ending: | | 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 |
|---|---|---|---|---|---|
| Liabilities at book value | | $(6,815,183) | $(16,894,479) | $(53,188,329) | $(45,774,246) |
| SEC Forfeiture Liability and other governmental liabilities | | | | | |
| | Current liabilities | $(11,093,429) | $(38,428,337) | $(82,471,855) | $(130,833,336) |
| | Cumulative prior liabilities | $(730,001) | $(11,823,430) | $(50,251,767) | $(132,723,622) |
| | Settlement Paid | | | | $35,000,000 |
| Customer Indemnification and other claims | | $(2,955,857) | $(12,562,942) | $(33,180,905) | $(65,889,239) |
| Total Unrecorded Liabilities | | $(14,779,287) | $(62,814,709) | $(165,904,527) | $(294,446,197) |
| Adjusted Equity Book Value (adjusting assets and liabilities) | | $(11,748,065) | $(50,098,676) | $(141,999,386) | $(277,717,302) |

72.    In this chart, for the period ending 12/31/2011, the current year's forfeiture liability only includes revenue for the 6-month period ending 12/31/2011, and the prior year's liability only includes revenue for the year ending 6/30/2010.  Additionally, this chart estimates customer indemnification and contract claims at 25% of F-Squared's governmental liability.  Finally, the Trustee assumes that forfeiture of revenue related to F-Squared's fraud is the most conservative estimation of F-Squared's liability to the SEC (as the amount would otherwise be $500,000 per violation for the hundreds or thousands of violations F-Squared committed).

73.     Given the purported equity values on F-Squared's audited balance sheets, as listed above, along with the necessary adjustments to the asset values, even a conservative estimate of the additional liabilities rendered F-Squared insolvent on a balance-sheet basis at each of the times of the Transfers.

**D.     F-Squared's Bankruptcy Filing**

~~22.~~74.  On July 8, 2015 (the "Petition Date"), filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") to sell its remaining assets and liquidate.

~~23.     On August 25, 2015, this Court entered the *Order (A) Authorizing and Approving (1) The Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests; and (2) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (B) Granting Related Relief* [D.I 192] (the "Sale Order"), pursuant to which the Debtors sold their assets (the "Sale") to Broadmeadow Capital, LLC (the "Purchaser").~~

~~24.~~75.  On October 28, 2015, F-Squared and the official committee of unsecured creditors appointed in the case by the Office of the United States Trustee filed a joint plan of reorganization (the "Plan"), which was confirmed by the Bankruptcy Court on January 14, 2016 and soon thereafter became effective.

~~25.~~76.  Pursuant to the Plan, the Trust was established for the purpose of, among other things, pursuing all causes of action not released, compromised and/or settled under the Terms of the Plan (the "Retained Causes of Action").  *See* Plan Arts. I(A)(73), IV(B)(1).

~~26.~~77.  The Trustee was given power under the Plan and the F-Squared Liquidation Trust Agreement [Docket No. 457-1] (the "Trust Agreement") to "prosecute, settle, abandon or

compromise the Retained Causes of Action."  Plan Art. ~~IV(C).~~ IV(C), see Trust Agreement §

2.2.  The Trustee has received all necessary authorization from the Oversight Committee (as

defined in the Trust Agreement) to bring the Complaint.

### ~~D.~~E.    The Debtors Pay Defendant Certain Dividends

~~27.~~78.  Defendant also owned equity in F-Squared.

79.    F-Squared was organized as a limited liability company that incurred no income

taxes of its own: rather, income taxes were incurred by each individual or entity with an

ownership interest in F-Squared, on a ratable basis.

~~28.~~80.  During the two years prior to the Petition Date, F-Squared distributed certain

Dividends to Defendant in the amount set forth in **Exhibit A** to pay Defendant's  personal

income taxes related to Defendant's equity interest in F-Squared and/or as profit interests in F-

Squared.

~~29.~~81.  F-Squared received no value in consideration for the Dividends, and were not

obliged to pay the Dividends by the Debtors' LLC agreement or any other document.

