## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) Chapter 11 |
| F-SQUARED INVESTMENT | ) |
| MANAGEMENT, LLC, *et al.*, | ) Case No. 15-11469 (LSS) |
| | ) Jointly Administered |
| Debtors | ) |
| | ) |
| Craig Jalbert, in his Capacity as Trustee for F2 | ) |
| Liquidating Trust, | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |

| | |
|---|---|
| Agnes Carol McClelland | ) Adv. Pro No. 17-50718-LSS |
| Ann Aghababian | ) Adv. Pro No. 17-50719-LSS |
| Charles Hart | ) Adv. Pro No. 17-50722-LSS |
| Geordie McClelland | ) Adv. Pro No. 17-50755-LSS |
| George McClelland | ) Adv. Pro No. 17-50758-LSS |
| Graham Hart | ) Adv. Pro No. 17-50767-LSS |
| Hazel McClelland | ) Adv. Pro No. 17-50772-LSS |
| Jacquelyn McClelland | ) Adv. Pro No. 17-50786-LSS |
| Lindsay Hart | ) Adv. Pro No. 17-50849-LSS |
| Lindsay McClelland | ) Adv. Pro No. 17-50850-LSS |
| McClelland Irrevocable Grantor Trust | ) Adv. Pro No. 17-50854-LSS |
| Quinn McClelland Hart | ) Adv. Pro No. 17-50859-LSS |
| | ) |
| Defendants | ) |

## MEMORANDUM IN SUPPORT OF OBJECTION
## TO MOTION FOR LEAVE TO AMEND COMPLAINT

**POTTER ANDERSON & CORROON LLP**

Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
Hercules Plaza
1313 North Market Street, 6th Floor
P.O. Box 951
Wilmington, DE 19801
Tel.: (302) 984-6108

**MCLANE MIDDLETON,**
**PROFESSIONAL ASSOCIATION**

Joseph A. Foster (pro hac vice)
Scott H. Harris (pro hac vice)
900 Elm Street, P.O. Box 926
Manchester, NH 03105-0326
Tel.: (603) 628-1175

## TABLE OF CONTENTS

I.   BRIEF STATEMENT ............................................................................................................1

II.  ARGUMENT ......................................................................................................................3

    A.   GRANTING LEAVE FOR THE TRUSTEE TO AMEND HIS COMPLAINT
        WOULD BE FUTILE ...................................................................................................3

        1.   The Trustee's proposed amendment relies on invented and implausible facts
            that were not within F2's reasonable contemplation at the critical time
            periods and unpon conclusory allegations that are not facts....................................5

        2.   The Trustee's proposed Amended Complaint also depends upon
            impermissible hindsight bias................................................................................10

        3.   While the Bankruptcy Code provides an alternative avenue of relief through
            pleading unreasonably small capital, the Trustee's proposed Amended
            Complaint does not discuss it ...............................................................................12

        4.   In its Motion for Partial Summary Judgment and Reply in Support of
            Motion for Partial Summary Judgment, Defendants contend that the
            transfers in question were made for reasonably equivalent value ........................13

    B.   UNDUE DELAY ..........................................................................................................14

        1.   The Trustee has offered no explanation for why he did not plead the
            arguments contained in his proposed Amended Complaint until November
            2019, two years after commencement of this case ................................................15

        2.   The Trustee's proposed Amended Complaint is purposefully vague in order
            to obscure the fact that there is no evidence to support his case...........................16

    C.   JUDICIAL ECONOMY AND EQUITABLE FACTORS ............................................20

III. CONCLUSION ........................................................................................................................23

# TABLE OF AUTHORITIES

**CASES**

**Page(s)**

*Adams v. Gould Inc.*,
739 F.2d 858 (3d Cir. 1984)................................................................................................15

*Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*,
786 F. Supp. 1223 (W.D. Pa. 1992)................................................................................. 13-14

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009)..........................................................1

*Bader v. Special Metals Corp.*,
985 F.Supp.2d 291 (N.D.N.Y. 2013)....................................................................................15

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 2007, 127 S.Ct. 1955, 167 L. Ed. 929 (2007)..........................................................1

*Bleiler v. Cristwood Contracting Co., Inc.*,
868 F.Supp. 461 (D.Conn.1994), affirmed in part, reversed in part 72 F.3d 13......................21

*Charys Liquidating Tru. v. Hades Advisors, LLC (In re Charys Holding Co.)*,
443 B.R. 638 (Bankr. D. Del. 2011) ................................................................................. 3-4

*Collins v. Wal-Mart, Inc.*,
245 F.R.D. 503 (D.Kan. 2007)...........................................................................................15

*Dussouy v. Gulf Coast Inv. Corp.*,
660 F.2d 594 (5th Cir. 1981) .............................................................................................14

*Foman v. Davis*,
83 S. Ct. 227 (1962).....................................................................................................3, 15

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009)................................................................................................5

*Goldfish Shipping, S.A. v. HSH Nordbank AG*,
623 F. Supp.2d 635 (E.D. Pa. 2009), aff'd, 377 F. App'x 150 (3d Cir. 2010) ........................20

*GSS Props., Inc. v. Kendale Shopping Center, Inc.*,
119 F.R.D. 379 (1988)................................................................................................15, 21

*In re Davis*,
120 B.R. 823 (Bankr. W.D. Pa. 1990) ................................................................................11

*In re F-Squared Inv. Mgmt., LLC*,
No. AP 17-50716, 2019 WL 4261168 (Bankr. D. Del. Sept. 6, 2019) .................................... 12

*In re: F-Squared Investment Management*,
No. 17-50474 (July 23, 2019) .......................................................................................... 17-18

*In re R.M.L., Inc.*,
92 F.3d at 156 .............................................................................................................. 8, 11

*In re Semcrude, L.P.*,
526 B.R. 556 (D. Del. 2014) .............................................................................................. 12

*In re SemCrude L.P.*,
648 F. App'x 205 (3d Cir. 2016) .................................................................................. 11-12

*In re THQ, Inc.*,
No. 12-13398, 2016 WL 1599798 ...................................................................................... 5

*In re United Tax Grp., LLC*,
No. 14-10486 (LSS), 2018 WL 1135496 (Bankr. D. Del. Feb. 28, 2018) ............................ 14

*In re Xonics Photochemicals, Inc.*,
841 F.2d at 198 (7th Cir. 1987)........................................................................................... 8

*J.E. Mamiye & Sons, Inc. v. Fidelity Bank*,
813 F.2d 610 (3d Cir.1987)............................................................................................... 15

