# EXHIBIT B

Volume I
Pages 1-150

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                              Chapter 11
F-SQUARED INVESTMENT                Case No. 15-11469 (LSS)
MANAGEMENT, LLC, et al.
                                    Jointly Administered
            Debtors.

_____


CRAIG JALBERT, IN HIS
CAPACITY AS TRUSTEE FOR
F2 LIQUIDATING TRUST,

            Plaintiff,
                                    Adv. Pro.
        vs.                         No. 17-50474 (LSS)

VADIM FISHMAN,

            Defendant.


DEPOSITION OF DEBORAH L. DESKAVICH
Tuesday June 11, 2019
1:30 p.m.

Flynn Reporting Associates
873 Waverly Street, 2nd Floor
Framingham, Massachusetts   01702

Court Reporter:  Carol S. Kershaw, CSR

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
FLYNN REPORTING ASSOCIATES
Professional Court Reporters
(508) 755-1303   *   (888) 244-8858
www.flynnreporting.com
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1   APPEARANCES:
2
3   FOR THE PLAINTIFF:
4
        BROWN RUDNICK, LLP
5       BY:  Shari I. Dwoskin, Esq.
        One Financial Center
6       Boston, Massachusetts  02111
        (617) 856-8200
7       sdwoskin@brownrudnick.com
8
9
    FOR THE DEFENDANT:
10
11      KLEIN, LLC
        BY:  Julia B. Klein, Esq.
12      225 West 14th Street
        Wilmington, Delaware  19801
13      (302) 438-0456
        Klein@KleinLLC.com
14
15
16  ALSO PRESENT:
17
        Vadim Fishman
18
19
20
21
22
23
24

Page 3

1  I N D E X
2
3  Testimony of:      Direct    Cross    Redirect    Recross
4      DEBORAH L. DESKAVICH
5  By Ms. Klein         5                  141
6  By Ms. Dwoskin                76                  147

1    A.   If the strategy was viable, then I felt the
2  company was viable.
3    Q.   Did your clients agree with you?
4    A.   There were a lot of clients that loved the
5  strategy.
6    Q.   Did F-Squared have a loss in clients after
7  the SEC transfer order was entered?
8    A.   Yes.  And I mentioned that after 2016 there
9  was an article that came out that said that the SEC
10 had been pursuing most of the clients of the company
11 and extracted payments out of them.  We did not know
12 that at the time.
13   Q.   Did F-Squared's reduction in client base
14 surpass what you expected at the time that you or at
15 the time F-Squared entered into the agreement with
16 the SEC -- let me ask the question a different way.
17        Did F-Squared lose more clients after the
18 SEC order was entered than you had expected
19 previously?
20   A.   That's hard to say.
21   Q.   At the time that you entered into the, at
22 the time F-Squared entered into the SEC transfer
23 order -- when I say the "transfer order," I'm
24 referring to the order by which F-Squared was

required to pay $35 million to the SEC. Do you recall that an order existed?

A. I remember that F-Squared paid $35 million in to the SEC in December of 2014.

Q. That's what I'm referring to.

Prior to December of 2014, do you recall any discussions at F-Squared about what the effect of that was likely to be?

A. We had no idea that the SEC was going to take $35 million from the company.

Q. At the time --

A. We had hired a consultant who told us that the amount would be much less than that based on their experience.

Q. Were there discussions about what the impact of paying any amount would be on F-Squared's clients, on F-Squared's clients deciding to stay with F-Squared or deciding to leave?

A. Yes. That was a general concern. Do I recall specific discussions? No, but we had them.

Q. Let's jump forward a few months to early 2015, to May of 2015 when Virtus left. By May of 2015, did the actual number of clients who left F-Squared between 2014, between December of 2014 and