### ~~E.  The Preferential Transfers~~

~~30.    The Debtors were not obligated to make the Transfers under either Defendant's~~

~~employment agreement or the Debtors' LLC agreement (together, the "Agreements").  However,~~

~~if such an obligation existed, any such Transfer received by Defendant from April 8, 2015 to July~~

~~8, 2015 (the "Preference Period") or July 8, 2014 to July 8, 2015 (the "Insider Preference~~

~~Period") is a Transfer on account of an antecedent debt owed by the Debtors to Defendant.  The~~

~~details of each such payment are set forth in **Exhibit A**.~~

~~31.    During the course of this proceeding, Plaintiff may learn (through discovery or~~

~~otherwise) of additional transfers made to Defendant during the Preference Period or Insider~~

~~Preference Period. It is Plaintiff's intention to avoid and recover all transfers made by the Debtors of an interest of the Debtors in property and to or for the benefit of Defendant or any other transferee. Plaintiff reserves its right to amend this original Complaint to include: (i) further information regarding the Transfer(s), (ii) additional transfers, (iii) modifications of and/or revision to Defendant's name, (iv) additional defendants, and/or (v) additional causes of action authorized by the Plan, if applicable (collectively, the "Amendments"), that may become known to Plaintiff at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.~~

## CLAIMS FOR RELIEF

## COUNT I

### Constructive Fraudulent Transfer (11 U.S.C. § 548)

~~32.~~82.  Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

~~33.~~83.  The Transfers constituted an interest of one or more of the Debtors in property.

~~34.~~84.  The Debtors received less than reasonably equivalent value in exchange for the Transfers.

~~35.~~85.  The Debtors: (i) were insolvent on the date that the Transfers was made, or became insolvent as a result of the Transfers; (ii) were engaged in a business or a transaction, or where about to engage in a business or transaction, for which any property remaining with the Debtors was an unreasonably small capital; or (iii) intended to incur, or believed that they would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

~~36.~~86.  As a result of the foregoing, Plaintiff demands an entry of judgment avoiding the Transfers pursuant to Section 548 of the Bankruptcy Code.

## COUNT II

## 11 U.S.C. § 544, MASS. GEN. LAWS 109A § 5, Delaware Uniform Fraudulent Transfer Act § 1304(a)(1)

37.87.  Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

38.88.  Pursuant to § 544(b) of the Bankruptcy Code, Plaintiff may avoid any transfer of an interest of the Debtor in property that is voidable under applicable state law.

39.89.  The Transfers were made within four years of the Petition Date. The Transfers are more fully described in **Exhibit A** hereto.

40.90.  The Debtors received less than reasonably equivalent value in exchange for the Transfers.

41.91.  At the time of the Transfers, the Debtors: (i) were engaged or were about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

42.92.  As a result of the foregoing, Plaintiff demands entry of judgment avoiding the transfer under 11 U.S.C. § 544(b)(1) and applicable state law; provided, however, it is  Plaintiff's intent to avoid and recover any Transfer only once, either pursuant to this Count III or Count III.

## COUNT III

### Preferential Transfer (11 U.S.C. § 547)

1.      Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein and pleads this Count IV in the alternative to Counts II and III

2.      As more particularly described on **Exhibit A** attached hereto and incorporated herein, during the Preference Period or Insider Preference Period, the Debtor(s) identified on

{00020803. }

**Exhibit A** made the Transfers to or for the benefit of Defendant in an aggregate amount not less than as set forth on **Exhibit A**.

3.      Each Transfer was made from the Disbursement Account described *supra,* and constituted transfers of an interest in property of the transferring Debtor(s) as identified on **Exhibit A.**

4.      Defendant was a creditor at the time of each Transfer by virtue of the Agreement, for which the Debtor(s) identified on **Exhibit A** were obligated to pay in accordance with the Agreement.

5.      Each Transfer was to or for the benefit of a creditor within the meaning of 11 U.S.C. § 547(b)(1) because each Transfer either reduced or fully satisfied a debt or debts then owed by the Debtor(s) identified on **Exhibit A** to Defendant.

6.      Each Transfer was made for, or on account of, an antecedent debt or debts owed by the Debtor(s) identified on **Exhibit A** to Defendant before such Transfers were made, as asserted by Defendant and memorialized in the Agreement, each of which constituted a "debt" or "claim" (as those terms are defined in the Bankruptcy Code) of Defendant prior to being paid by the transferring Debtor(s) as set forth on **Exhibit A** hereto.

7.      Each Transfer was made while the Debtors were insolvent.  Plaintiff is entitled to the presumption of insolvency for each Transfer made during the Preference Period pursuant to 11 U.S.C. § 547(f).

8.      Each Transfer was made during the Preference Period or Insider Preference Period as set forth on **Exhibit A**.

9.      As a result of each Transfer, Defendant received more than Defendant would have received if: (i) the Debtors' cases were under chapter 7 of the Bankruptcy Code; (ii) the

{00020803. }

Transfers had not been made; and (iii) Defendant received payments of its debts under the provisions of the Bankruptcy Code.  As evidenced by the Debtors' schedules filed in the underlying bankruptcy case as well as the proofs of claim that have been received to date, and the Plan, the Debtors' liabilities exceed their assets to the point that unsecured creditors will not receive a full payout of their claims from the Debtors' bankruptcy estates.