*Leibstein v. LaFarge North American, Inc.*,
689 F.Supp.2d 373 (E.D.N.Y. 2010) ................................................................................ 14

*MFS/SunLife Tr. High Yield Series v. Van Dusen Airport Servs. Co.*,
910 F.Supp. 913 (S.D.N.Y. 1995) ..................................................................................... 12

*Millar v. Bay Area Rapid Transit Dist.*,
236 F.Supp.2d 1110 ......................................................................................................... 21

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
971 F.2d 1056 (3d Cir. 1992)............................................................................................ 12

*Mulder v. Kohl's Department Stores, Inc.*,
865 F.3d 17 (1st Cir. 2017)............................................................................................... 15

*Mullin v. Balicki*,
875 F.3d 140 (3d Cir. 2017).......................................................................................... 3, 20

*Smith v. Chrysler Corp.*,
938 F. Supp. 1406 (S.D. Ind. 1996) ................................................................................. 14

*Trans Video Elecs., Ltd. v. Sony Elecs.*,
    278 F.R.D. 505 (N.D. Cal. 2011) ..................................................................................... 14-15

*Trueposition, Inc. v. Allen Telecom, Inc.*,
    No. CIV.A.01-823 GMS, 2002 WL 1558531 (D. Del. July 16, 2002) ....................................15

*Wilson v. American Trans Air, Inc.*,
    874 F.2d 386 (7th Cir. 1989) ................................................................................................14

**STATUTES**

**Page(s)**

11 U.S.C. § 101 (32) ........................................................................................................................5

**SECONDARY AUTHORITIES**

**Page(s)**

*Jalbert v. Zurich*
    No. 18-2244 (1st Cir. 2019) ................................................................................................22

George McClelland ("McClelland"), Charles Hart, Geordie McClelland, Graham Hart, Hazel McClelland, Jacquelyn McClelland, Lindsay Hart, McClelland Irrevocable Grantor Trust, Quinn McClelland Hart, Lindsay McClelland and Agnes Carol McClelland and Ann Aghababian (collectively, "McClellands" or "Defendants"), by their undersigned counsel, Potter Anderson & Corroon, LLP and McLane Middleton, Professional Association, hereby Object to the Plaintiff's Motion For Leave to Amend, and state as follows:

## I.    BRIEF STATEMENT

In July 2017, over two years ago, the Trustee initiated the above-captioned adversary proceedings to avoid cash distributions that F-Squared Investment Management, LLC ("F2" or the "Company") paid to the Defendants on approximately a quarterly basis beginning in August 2013, and continuing through October 2014.  Over 85% of those payments were to cover the tax on the company's profits that passed through to the McClellands as owners of F2.  The Court dismissed the Trustee's complaints by its September 9, 2019 Order, finding that he had failed to plead facts that would allow the Court to find that he had established a plausible case for F2's insolvency under the standard established by *Iqbal[1]* and *Twombly.*[2]

In his proposed Amended Complaint, the Trustee attempts to remedy the deficiency identified by the Court by asserting a fictionalized version of what could have happened in a worst-case scenario with the SEC investigation of both F2 and its clients.  He uses this imagined version of events as a means of rewriting F2's audited financial statements so that a company whose audited financial statements showed that it was exceedingly solvent at the time of each of the questioned transfers between August 2013 and October 2014, is transformed into a hopelessly

---

[1]     *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1941, 173 L. Ed. 2d 868 (2009).

[2]     *Bell Atlantic Corp. v. Twombly*, 550 U.S. 2007, 127 S.Ct. 1955, 167 L. Ed. 929 (2007).

insolvent company.  The Trustee exacerbates the impropriety of his effort by supporting it with hindsight bias that he says allows him to reach the fantastical conclusion that F2 was "insolvent from the inception."

In contrast to the Trustee's approach in his Amended Complaint, the law requires that in order to establish solvency or insolvency the Trustee must assess the fair value that F2 should reasonably have assigned to its assets and liabilities at the exact time of the questioned payments. The Trustee has had almost two years to formulate allegations that plausibly articulate a sustainable cause of action.  During that entire time, the Trustee has had possession of the company's books and records and the full ability to investigate the validity and support for his claims, including having access to the Debtors' former management, lawyers, accountants and consultants.

Despite the passage of time and all the resources available to him during that period, the best the Trustee can do is assert his fictionalized, conclusory version of the facts that misses the point in that it fails to allege a basis upon which the Court could plausibly conclude that F2's management should have recognized a fair value of its assets and liabilities that varied from its audited financial statements.  Thus, the Trustee's proposed Amended Complaint demonstrates that it would be futile to allow him to make the proposed amendment since that proposed complaint does not articulate a plausible basis for a cause of action any more than his initial complaint did.

While the futility of the proposed amendment is reason enough for the Court to deny the Trustee's motion, he creates a further basis for denial by failing to provide any explanation as to why he waited two years to bring this amendment that rests on revised "facts" that he could have pled when he initially filed his Complaints two years ago.  From the moment the complaints were filed, the Trustee knew they were deficient.  The Defendants, joined by dozens of other defendants

facing nearly identical actions, moved to dismiss.  Rather than seeking leave to re-plead, the Trustee ventured ahead, forcing two years of needless litigation.  This exercise has already caused both the Court and the parties (including those smaller defendants who were forced to settle or face economic ruin) to expend substantial resources, both in time and money.  The Trustee's proposed Amended Complaint—futile and delayed as it is, will only result in a further waste of scarce resources.  The Court should deny the Trustee leave to amend.

## II.   ARGUMENT

Although courts are liberal in granting leave to amend, no litigant has an absolute right to amendment.  *Foman v. Davis*, 83 S. Ct. 227, 230 (1962).  There are four factors relevant here which, individually or in combination, would justify the Court in denying the Trustee a "do over" in pleading his case.  They are: (1) the proposed amendment is futile in that the plaintiff does not state a viable case; (2) the proposed amendment comes after undue delay; (3) the proposed amendment is the product of bad faith or dilatory motive, *id.*; and (4) judicial economy.[3]  All four of these factors are present here, and thus the Trustee should be denied leave to amend his complaint.

### A.   GRANTING LEAVE FOR THE TRUSTEE TO AMEND HIS COMPLAINT WOULD BE FUTILE.

Courts may deny a plaintiff leave to amend where the party opposing amendment can show that the proposed amendment is futile, *i.e*., that the amendment fails to articulate a viable cause of action.[4]  Not surprisingly, courts do not permit amendments only to have to dismiss the case

---

[3]      *Mullin v. Balicki,* 875 F.3d 140, 149–50 (3d Cir. 2017) ("The *Foman* factors are not exhaustive, allowing a court to ground its decision, within reason, on consideration of additional equities, such as judicial economy/burden on the court.").