Page 109

1  May of 2015, comport with your expectations of what
2  would happen?
3       A.   I didn't have expectations.  We had a high,
4  medium, low forecast of what might happen to the
5  company so that we were prepared.
6       Q.   Do you recall did the actual number of
7  clients that left, was that high, medium, or low,
8  compared to that forecast?
9       A.   I don't recall.
10      Q.   Who prepared the forecast that you're
11 describing?
12      A.   Betsy Callahan actually executed the
13 forecast; she worked for me.
14      Q.   What kinds of information did she take into
15 account when preparing that forecast, do you know?
16      A.   All of the financial information that she
17 had about what the required payments were that the
18 company would make, the number of employees that the
19 company had.  That was the largest expense of the
20 company, was the number of employees, and that
21 revenue that they had to support that business and
22 regrow it.
23      Q.   Did it also factor in, did it make an
24 estimate about what clients might stay and which

Page 118

1  suggested that the company be sold through
2  bankruptcy, and Larry Ginnari, who was our outside
3  counsel, said --
4      **Q.**  I'm going the stop you right there because
5  Larry Gennari is counsel for the company and the
6  trustee holds the privilege to prevent you saying
7  anything Larry Gennari said to you because you were
8  also with the company.
9      I want to clarify one point that came up
10 earlier.  You mentioned in your testimony that you,
11 when you were being questioned by Ms. Klein, that
12 F-Squared turned $6 million over to the trustee.  Do
13 you recall that?
14     A.  That was my recollection.
15     **Q.**  And by the "trustee," who are you referring
16 to?
17     A.  Craig Jalbert.
18     **Q.**  Did F-Squared at any point obtain
19 bankruptcy counsel?
20     A.  I don't recall.
21     **Q.**  Do you recall a firm called Richard, Layton
22 & Finger?
23     A.  Yes.
24     **Q.**  Do you know when Richards, Layton & Finger

Page 119

1  was retained?
2      A.  No.
3      Q.  Did you or, to your knowledge, anyone at
4  F-Squared consider whether F-Squared would be able to
5  pay its creditors in full when it decided to pay
6  Mr. Fishman's signing bonus?
7      A.  I don't recall.
8      Q.  You mentioned earlier that part of your job
9  was to review the financial statements of the company
10 and its income statements.  Do you recall that
11 testimony?
12     A.  Yes.
13     Q.  Was part of your job to review the
14 company's assets and liabilities?
15     A.  Yes.
16     Q.  Were those assets and liabilities noted on
17 the company's balance sheets?
18     A.  Yes.
19     Q.  Did the assets -- did the liabilities
20 listed on the company's business balance sheets
21 include liabilities that F-Squared had to its clients
22 as a result of the marketing that was the subject of
23 the SEC investigation?
24              MS. KLEIN:  Objection as to form.

Page 120

That presumes that any such liability existed at that point.

          MS. DWOSKIN:  Fair enough.

   A.   If you speak to accounting firms, they will tell you you cannot put on your financial statements anything that you don't know is going to happen.

       I do recall that we asked our accounting firm prior to December of 2014 if we should include something for an SEC settlement.  They said since you have no idea what that's going to be, you cannot do that.  So we followed the instructions of our accountants as to what we included on our income statements or balance sheets.

   **Q.**   If F-Squared had had any liablities to its own clients based out of the marketing that was the subject of the SEC investigation, would those liabilities have been on the balance sheets?

          MS. KLEIN:  Objection.

   A.   I'm not sure what you're referring to.

   **Q.**   You just stated that if you don't know what amounts might be, they wouldn't be on your balance sheet.  Do you recall that?

   A.   Right, right.

   **Q.**   My question --

1  A.  Because that's an accounting rule.

2  Q.  Fair enough.

3     My question is, for the same reason, would any liabilities that F-Squared had, whether or not it had any, would any liablities that F-Squared may have had to its clients have similarly not appeared on the balance sheet?

8     MS. KLEIN:  I'm going to object to form, because, again, that presumes that some liability or claims may be out there.

11 Q.  You can answer.

12 A.  I am not aware of what those were or whether they were quantifiable, so it's difficult to say.

15 Q.  To your knowledge and based on your recollection of your review of these balance sheets, did any liability to F-Squared's clients appear on its balance sheets?

19 A.  I don't recall.

20 Q.  You don't recall, okay.

21    Who put together F-Squared's balance sheets?

23 A.  The accounting department would put together a balance sheet, it would be reviewed by our