10.    In accordance with the foregoing, each Transfer is avoidable pursuant to 11 U.S.C. § 547(b).

### COUNT IV

### (11 U.S.C. § 550)

43.93.  Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

44.94.  Defendant was the original transferee of the Transfers, or the entity for whose benefit the Transfer was made, or the immediate or mediate transferee of the original transferee receiving such Transfer.

45.95.  Plaintiff is entitled to recover the value of the Transfers pursuant to Section 550(a) of the Bankruptcy Code, plus interest thereon to the date of payment and the costs of this action.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in its favor and against Defendant: (a) awarding Plaintiff the amount of the Transfers; (b) awarding Plaintiff prejudgment interest at the legally allowed applicable rate; (c) awarding Plaintiff its costs, fees, and expenses associated with the prosecution of this action; and (d) granting such other and further relief as is just and proper.

Dated: ~~June ___, 2017~~October ___, 2019
Wilmington, Delaware

THE ROSNER LAW GROUP LLC

/s/ ~~Frederick B. Rosner~~Draft
Frederick B. Rosner, Esq. (DE 3995)
Scott J. Leonhardt, Esq. (DE 4885)
Jason A. Gibson, Esq. (DE 6091)
824 N. Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
rosner@teamrosner.com
leonhardt@teamrosner.com
gibson@teamrosner.com

  -and-

BROWN RUDNICK LLP

William R. Baldiga, Esq.
~~Seven Times Square~~
~~New York, NY 10036~~
~~Telephone: (212) 209-4800~~
~~wbaldiga@brownrudnick.com~~

  ~~-and-~~

Sunni P. Beville, Esq.
Sharon I. Dwoskin, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
wbaldiga@brownrudnick.com
sbeville@brownrudnick.com
sdwoskin@brownrudnick.com

  -and-

D. Cameron Moxley, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
cmoxley@brownrudnick.com

sbeville@brownrudnick.com
sdwoskin@brownrudnick.com

# Exhibit A

Exhibit A

### F-Squared Investment Management, LLC et al
### Statement of Payments Issued

**PAID TO:**
George McClelland
12 Reservoir Drive
Southboro, MA 01772

| Date Paid | Check # | Bonus | 401K Match | Total Bonus Payout | Tax Distribution | Profit Distribution | Total Tax & Profit Distributions | Paid During Preference Period | Units Repurchase | Total Payments |
|-----------|---------|-------|------------|--------------------|------------------|---------------------|----------------------------------|-------------------------------|------------------|----------------|
| Transferring Debtor: | F-Squared Investment Management, LLC | | | | | | | | | |
| 8/29/2013 | 1407 | | | 0.00 | 206,021.00 | | 206,021.00 | | | 206,021.00 |
| 12/5/2013 | 1028 | | | 0.00 | 206,021.00 | | 206,021.00 | | | 206,021.00 |
| 1/16/2014 | 1104 | | | 0.00 | | 399,861.90 | 399,861.90 | | | 399,861.90 |
| 3/25/2014 | 1161 | | | 0.00 | 851,089.00 | | 851,089.00 | | | 851,089.00 |
| 4/3/2014 | 1233 | | | 0.00 | 103,299.00 | | 103,299.00 | | | 103,299.00 |
| 6/5/2014 | 1360 | | | 0.00 | 383,592.00 | | 383,592.00 | | | 383,592.00 |
| 9/4/2014 | 1433 | | | 0.00 | 383,592.00 | | 383,592.00 | 383,592.00 | | 383,592.00 |
| 10/30/2014 | 1459 | | | 0.00 | | | 0.00 | | 86,184.00 | 86,184.00 |
| | | | | | | | | 86,184.00 | | |
| Transferror Total: | | | | 0.00 | 2,133,614.00 | 399,861.90 | 2,533,475.90 | 469,776.00 | 86,184.00 | 2,619,659.90 |
| | | | | | | | | | | |
| Transferring Debtor: | F-Squared Investments Inc | | | | | | | | | |
| 2/6/2014 | 2530 | 75,000.00 | | 75,000.00 | | | 0.00 | | | 75,000.00 |
| Transferror Total: | | 75,000.00 | | 75,000.00 | | | 0.00 | | | 75,000.00 |
| | | | | | | | | | | |
| Overall Totals: | | 75,000.00 | | 75,000.00 | 2,133,614.00 | 399,861.90 | 2,533,475.90 | 469,776.00 | 86,184.00 | 2,694,659.90 |

# Exhibit B

(Added)

# Exhibit C

(Added)

# Exhibit D

(Added)