[4]      *Foman*, 83 S.Ct. at 230; *See also Charys Liquidating Tru. v. Hades Advisors, LLC (In re Charys Holding Co.*), 443 B.R. 638, 642 (Bankr. D. Del. 2011) ("An amendment is futile if the complaint, as amended, would fail to state a claim upon which relief could be granted.") (internal quotations omitted).

thereafter.[5]  The critical problem with the Trustee's pleading, and the reason his effort is futile, is that he fails to plead (and cannot plead) a plausible case of insolvency.

The Trustee's starting point to address the question of solvency is his summary of F2's audited balance sheets.  That starting point reflects F2's equity book value for the years 2011 through 2014, to be as follows:  2011, $5,475,974; 2012, $16,423,772; 2013, $53,188,329; and, 2014, $36,570,205.  Put otherwise, in the considered opinion of F2's auditors, F2 was at all times solvent.  In fact, in 2013 and 2014 when F2 made the questioned transfers to the Defendants, the Trustee concedes F2 had an audited net worth of more than $36 million in each of those years, reflecting a highly successful securities advisory firm with a product generating sufficient returns to warrant approximately $27 billion to be invested according to its dictates.

To establish insolvency, the Trustee attempts to reconstruct F2's audited balance sheet. This reconstruction, however, is more aptly described as a legally unavailing distortion for two fundamental reasons.  First, his perversion of the balance sheets is the product of his imagining a fictitious, worst case scenario that cannot pass the feasibility standard.  Second, he misapplies hindsight in a way that warps his analysis of what a reasonable management team at F2 knew or should have known when assessing the company's assets and liabilities.  As a sample of the absurdity of the Trustee's "reconstruction," he posits that F2 should have recorded a $458,355,777 liability to the SEC for potential fines and disgorgement in lieu of either the zero liability as recorded on F2's audited statements or the $35 million liability it in fact paid.

---

[5]      *Id.*

1.     **The Trustee's proposed amendment relies on invented and implausible facts that were not within F2's reasonable contemplation at the critical time periods and upon conclusory allegations that are not facts.**

In pleading a case for insolvency, the Trustee must analyze F2's balance sheet at the time of each of the questioned transfers.  Insolvency is the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." Order at 23, [D.I. 71] citing 11 U.S.C. § 101 (32).  The Trustee's balance sheet analysis must be plausible. Plausibility cannot be informed by conclusory statements.[6]

a.     **The Trustee's allegations are not plausible.**

The fundamental problem with the Trustee's pleading, then and now, is that he does not plead any facts that provide a plausible rationale for why he would claim that F2's audited statements failed to reasonably assess the fair value of the company's assets and liabilities. Revising the value of the contingent assets or amount of contingent liabilities included on a company's balance sheet requires reaching a conclusion that a reasonable management team for the company would have and should have assessed the balance sheet items differently.  The Trustee fails to plead facts that can lead to that determination.

After reviewing the Trustee's initial Complaint, the Court noted the Trustee had failed to plead "specific allegations regarding [F2's] assets or liabilities at the time of each transfer."  *Id*. Instead, the Trustee relied upon conclusory allegations such as "at all relevant times, [F2] generated a great majority of its revenue by means of illegal activity almost certain to give rise, at some point, to massive liabilities on account of that activity, and so [F2] was insolvent form the

---

[6]     "It is insufficient to provide 'threadbare recitals of a cause of action's elements, supported by mere conclusory statements.'"  Order at 15-16, [D.I. 71], citing *In re THQ, Inc.,* No. 12-13398, 2016 WL 1599798, at *2 ((Bankr. D. Del. Apr. 18, 2016).  "Instead, a complaint 'must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory.'"  Order at 16, [D.I. 71], citing *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210-22 (3d Cir. 2009).

inception of its use of the AlphaSector Index Strategy," *id*. at 25, n. 92, and, "[d]ue to [F2's] fraud, and because many of them were facing their own SEC investigations and penalties for false advertising, [F2's] clients fled." *Id*. at 26. The Court recognized that these conclusory statements:

> do not permit [the Court] to draw a reasonable inference that Debtors were insolvent at the time of each transfer. Simply facing liability for securities fraud does not make a company insolvent. And use of words such as "massive" and "enormous" to describe a company's liabilities are conclusory in nature and say nothing regarding the actual magnitude of the liabilities much less the magnitude relative to the company's assets.

*Id.* at 27.

Even drawing every reasonable inference in the Trustee's favor, the most the Court could conclude from reading the Complaint was that "on the date of each transfer that occurred prior to the Transfer Order, the SEC had a claim against F-Squared in the amount of $35 million on account of [F2's] false advertising." *Id.* at 33. The Court also emphasized that "[u]nlike [F2's] false advertising, the loss of clients is not an established fact that existed at the date of each transfer. This argument requires predicting that the SEC would not only investigate and threaten to prosecute Debtors, but that the SEC would choose to investigate and threaten to prosecute Debtors' customers." *Id.* at n. 129.

The Trustee perpetuates this same basic flaw in his deconstruction of F2's balance sheet. To be exact, the Trustee concludes that "the fair value of F-Squared's property, equipment, and improvements was substantially less than its book value." Trustee's Motion for Leave to File Amended Complaint at 13, [D.I. 75-1]. His "explanation" for this conclusion consists of three additional conclusory points:

> From 2011 forward, F-Squared had millions of dollars of deferred income tax assets on its balance sheet. That asset could only have been monetized if F-Squared generated future income. Given F-Squared's fraudulent conduct and the resulting foreseeable exodus

of financial clients, F-Squared should have known that this future income was highly unlikely to arise. . . . [7]

[I]n 2013, F-Squared acquired intangible assets totaling over $14.3 million. These intangible assets were primarily comprised of customer contracts. F-Squared knew or should have known that these customer contracts were not marketable to third parties (and were thus valueless or nearly so) given that F-Squared was defrauding these customers. . . . [8]

[G]iven that F-Squared knew that it was defrauding its customers, F-Squared should have known that it would not be able to collect 100% of its accounts receivable on a go forward basis, and should therefore have discounted its Accounts Receivable on its balance sheets.[9]

Based on these conclusory statements, the Trustee then erases almost $43 million from F2's balance sheet and alleges that for the years 2011 through 2014: "F-Squared's assets were always worth far less than it had represented, simply because what had always been true (and what was true at the time of the Transfers) had become known – namely, that all of F-Squared's revenues were derived from its willful unlawful conduct."[10] *Id.* at 18.

The Trustee appears to think that by making fantastic allegations about events unknown and unknowable to management at the time of the transfers that much later impacted F2's assets

---

[7]    Trustee's proposed Amended Complaint at 17 [D.I. 75-2]. The Trustee's conclusory statements raise additional questions. For example, what facts does the Trustee allege that F2 knew or should have known that would lead it to this conclusion? Was the SEC pursuing clients? Had the SEC announced an intention to do so? Did anyone assess the likelihood that SEC's prosecution of F2's clients would be successful? Was there any assessment made of the costs the clients would incur in defending against these claims? Do we know whether F2 had ruled out being able to retain its clients (or many of them) based on its successful technology and the change in management after it paid the SEC?

[8]    *Id.* Again, several important questions are left unaddressed: Upon what facts does the Trustee base this conclusory assertion? Was there anything in 2013 and 2014 that would have led F2 to know (or that should have led it to believe) that its clients' contracts were unmarketable?

[9]    *Id.* at 18. Again, what facts told F2 that? Have there been other examples that F2 knew about where an investment advisor violated the securities laws by misrepresenting an investment similar to what F2 did where the SEC went after the offender's clients? Were F2's lawyers telling it that the SEC would go after all its clients such that its business was doomed, but that it should nonetheless pay $35 million to the SEC on the outside chance that payment would provide it a clean slate?

[10]    What facts support the idea that "all of F-Squared's revenues were derived from its willful unlawful conduct." How did F2's auditors make such a such a substantial error in evaluating F2's assets and liabilities?

he can dress up his "insolvent from the inception" blandishment and masquerade it as a plausible claim.  In order to assemble a viable pleading, however, the Trustee needs to have pled actual facts that demonstrate a plausible basis for the Court to  disregard F2's  audited financials.  As Judge Posner opined in *Matter of Xonics Photochemicals*, Inc., 841 F.2d 198, 199 (7th Cir. 1988), to assume that a guaranty, an indemnification agreement or any other contingent liability should be assigned its face value is "absurd."  Indeed,

> Every firm that is being sued or that may be sued, every individual who has signed an accommodation note, every bank that has issued a letter of credit, has a contingent liability.  Such liabilities are occasionally listed on the firm's balance sheet, for example by earmarking a portion of surplus for contingent liabilities.  (They are supposed to be listed "if the future event is *likely to occur* and if its amount can be *reasonably estimated*.)"  More often they are listed in a footnote, thus having the firm's stated net worth undisturbed.  Often they are not listed at all, when they are remote or when they are too small to affect that net worth substantially.

*Id.* at 199-200 (citations omitted) (emphasis in original).   Similarly, the Third Circuit has instructed,

> a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable.  The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising liabilities) to reflect the debtor's true financial condition at the time of the alleged transfers.

*In re R.M.L., Inc.*, 92 F.3d at 156 (citing *In re Xonics*, 841 F.2d at 199).

The Trustee's approach ignores these cases and instead embraces a notion that a prudent management team facing an investigation or contingent claim must book the greatest possible fine or judgment the matter might produce.  Perhaps the most striking example of this is the Trustee's assertions of the "massive liabilities" to the SEC he claims F2 should have recorded on its balance sheet.  He begins by asserting that various acts of F2, ranging from sending emails to issuing press

8

releases, each, he says, "constituted a separate violation of securities laws." *Id.* at 19. He then describes the penalties he posits the SEC could have collected based on each such act of violation, concluding that "at the times of all transfers, F-Squared's balance sheet should have reflected a liability to the SEC in the amount of the penalties the SEC was entitled to extract from F-Squared, including forfeiture of the gross amount of pecuniary gain resulting from such violation."[11] *Id.* at 20. He claims, "F-Squared's balance sheet should have included a liability equal to its profits (or, at the very least, a liability of the statutory amount for each and every instance of violation listed above) at the times it was committing its violations–that is, from 2008 through 2013–and carrying those liabilities forward."[12] *Id.* at 20.

Notably, the Trustee makes no effort to reconcile his invented $458 million liability with the $35 million liability F2 ended up paying.[13] On its face, the Trustee's conception of what is and is not plausible is off kilter. And it gets worse—he wants the Court to believe that F2, when it paid $35 million to the SEC, knew facts that would reasonably have led it to conclude that it was about to confront an additional $450 million indemnification liability to its clients and a loss of all the revenue they were providing which together would inexorably lead it to shutter its operations. Again, however, he offers no "facts" that would support such a wild conclusion.

### i. If the Trustee's claim of balance sheet insolvency were actually viable, one would expect real factual allegations to support his conclusions.

The proposed Amended Complaint lacks factual averments that support the theory that F2

---

[11]    Was it reasonable for anyone to expect that the SEC would compel disgorgement of F2's profits derived from 2008 to 2014? Based on what? Is that what has happened in other similar situations? Are there enforcement guidelines that the government looks to in justifying such draconian measures?

[12]    Why in 2013 and 2014 was it reasonable to anticipate the SEC would force disgorgement of all of F2's profits from 2008 forward? How can that conclusion be reconciled with the fact that the SEC only assessed a $5 million penalty and forced F2 to disgorge $30 million in profits?

[13]    He does imply that this $400 million "savings" was due to F2's successful negotiating tactics. Not surprisingly, this too is a conclusory assertion bereft of any factual predicate.

knew or should have known that a fair valuation of its assets and liabilities was closer to the

Trustee's view of its balance sheet than what F2's accountants and auditors had recorded.  If the

Trustee's theory were true, one would expect he would have plead some of the myriad of possible

facts that would provide at least a partial platform for his legal claims.  For example, one might

expect that:

(1) Early on in its investigation, the SEC declared that it would be seeking penalties for each act of F2's securities law violation, along with disgorgement of all its profits since the inception of its business in 2008 due to F2's misstatement of its track record;

(2) Once F2 secured counsel to help it respond to the SEC subpoena and investigation, counsel informed F2 prior to October 2013 that it was facing the magnitude of fines and disgorgement the Trustee asserts F2 should have booked on its financial statements;

(3) F2's clients put F2 on notice prior to October 2014, that they would be seeking indemnification if the SEC began to target them as a consequence of F2's securities violations;

(4) F2's clients made claims for indemnification prior to October 2014;

(5) The SEC had a history of pursuing the asset manager clients of financial advisors like F2 who misrepresented their financial products' historic track records or other associated results;

(6) F2 was informed by its attorneys, accountants or other advisors that it was likely that the SEC would target its customers; or,

(7) F2 was informed by its clients at any point prior to January 2015, that the SEC was investigating them because of their relationship with F2.

The Trustee alleges none of this, because none of these facts occurred.  Instead, the Trustee relies

upon his own proclamations about what he thinks F2's management should have guessed –like

predicting the SEC would hound F2's clients after F2 had paid its fine and disgorgement—and

accounted for the resulting indemnification claims and loss of revenue.

**2.    The Trustee's proposed Amended Complaint also depends upon impermissible hindsight bias.**

The balance sheet test is not a function of what the company "should have considered"

based on what actually happened months or years later.  *In re SemCrude L.P.*, 648 F. App'x 205, 210 (3d Cir. 2016); *In re R.M.L., Inc.*, 92 F.3d 139, 156 (3d Cir. 1996) (condemning the use of hindsight); *In re Davis,* 120 B.R. 823, 825 (Bankr. W.D. Pa. 1990) (holding that balance sheet should be assessed at time of the alleged transfer and "not what they turned out to be worth at some time after the bankruptcy intervened.").

The Trustee's most prevalent misuse of hindsight is in his analysis of what he labels F2's "indemnification" liabilities.  In particular, he asserts:

> As F-Squared understood, many if not all of F-Squared's Financial Clients relied on and used F-Squared's advertisements and securities filings in their own advertisements and securities filings in their dealings with their own clients.  As a result, the SEC also opened investigations into many of F-Squared's Financial Clients, and charged several such clients with violations of the securities laws based on false advertising and failing to maintain accurate books and records.  These investigations resulted in settlements with the SEC in 2015 and 2016, in which each charged F-Squared's Financial Client admitted to violation of the securities laws, due to each entity's use of F-Squared's AlphaSector strategy as to their own clients.[14]

The Trustee then claims there were about $45 million in fines and disgorgement paid by F2's clients to the SEC.  The Trustee then adds an amount he guesses F2's clients would have incurred for attorneys' fees and costs to defend against the SEC's charges (in 2015 and thereafter).  In order to enhance his musings, the Trustee adds in the conceptual risk that F2's clients could have sued F2 for double or treble damages under Massachusetts' Consumer Protection Act.[15]

---

[14]    Amended Complaint at 21.  Would a reasonable business in F2's same circumstance have assessed this as a likely result in 2013?  In 2013, what should F2 have assessed as the likely penalty amounts that the SEC would impose against F2's clients?

[15]    *Id.* at 25.  Had any client of F2 been threatened by the SEC prior to F2's settlement with the SEC on December 22, 2014?  Had any client of F2 put F2 on notice that they would be seeking indemnification from F2?  Any client threatened suit against F2 for any reason prior to December 22, 2014?  Based upon what fact or facts known as of 2013, would any reasonable person conclude that F2's clients would seek indemnification or sue it  for deceptive business practices?

Despite the pivotal nature of these allegations (if true), the Trustee never once alleges a single fact to support his conclusion that F2's management should have determined (or even considered) the SEC would attack its clients.   Mixing together all these conclusions and possibilities, the Trustee derives a fictionalized adjustment to F2's balance sheet that records more than $460 million of additional liabilities (which he claims were "conservatively estimated").   *Id.* at 26.

      **3.**      **While the Bankruptcy Code provides an alternative avenue of relief through pleading unreasonably small capital, the Trustee's proposed Amended Complaint does not discuss it.**

The Bankruptcy Code establishes undercapitalization as a separate means of supporting a fraudulent conveyance claim.   A debtor has unreasonably small capital if it has an "inability to generate sufficient profits to sustain operations" at the time of or because of the challenged transfer,[16] or, in other words, where a debtor is "technically solvent but doomed to fail."[17]   The standard is reasonable foreseeability.[18]   In order to ascertain whether a company was undercapitalized at the time of a questioned transfer, courts have considered "a debtor's assets and liabilities, cash flow, revenue generating assets, access to capital, debt to equity ratio and capital cushion."   *In re F-Squared Inv. Mgmt., LLC*, No. AP 17-50716, 2019 WL 4261168, at *17 (Bankr. D. Del. Sept. 6, 2019).

As was the case with his initial Complaint, the Trustee does not make any effort to establish that F2 had "unreasonably small capital."   He makes almost no mention of cash flow, does not examine the value of F2's underlying technology or whether the technology could have been sold

---

[16]     *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).

[17]     *MFS/SunLife Tr. High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody*, 971 F.2d at 1070 & n.22).

[18]     *In re Semcrude, L.P.*, 526 B.R. 556, 560 (D. Del. 2014) (citing to Moody, 971 F.2d at 1073), aff'd sub nom. *In re SemCrude L.P.*, 648 F. App'x 205 (3d Cir. 2016).

apart from the company as a whole.  Similarly, he makes no mention of F2's access to capital or whether it had other revenue generating assets available to it.  Most important, he does not plead facts relative to what F2 actually knew at the time it made the questioned transfers in terms of its future ability to generate income from the more than $20 billion of investments that as of the date of the questioned distributions were following F2's strategy.

As with the Trustee's failure to plead a plausible case for balance sheet insolvency, he provides no facts that would allow the Court plausibly to infer that F2's Board knew facts that would reasonably cause it to conclude that the SEC would eventually pursue F2's clients in a way that would cause them to abandon F2's technology thereby curtailing F2's income.  To the contrary, the only plausible explanation for F2's payment of $35 million to the SEC at the end of 2014 is that F2 believed that in doing so it was terminating the liability that arose from Howard Present's acts and omissions concerning the pre-2008 track.

It would be absurd to think that at the time of the December 22, 2014 payment, F2 anticipated that in a few short months the SEC would begin to prosecute and alienate F2's clientele such that its stream of income would dry up.  No prudent business would do such a thing, and the Trustee is silent on this dispositive issue.  If he had evidence to support his supposition, the Trustee would have pled it.  In any event, the Trustee has not offered to amend his Complaint in a way that would plausibly support a theory that F2 was undercapitalized.

    **4.**    **In its Motion for Partial Summary Judgment and Reply in Support of Motion for Partial Summary Judgment, Defendants contend that the transfers in question were made for reasonably equivalent value.**

In assessing the futility of a proposed amendment, Courts may look beyond the four corners of the proposed amended complaint.  This is especially true where a motion for summary judgment is already on file.  *See Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 786 F. Supp. 1223,

1228 (W.D. Pa. 1992) ("To allow a meritless claim to proceed to the motion to dismiss and motion for summary judgment stages is an abdication of judicial responsibility that serves neither justice nor efficiency."); *Smith v. Chrysler Corp.*, 938 F. Supp. 1406 (S.D. Ind. 1996) (court evaluated proposed amended complaint for futility based upon consideration of whether it could survive summary judgment), *citing Wilson v. American Trans Air, Inc.*, 874 F.2d 386, 392 (7th Cir. 1989); *see also, Leibstein v. LaFarge North American, Inc.*, 689 F.Supp.2d 373 (E.D.N.Y. 2010) (court held that where it is established that there is no triable fact such that summary judgment would be warranted notwithstanding allowance of the motion to amend, the amendment was futile and would not be allowed).

In December 2018, the Defendants moved for partial summary judgment based on their contention that the tax distributions that comprise over 85% of the Trustee's claims against them were made for reasonably equivalent value. The court should consider the partial summary judgment motion when assessing whether or not the Trustee's proposed amendment is futile.[19]

## B.    UNDUE DELAY

While mere delay is an insufficient reason to deny leave to amend, "[a] motion to amend may . . . be denied for undue delay where a party seeking to amend its pleading knew or should have known—and therefore should have pled in the first instance—the facts upon which the proposed amendment is based." *In re United Tax Grp., LLC*, No. 14-10486 (LSS), 2018 WL 1135496, at *3 (Bankr. D. Del. Feb. 28, 2018).[20] "[U]nder a theory analogous to laches, delay can

---

[19]    It is interesting to note that the Trustee's opposition to that motion for partial summary judgment relies heavily upon the content of the Amended Complaint.

[20]    Courts have found bad faith where a litigant failed to include all known facts and theories of recovery in the initial pleading. "[A]wareness of facts and failure to include them in the complaint might give rise to the inference that the plaintiff was engaging in tactical maneuvers to force the court to consider various theories seriatim. In such a case, where the movant first presents a theory difficult to establish but favorable and, only after that fails, a less favorable theory, denial of leave to amend on the grounds of bad faith may be appropriate." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 599 (5th Cir. 1981); *see also Trans Video Elecs., Ltd. v. Sony Elecs.*, 278 F.R.D. 505 (N.D.

itself be evidence of bad faith justifying denial of leave to amend." *Adams v. Gould Inc*., 739 F.2d 858, 868 (3d Cir. 1984) (citing 6 C. Wright & A. Miller, Federal Practice and Procedure § 1488 at 443–44 (1971)); *see also Trueposition, Inc. v. Allen Telecom, Inc.*, No. CIV.A.01-823 GMS, 2002 WL 1558531, at *2 (D. Del. July 16, 2002) (citing *J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 614 (3d Cir.1987) ("[T]he question of bad faith . . . requires that we focus on the plaintiffs' motives for not amending their complaint to assert this claim earlier"); *Foman*, 371 U.S. 178, 182 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (coupling "bad faith" together with "dilatory motive")).

> **1.    The Trustee has offered no explanation for why he did not plead the arguments contained in his proposed Amended Complaint until November 2019, two years after commencement of this case.**

There is no reason, and the Trustee suggests none, that he did not file the exact pleading he seeks to file in November 2019, when he determined to commence these fraudulent conveyance claims in July 2017.  His theory then, as it is now, is that F2's advertising misrepresentation in violation of the securities law exposed it to "massive liabilities" that rendered it "insolvent from the inception" of its business.  Basically, what the Trustee purports to have done in his proposed amendment is to attempt to quantify those "massive liabilities."  The facts allegedly supporting

---

Cal. 2011) (holding bad faith when patentee made a tactical decision not to include "new" claim at the outset of litigation, and shifted its strategy only after "writing was on the wall" and motion had been taken as a "last-ditch" attempt to avoid dismissal of the action in its entirety); *GSS Props., Inc. v. Kendale Shopping Center, Inc.*, 119 F.R.D. 379 (1988) (holding the plaintiff acted in bad faith when it knew of the facts constituting the amendment prior to filing the action, then withheld such facts, moving to amend in an attempt to force the defendant to settle or punish the defendant for failing to settle); *Bader v. Special Metals Corp*., 985 F.Supp.2d 291 (N.D.N.Y. 2013) (holding that leave to amend was not appropriate when plaintiff "despite being aware, before she even commenced this action, of the protected activity she sought to add to her complaint, Plaintiff failed to move to amend in a timely action."); *Collins v. Wal-Mart, Inc*., 245 F.R.D. 503, 512 (D.Kan. 2007) ("If the movant has been aware of the facts on which the amendment is based for some time prior to the motion for leave to amend, the Court may properly deny the motion for failure to demonstrate excusable neglect.").  Overall, when a defendant is aware of facts, or of arguments based upon those facts, and does not include them in the initial complaint as a strategic tactic, or uses the amended complaint to rectify deficiencies in the previous complaint rather than add new allegations that came to light during discovery, this is generally considered evidence of bad faith. *See, e.g., Mulder v. Kohl's Department Stores, Inc*., 865 F.3d 17 (1st Cir. 2017).

this quantification were, however, evident when he plead his initial Complaint. Moreover, in apparent recognition that his Complaint was deficient and in need of amendment, the Trustee attempted to usher in the facts he did not plead by way of his Memorandum of Law in Opposition to Defendants' Motion to Dismiss [D.I. 14], filed almost two years ago—but he steadfastly refused to amend, choosing instead to burden the Court and the parties with addressing his "insolvent from the inception" case theory, albeit on what he now claims was a partial record of support.

Rather than provide an explanation for why he could not have articulated the exact same conclusory allegations comprising the content of his amended complaint, he says only that "delay is not undue where a plaintiff waits for a ruling on a motion to dismiss before amending its complaint." Motion for Leave to File Amended Complaint at 9 [D.I. 75]. This "explanation" does not justify the Trustee's delay in this case where the motions to dismiss were mostly based on the Trustee's thin pleading that did not even support his unique legal theories. Put another way, the Trustee's proposed Amended Complaint is based on content that he "knew or should have known—and therefore should have pled in the first instance . . . ," not on any revisions he has made in response to the Court's confirmation of some unique question of law.

### 2. The Trustee's proposed Amended Complaint is purposefully vague in order to obscure the fact that there is no evidence to support his case.

The Trustee's Amended Complaint fails to plead facts establishing insolvency one would expect to be included if the evidence existed. Instead, the Trustee effectively skirts reality (or tried to) by dressing up his rejected "insolvent from the inception" theory with fictional liabilities and implausible assumptions.

Why does he take this approach? The Trustee, after all, has had access to F2's books and records, emails, board minutes and other documentation regarding its operations and the decision making of its board and managers prior to filing his initial Complaint in July 2017. He also had

all of the communications by and between F2 and its lawyers, along with the right to question those lawyers about the advice they gave F2 on the critical question of whether F2's payment of the $35 million to the SEC would result in F2's having a "clean slate."  Since the Trustee's case hinges on the assumption that F2 knew or reasonably should have known that its income stream would dry up once the SEC went after its clients for securities fraud, one would think that the Trustee would be able to offer some evidence that F2's lawyers or other advisors had outlined that risk for its Board at some point.

The answer is simple—he knows the evidence available is to the contrary—that the management, its advisors and consultants believed just the opposite and the Trustee cannot plead what he knows Defendants will prove false.  Since he cannot honestly plead a viable case, he obscures his invalid legal theory behind the cloak of fictionalized facts in an effort to perpetuate a case he knows would otherwise be dismissed if he candidly admitted it was based on his invalid legal theory of "insolvency from the inception."

While discovery has been curtailed in the above-captioned cases over the past two years, it has been ongoing in Vadim Fishman's case.  In that case, F2's CEO and CFO were deposed. Their testimony contradicts the Trustee's implicit theory that F2 did, or should have, recognized its insolvency by the time of the SEC's announced investigation in 2013.

Take, for example, the testimony of Laura Dagan, F2's Chief Executive Officer at the time F2 paid the SEC the $35 million.  Ms. Dagan is a graduate of Lehigh University and Harvard Business School's Advanced Management Program.  Among the other roles she has fulfilled in her career, she served as the CEO for another financial services firm from 2004 to 2010. Deposition of Laura Dagan, *In re: F-Squared Investment Management*, No. 17-50474 (July 23, 2019) (hereinafter "Dagan Dep.") at 9:5-11; 9:21-10:9, attached as **Exhibit A**.  She joined the F2

Board in 2011, and took over as its CEO in November 2014. When asked about F2's understanding of the SEC's intentions for F2 after it began its investigation, Dagan indicated that the Board had no real sense until closer in time to the settlement payment in December 2014. Dagan Dep. at 25:15-22. The Company anticipated it would pay the settlement to the SEC and would then recover to its former profitability. *See* Dagan Dep. at 32:6-11. At no point prior to the SEC settlement did F2 believe it had "massive liabilities" because of its liability to the SEC or indemnification agreements with clients. *See* Dagan Dep. at 198:13-21.

F2's CFO, Deborah Deskavich, expressed similar views at her deposition. Ms. Deskavich has an undergraduate degree in economics and a Master's in business administration. She worked for nine years for Data General in financial roles, primarily international finance. Deskavich also spent 14 years with Fidelity Investments in senior financial and operational roles. Deskavich, who began her work with F2 in 2009, commented on F2's estimation of the financial impact of the SEC investigation: "We had no idea that the SEC was going to take $35 million from the company. *** We had hired a consultant who told us that the amount would be much less than that based on their experience." Deposition of Deborah Deskavich, *In re: F-Squared Investment Management*, No. 17-50474 (June 11, 2019) (hereinafter "Deskavich Dep.") at 108:9-14, attached as **Exhibit B**. Deskavich too had no reason to believe that F2 had "massive liabilities" based on its indemnification agreements with clients. See Deskavich Dep. at 119:19-120:17.

Outside parties came to similar conclusions. On November 19, 2014, F2 commissioned The Michel-Shaked Group to perform a valuation of F2, to determine the fair market value of the company's Preferred and Common units in order to verify the propriety of F2's employee compensation arrangements that were subject to 409A of the Internal Revenue Code (hereinafter

the "Shaked report"), attached as **Exhibit C**. [21]

In order to formulate its opinion of F2's fair market value, Shaked conducted an analysis of F2's management's handling of the SEC investigation and forecasted how the issues raised in that investigation would impact F2's future results. *See, e.g., id.* at 10. Shaked determined that management's and the Board's analysis of the impact of the SEC investigation were consistent with its own independent research and analyses. *Id.* at 9. Shaked's opinion was, therefore, that F2's management's assessment was "a reliable source for historical and projected financial information." *Id.*

Of particular importance here, Shaked represented that F2 anticipated the SEC problems would negatively impact its business in 2014, and that "management has appropriately incorporated the potential long-term financial impact and risk of Mr. Present's departure and the SEC investigation into the projections by lowering the anticipated revenue growth of the company." *Id.* at 10. Shaked stated that management's projected revenue for the year ending December 31, 2018 was approximately 18% lower than the projection provided to it by the company in March 2014. *Id.*

Based on Shaked's examination of the company's historic and projected financials, its interviews with management and the Board and its own separate investigation of the business and industry, it concluded that as of the end of 2014 (a time when the Trustee asserts the company was insolvent many times over) the fair market value of F2's equity on a controlling, marketable basis was $461.7 million and on a non-controlling, unmarketable basis, $271.3 million. *Id.* at 27.

---

[21]    The Michel-Shaked Group, Valuation of F-Squared Investment Management, LLC (December 29, 2014). The report specifies it is to be utilized only to evaluate the company's compliance with 409A of the Internal Revenue Code unless Michel-Shaked provided its express written consent. *Id.* The report states that its valuation opinion is not a fairness or solvency opinion. *Id.* Nonetheless, the report contributes to an understanding of the company's solvency as of December 31, 2014, two months after the last of the questioned tax distributions to the Defendants.

In summary, the Trustee has imposed significant burden on the Court and the parties by his failure to plead fully and fairly his true theory of recovery which is that hindsight shows us that whether it knew it or not, F2 was insolvent from the inception.  Had the Trustee pled this theory from the beginning the Court and the parties could have made short work of the case.  The downside for the Trustee in that approach would be he would not have had the leverage of pending litigation to force settlements from the vast majority of the defendants.  Imposing cost on the Court and the Defendants so that he could generate settlements is inequitable and contrary to the principles of a just system of judicial administration.  The Court's refusal to allow the Trustee to further his inequitable conduct would be appropriate.

### C.    JUDICIAL ECONOMY AND EQUITABLE FACTORS

The above-referenced factors standing alone support the Court in denying the Trustee leave to amend.  Those factors are not, however, exhaustive.  The Court can consider other factors also "such as judicial economy/burden on the court . . . "  *Mullin v. Balicki*, 875 F.3d 140, 149-50 (3d Cir. 2017).  "Judicial economy is an equitable consideration that can be considered in deciding whether amendment should be allowed.  It is uncommonly a factor that stands entirely alone, separate and apart from prejudice and factors relevant to whether a delay was 'undue.'  Considerations include judicial efficiency and effective case management."  *Id*. at 157 (citations and quotations omitted); *see also, Goldfish Shipping, S.A. v. HSH Nordbank AG*, 623 F. Supp.2d 635, 641 (E.D. Pa. 2009), aff'd, 377 F. App'x 150 (3d Cir. 2010) (holding that "[i]f [Plaintiff] had viable, alternative theories of recovery in this case, it was obligated to present those theories to the Court either in the First Amended Complaint or in response to [Defendant's] Motion to Dismiss" because to do otherwise trifles with the Court and forces it to address matters that should never have burdened the court's time and resources).  The Court should consider these factors in

determining whether to allow the Trustee's proposed Amended Complaint.

The Trustee offers no explanation for why he chose to force the Court to decide the Defendants' motions to dismiss rather than recognizing the woefully deficient nature of his pleading and curing it sooner. It cannot be that the Trustee did not recognize the flawed nature of his initial pleading. First, he attempted to amend it by fiat by including the facts he now seeks to include in his amended pleading in his reply memorandum objecting to the motion to dismiss. Second, the Court raised questions about the efficacy of the initial Complaint repeatedly at the status conferences and hearings held over the more than 18 months the motions to dismiss were pending.

This record makes it apparent that the Trustee's failure to plead fully in the first instance and his refusal to amend once it became plain that his Complaint did not support even the legally inadequate claim of "insolvent from the inception" is because his intention was to use the pendency of the litigation itself as means to coerce settlement payments.[22] This approach to litigation causes enormous harm, especially in matters like this where wage earners who live pay check to pay check get ensnared in a case that threatens to have them pay tens of thousands of dollars they do not have, or face legal bills that are equally insupportable.

The Trustee's willingness to take positions whose sole merit seems to be that they favor his recovery is also disturbing. One glaring example is his fundamental position in this proceeding that just because the SEC had begun an investigation F2 should have, in essence, battened down

---

[22]     *GSS Properties, Inc. v. Kendale Shopping Center, Inc.*, 119 F.R.D. 379 (1988) (holding that, when "[d]elay was blatant in that plaintiff clearly knew of facts constituting amendment prior to filing action, and acted in bad faith in withholding such facts and then moving to amend complaint in an attempt to force defendant to settle, or punish defendant for failing to settle," court was justified in denial of leave to amend); *Millar v. Bay Area Rapid Transit Dist.*, 236 F.Supp.2d 1110 (N.D.Cal.2002), (identifying that using motion to gain additional leverage in settlement negotiations is an inadmissible use of motions to amend and an indication of bad faith); *Bleiler v. Cristwood Contracting Co., Inc.*, 868 F.Supp. 461 (D.Conn.1994), affirmed in part, reversed in part 72 F.3d 13 (holding that permitting a proposed amendment of a complaint may result in prejudice to the opposing party if there is an imminent danger that the moving party would seek to abuse the discovery process to force a favorable settlement).

for "massive liabilities" and recognized that F2 had been insolvent from the inception.  The Trustee has urged the Court to take note of a number of related collateral court proceedings.

The Trustee took a very different position in his case against Zurich Services Corporation ("Zurich") and X.L. Global Services, Inc. ("XL") in seeking to establish F2's coverage for the SEC's investigation.  *See* Opening Brief for Plaintiff-Appellant at 12, *Jalbert v. Zurich*, (No. 18-2244) (1st Cir. Mar. 29, 2019).  In *Zurich*, the Trustee's core position was that:

> [a] reasonable juror could find that the Formal Order [commencing the SEC's investigation in 2013] was not conclusive proof that enforcement proceedings against F-Squared were a reasonable possibility.  Here, a reasonable juror could reach the same conclusion that federal courts have: because investigation and enforcement are distinct, the Formal Order is no indication (one way or another) that an enforcement proceeding against F-Squared was a reasonable possibility.  The juror's conclusion could be based on the text of the Formal Order, the disclaimer in the Subpoena, the SEC Enforcement Manual, or the stark difference between a formal order of investigation and a Wells Notice or target letter.

*Id.*  Put another way, in the instant case against investors, the Trustee claims that the start of the SEC investigation marked the beginning of the period when F2 should have desisted from making any further distributions because at that moment it should have recognized a $450 million liability to the SEC and another couple hundred million dollars in liability to its clients.  As above-quoted, he takes an alternative position before the First Circuit in *Zurich*.  While the public at large may be growing accustomed to expeditious "alternative facts," the courts should not.

Invoking the machinery of the federal court system (or any court system for that matter) should not be undertaken lightly, especially by those given the quantum of power that the Bankruptcy Code gives to Trustees.  Piecemeal pleadings, manipulative filings and alternative facts all highlight a level of contrivance that the Court should consider in deciding whether to allow these cases to proceed on an amended complaint.

## III.    CONCLUSION

For the forgoing reasons, the Court should deny the Trustee's Motion For Leave To Amend

and dismiss the above-referenced cases with prejudice.

Dated:  December 20, 2019
     Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ R. Stephen McNeill*
Jeremy W. Ryan (DE Bar No. 4057)
R. Stephen McNeill (DE Bar No. 5210)
D. Ryan Slaugh (DE Bar No. 6325)
1313 North Market Street, Sixth Floor
P.O. Box 951
Wilmington, DE  19801
Telephone:  (302) 984-6000
Facsimile:  (302) 658-1192
Email:  jryan@potteranderson.com
       rmcneill@potteranderson.com
       rslaugh@potterandercon.com

-and-

**MCLANE MIDDLETON, PROFESSIONAL ASSOCIATION**
Joseph A. Foster
Scott H. Harris
900 Elm Street, P.O. Box 326
Manchester, NH 03105-0326
Telephone: (603) 628-1175
Facsimile: (603) 625-5650
Email:  joseph.foster@mclane.com
       scott.harris@mclane.com

*Counsel for George McClelland, Charles Hart, Geordie McClelland, Graham Hart, Hazel McClelland, Jacquelyn McClelland, Lindsay Hart, McClelland Irrevocable Grantor Trust, Quinn McClelland Hart, Lindsay McClelland, Agnes Carol McClelland and Ann Aghababian*